## UNITED STATES COURT OF INTERNATIONAL TRADE
### BEFORE THE HONORABLE JANE A. RESTANI

| | |
|---|---|
| KAPTAN DEMIR CELIK ENDUSTRISI VE TICARET A.S., | ) ) ) |
| *Plaintiff*, | ) ) ) |
| ICDAS CELIK ENERJI TERSANE VE ULASIM SANAYI, A.S., | ) ) ) **NON-CONFIDENTIAL VERSION** |
| *Plaintiff-Intervenor*, | ) ) ) |
| HABAS SINAI VE TIBBI GAZLAR ISTIHSAL ENDUSTRISI A.S., | ) Court No. 24-000018 ) ) Confidential Business Proprietary ) Information Deleted from Pages: 5, 19, |
| *Proposed Plaintiff-Intervenor*, | ) 21 -24, 27 -32 and 34. ) |
| v. | ) ) |
| THE UNITED STATES, | ) ) |
| *Defendant*, | ) ) |
| and | ) ) |
| REBAR TRADE ACTION COALITION, | ) ) ) |
| *Defendant-Intervenor*. | ) ) |

## PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD AND ACCOMPANYING MEMORANDUM OF POINTS AND AUTHORITIES PURSUANT TO RULE 56.2

Leah N. Scarpelli
Jessica R. DiPietro
Matthew M. Nolan
ArentFox Schiff LLP
1717 K Street, NW
Washington, DC 20006
Tel: (202) 857-6013
*Counsel for Kaptan Demir Celik Endustrisi ve Ticaret A.S.*

July 23, 2024

# TABLE OF CONTENTS

I.      RULE 56.2 STATEMENT ........................................................... 1

II.     ISSUES PRESENTED................................................................. 2

        A.      Whether Commerce Used the Correct Date of Sale For Sales of Subject
                Merchandise to the U.S. Market ...................................... 2

        B.      Whether Commerce Should Revise its DIFMER Calculation.............................. 3

        C.      Whether Commerce Should Recalculate Icdas's Assigned Dumping
                Margin If Kaptan's Rate Changes Pursuant to Litigation...................................... 3

III.    STATEMENT OF FACTS ........................................................... 4

IV.     STANDARD OF REVIEW ........................................................... 8

V.      ARGUMENT ....................................................................... 9

        A.      Invoice Date Is Not The Appropriate Date Of Sale For Kaptan's U.S.
                Sales ................................................................. 9

                1.      Statutory Guidance Regarding Date of Sale Is Ambiguous And
                        Commerce's Interpretation Has Been Inconsistently Applied................. 10

                2.      The Material Terms of Kaptan's U.S. Sales Were Set in the
                        Contract and Did Not Change................................. 20

                3.      Commerce's Determination Is Unsupported By Record Evidence ......... 26

                4.      The Chosen Date of Sale Methodology Yields An Absurd Result.......... 31

        B.      Commerce's Calculation of the DIFMER Adjustment Creates Distortive
                Timing Impacts ...................................................... 33

        C.      Commerce Should Recalculate Icdas's Assigned Dumping Margin If
                Kaptan's Rate Changes Pursuant to Litigation .................................. 35

VI.     CONCLUSION ................................................................... 36

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Allied Tube & Conduit Corp. v. United States*,
    127 F. Supp. 2d 207 (Ct. Int'l Trade 2000) ........................................................11, 18, 33, 35

*Allied Tube & Conduit Corp. v. United States*,
    132 F. Supp. 2d 1087 (Ct. Int'l Trade 2001) ........................................................................11

*ArcelorMittal Stainless Belg. N.V. v. United States*,
    694 F.3d 82 (Fed. Cir. 2012)................................................................................................21

*ArcelorMittal USA LLC v. United States*,
    302 F. Supp. 3d 1366 (Ct. Int'l Trade 2018) ......................................................................17

*Asociacion Colombiana de Exportadores de Flores v. United States*,
    6 F. Supp. 2d 865 (Ct. Int'l Trade 1998) ..............................................................................8

*Atar, S.r.l. v. United States*,
    637 F. Supp. 2d 1068 (Ct. Int'l Trade 2009) ......................................................................16

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*,
    426 F. Supp. 3d 1395 (Ct. Int'l Trade 2020), *rev'd on other grounds*, 5 F.4th
    1367 (Fed. Cir. 2021)................................................................................................11, 29

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*,
    Consol. Court No. 19-00056, 2020 WL 2613345, *5 (Ct. Int'l Trade May 22,
    2020) ....................................................................................................................................36

*Bureau of Alcohol, Tobacco and Firearms v. FLRA*,
    464 U.S. 89 (1983)................................................................................................................18

*Burlington Truck Lines, Inc. v. United States*,
    371 U.S. 156 (1962)................................................................................................................8

*Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc*.,
    467 U.S. 837 (1984)...........................................................................................................9, 10

*Consol. Edison Co. v. NLRB*,
    305 U.S. 197 (1938)................................................................................................................8

*Corus Staal BV v. United States*,
    502 F.3d 1370 (Fed. Cir. 2007)............................................................................................15

AFDOCS:200673155.1

*Daewoo Elecs. Co. v. Int'l Union of Electronic Elec., Tech., Salaried & Mach.*
   *Workers, AFL-CIO,*
   6 F.3d 1511 (Fed. Cir. 1993) ...................................................................................8

*DuPont Teijin Films USA, LP v. United States,*
   407 F.3d 1211 (Fed. Cir. 2005)...............................................................................8

*Eregli Demir ve Çelik Fabrikalari T.A.Ş. v. United States,*
   308 F. Supp.3d 1297 (Ct. Int'l Trade 2018) .....................................................12, 14

*Gallant Ocean (Thailand) Co. v. United States,*
   602 F.3d  1319 (Fed. Cir. 2010) ...........................................................................8,

*Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States,*
   625 F. Supp. 2d 1339 (Ct. Int'l Trade 2009)  .........................................................29

*Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States,*
   693 F. Supp. 3d 1368 (Ct. Int'l Trade 2024) .................................14, 16, 17, 21, 27,

*Linyi Chengen Imp. & Exp. Co. v. United States,*
   391 F. Supp. 3d 1283 (Ct. Int'l Trade 2019) .........................................................36

*Loper Bright  Enterprises v. Raimondo,*
   144 S. Ct. 2244 (2024)................................................................................ *passim*

*Nakornthai Strip Mill Pub. Co. v. United States,*
   558 F. Supp. 2d 1319 (Ct. Int'l Trade 2008) ...................................10, 13, 15, 17,

*Nakornthai Strip Mill Pub. Co. v. United States,*
   614 F. Supp. 2d 1323 (Ct. Int'l Trade 2009) .........................................14, 16, 31

*Nippon Steel Corp. v. United States,*
   458 F.3d 1345 (Fed. Cir. 2006)...............................................................................8

*NMB Sing. Ltd. v. United States,*
   557 F.3d 1316 (Fed. Cir. 2009)..............................................................................33

*NTN Bearing Corp. v. United States,*
   74 F.3d 1204 (Fed. Cir. 1995)..........................................................................33, 35

*Nucor Corp. v. United States,*
   612 F. Supp. 2d 1264 (Ct. Int'l Trade 2009) ...................................................... *passim*

*Qingdao Sea-Line Trading Co. v. United States,*
   766 F.3d 1378 (Fed. Cir. 2014).............................................................................26

*Rebar Trade Action Coal. v. United States,*
   Ct. No. 14-00268, 2016 WL 5122639 (Ct. Int'l Trade Sept. 21, 2016)....................11

iii

*Rhone Poulenc, Inc. v. United States*,
899 F.2d 1185 (Fed. Cir. 1990)......................................................................35

*Rhone-Poulenc, Inc. v. United States*,
927 F. Supp. 451 (Ct. Int'l Trade 1996) .......................................................11

*Sahaviriya Steel Indus. Pub. Co. v. United States*,
714 F. Supp. 2d 1263 (Ct. Int'l Trade 2010), *aff'd*, 649 F.3d 1371 (Fed. Cir. 2011) ..............................................................................................................14, 21

*USEC Inc. v. United States*,
498 F. Supp. 2d 1337 (Ct. Int'l Trade 2007) ...............................................16

*U.S. Steel Corp. v. United States*,
348 F. Supp. 3d 1248 (Ct. Int'l Trade 2018) ...............................................36

*Viraj Grp., Ltd. v. United States*,
162 F. Supp. 2d 656 (Ct. Int'l Trade 2001) .................................................31

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*,
16 F.3d 1370 (Fed. Cir. 2013) ......................................................................35

**Federal Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i).........................................................................8

19 U.S.C. § 1673d(c)(5)(A)(i) .......................................................................36,

19 U.S.C. § 1677a(a)......................................................................................12

**Regulations**

19 C.F.R. § 351.401(i) ...................................................................3, 10, 13, 26

*Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27296 (Dep't Commerce May 19, 1997) (final rule) ...........................................................13, 14

**Administrative Determinations**

*1,1,1,2-Tetrafluoroethane (R-134a) From the People's Republic of China*,
88 Fed. Reg. 60639 (Dep't Commerce Sept. 5, 2023) (final AD results & determ. of no shipments; 2021-2022), and accompanying Issues and Decision Memorandum......................................................................................15

*Certain Carbon and Alloy Steel Cut-To-Length Plate From Belgium*,
5 Fed. Reg. 3028 (Dep't Commerce Jan. 17, 2020) (final AD results; 2017-2018), and accompanying Issues and Decision Memorandum.............................33

AFDOCS:200673155.1

*Certain Cut-to-Length Carbon Steel Plate from Romania*,
72 Fed. Reg. 6522 (Dep't Commerce Feb. 12, 2007) (final AD results &
partial rescission), and accompanying Issues and Decision Memorandum ................... *passim*

*Certain Hot-Rolled Steel Flat Products From the Republic of Korea*,
84 Fed. Reg. 32720 (Dep't Commerce Jul. 9, 2019) (final AD results; 2016-
2017), and accompanying Issues and Decision Memorandum ...............................................33

*Certain Corrosion-Resistant Steel Products From the Republic of Korea*,
84 Fed. Reg. 10784 (Dep't Commerce Mar. 22, 2019) (final AD results; 2016-
2017), and accompanying Issues and Decision Memorandum ........................................33, 34

*Circular Welded Carbon Steel Pipes and Tubes From Thailand*,
77 Fed. Reg. 61738 (Dep't Commerce Oct. 11, 2012) (final AD Results), and
accompanying Issues and Decision Memorandum ...............................................................16

*Circular Welded Non-Alloy Steel Pipe From the Republic of Korea*,
63 Fed. Reg. 32833 (Dep't Commerce Jun. 16, 1998) (final AD results) ........................15, 16

*Large Newspaper Printing Presses and Components Thereof, Whether Assembled
or Unassembled, From Germany*,
66 Fed. Reg. 11557 (Dep't Commerce Feb. 26, 2001) (final AD results), and
accompanying Issues and Decision Memorandum ...............................................................16

*Polyethylene Terephthalate Resin From the Sultanate of Oman*,
87 Fed. Reg. 75594 (Dep't Commerce Dec. 9, 2022) (final AD results; 2020-
2021), and accompanying Issues and Decision Memorandum ...............................................26

*Steel Concrete Reinforcing Bar From the Republic of Turkey*,
85 Fed. Reg. 15765 (Dep't Commerce Mar. 19, 2020) (final AD results; 2017-
2018) ..............................................................................................................................32

*Steel Concrete Reinforcing Bar From the Republic of Turkey*,
86 Fed. Reg. 28574 (Dep't Commerce May 27, 2021) (final AD restuls & no
shipments determ.; 2018-2019) ........................................................................................32

*Steel Concrete Reinforcing Bar From the Republic of Turkey*, 87 Fed. Reg. 7118
(Dep't Commerce Feb. 8, 2022) (final AD results & determ. no shipments;
2019-2020), and accompanying Issues and Decision Memorandum ...............................27, 32

*Steel Concrete Reinforcing Bar From the Republic of Turkey*,
88 Fed. Reg. 7941 (Dep't Commerce Feb. 7, 2023) (final AD results &
determ. of no shipments; 2020-2021), and accompanying Issues and Decision
Memorandum ..............................................................................................................27, 32

*Steel Concrete Reinforcing Bar From the Republic of Turkey*, 88 Fed. Reg. 50100,
50101 (Dep't Commerce Aug. 1, 2023) (prelim. AD results; 2021-2022), and
accompanying Decision Memorandum .................................................................................6

AFDOCS:200673155.1

*Steel Concrete Reinforcing Bar From the Republic of Turkey*,
 88 Fed. Reg. 89663 (Dep't Commerce Ded. 8, 2023) (final AD results; 2021-
 2022), and accompanying Issues and Decision Memorandum........................................ *passim*

*White Grape Juice Concentrate From Argentina*,
 87 Fed. Reg. 66269 (Dep't Commerce Nov. 3, 2022) (prelim. affirm. LTFV
 determ., postponement of final determ., ext. of provisional measures), and
 accompanying Decision Memorandum ..................................................................................15

## Other Authorities

Agreement on Implementation of Article VI of the General Agreement on Tariffs
 and Trade 1994 ....................................................................................................................11

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep.
 No. 103-316 (1994), reprinted in 1994 U.S.C.C.A.N. 4040...............................................11, 12

AFDOCS:200673155.1

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE JANE A. RESTANI**

| | |
|---|---|
| KAPTAN DEMIR CELIK ENDUSTRISI VE TICARET A.S., <br><br> *Plaintiff,* <br><br> and <br><br> ICDAS CELIK ENERJI TERSANE VE ULASIM SANAYI, A.S., <br><br> *Plaintiff-Intervenor,* <br><br> HABAS SINAI VE TIBBI GAZLAR ISTIHSAL ENDUSTRISI A.S., <br><br> *Proposed Plaintiff-Intervenor,* <br><br> v. <br><br> THE UNITED STATES, <br><br> *Defendant,* <br><br> and <br><br> REBAR TRADE ACTION COALITION, <br><br> *Defendant-Intervenor.* | **NON-CONFIDENTIAL VERSION** <br><br> Court No. 24-000018 <br><br> Confidential Business Proprietary Information Deleted from Pages: 5, 19, 21 -24, 27 -32 and 34. |

**PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD AND ACCOMPANYING MEMORANDUM OF POINTS AND AUTHORITIES PURSUANT TO RULE 56.2**

## I.    RULE 56.2 STATEMENT

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade,

Plaintiff Kaptan Demir Celik Endustrisi ve Ticaret A.S. ("Kaptan") and Plaintiff-Intervenor

Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. ("Icdas"), foreign manufacturers and foreign

exporters of steel concrete reinforcing bar ("rebar") from Turkey, hereby submit this motion for judgment on the agency record and accompanying memorandum of points and authorities to challenge the final affirmative determination as set forth below.

This is an appeal from the final results in the 2021-2022 administrative review of the antidumping duty order on *Steel Concrete Reinforcing Bar From the Republic of Turkey* ("Rebar from Turkey"). The U.S. Department of Commerce's ("Commerce") final results were published in the *Federal Register* on December 28, 2023. *Steel Concrete Reinforcing Bar From the Republic of Turkey,* 88 Fed. Reg. 89663 (Dep't Commerce Dec. 28, 2023) (final AD results; 2021-2022) ("*Final AD Results*"), P.R. 154, ECF 29-5. Commerce's factual and legal conclusions underlying the *Final AD Results* are set forth in its Memorandum from S. Fullerton to J. Maeder, re: Issues and Decision Memorandum for the Final Results of the Antidumping Duty Administrative Review Antidumping; 2021-2022 (Dec. 20, 2023) ("*Final IDM*"), P.R. 150, ECF 29-5.

## II.    ISSUES PRESENTED

### A.    Whether Commerce Used the Correct Date of Sale For Sales of Subject Merchandise to the U.S. Market

No. Commerce's reliance on the date of invoice as the date of U.S. sales for Kaptan is not based on substantial evidence nor in accordance with law. Commerce's presumption in favor of using the invoice date as the date of sale is contrary to the statute and the Court owes no deference to Commerce's interpretation. The "best" interpretation of the statute requires that Commerce select the date of sale based on an independent analysis of the circumstances present in each period of review. Instead, Commerce has adopted a date of sale standard that is unpredictable, inconsistent, and based on a results-driven analysis that has become prohibitive to use of anything other than invoice date. Use of invoice date is improper where, as here, the

AFDOCS:200673155.1

evidentiary record supports that another date "better reflects the date on which the material terms of sale are established." *Final IDM* at 15 (citing 19 C.F.R. § 351.401(i)), P.R. 150. In relying on the invoice date as Kaptan's date of sale, Commerce ignored important evidence on the record, including the fact that the material terms of Kaptan's export contracts did not change during the period of review ("POR") and that all contracts must be approved by Kaptan's Board of Directors with specific direction that they cannot be changed. Record evidence clearly demonstrates that Kaptan's contract terms did not and could not change prior to the invoice date and supports use of the contract date as the date of sale in this case. Commerce's failure to fully analyze the unique circumstances and factual evidence on the record when making its date of sale determination is unlawful and should be rejected by the Court.

**B.    Whether Commerce Should Revise its DIFMER Calculation**

Yes. Consistent with its longstanding practice, Commerce must ensure that the per unit cost differences for the reported cost of production for different CONNUMs only reflect differences between product characteristics. Here, Commerce's calculation of Kaptan's differences in merchandise ("DIFMER") adjustment significantly distorts the dumping margin calculation due to timing impacts. Instead of weight averaging and indexing Kaptan's reported costs, Commerce should have based in calculation of Kaptan's accurate reporting of its monthly per unit costs for each CONNUM in this review. Commerce's distortive DIFMER adjustment is not in accordance with law or based on substantial evidence.

**C.    Whether Commerce Should Recalculate Icdas's Assigned Dumping Margin If Kaptan's Rate Changes Pursuant to Litigation**

Yes. To the extent that Commerce recalculates the rates assigned to Kaptan as a result of this litigation, it must redetermine the "all-others" antidumping duty rate for Icdas and other non-selected respondents in accordance with the statute.

AFDOCS:200673155.1

III.     STATEMENT OF FACTS

Kaptan and Icdas are foreign producers of steel concrete reinforcing bar from the

Republic of Turkey. Plaintiff Kaptan filed a request for an administrative review on July 27,

2024. *See* Kaptan's Request for Antidumping Administrative Review (July 27, 2024), P.R. 4.

Plaintiff-Intervenor Icdas filed a request for an administrative review on July 28, 2024. Turkish

Parties' Request for Antidumping Administrative Review (July 28, 2022), P.R. 6. On September

29, 2021, Commerce designated Kaptan as a mandatory respondent. Memorandum from R.

Copyak to S. Thomson, re: Respondent Selection Memorandum for Administrative Review of

the Antidumping Duty Order on Steel Concrete Reinforcing Bar from the Republic of Turkey;

2021-2022 (Oct. 7, 2022) ("Respondent Selection Memo"), C.R. 5, P.R. 29.

Kaptan actively participated in the administrative review by filing responses to

questionnaires and supplemental questionnaires. *See e.g.,* Kaptan's Response to the

Department's Section A Questionnaire (Nov. 7, 2022) ("Sec. A QR"), C.R. 7-18, P.R. 45;

Kaptan's Response to the Department's Section B Questionnaire (Dec. 8, 2022) ("Sec. B QR"),

C.R. 29-47, P.R. 60; Kaptan's Response to the Department's Section C Questionnaire (Dec. 8,

2022) ("Sec. C QR"), C.R. 48-70, P.R. 61; and Kaptan's Response to the Department's Section

D High Inflation Questionnaire (Dec. 8, 2022) ("Sec. D QR"), C.R. 71-97, P.R. 62; Kaptan's

Response to the Department's Supplemental Sections A-C Questionnaire (June 1, 2023) ("Supp.

A-C QR"), C.R. 180-246, P.R. 89-90; Kaptan's Response to the Department's Supplemental

Section D Questionnaire (June 29, 2023), C.R. 250-286, P.R. 101; and Kaptan's Responses to

the Department's Third and Fourth Supplemental Questionnaires (July 20, 2023) ("3rd&4th

Supp. QR"), C.R. 332-357, P.R. 117.

Kaptan provided substantial evidence relating to date of sale and demonstrating that

invoice date was not the best date of sale for sales to the United States during the POR. Sec. C

QR, C.R. 48-70, P.R. 61; Supp. A-C QR, C.R. 180-246, P.R. 89-90, and 3rd&4th Supp. QR, C.R. 332-357, P.R. 117. Specifically, in it is initial questionnaire response, Kaptan reported that "all major terms of sale, including the price, quantity, size breakdown, and latest date of shipment, were finalized on the date of the contract and did not change between the invoice and contact date." Sec. C QR at C-19-20, C.R. 48, P.R. 61. Kaptan provided a "comparison chart, which demonstrates that the material terms of Kaptan's sales are set on the contract date and are consistent with the final invoice, within permissible tolerances." *Id.* at C-20, Exh. C-6.a. In its supplemental Section A-C Questionnaire, Kaptan provided additional explanation as to why the material terms of sale did not change between invoice and contract date." Supp. A-C QR at 3, 26-29, C.R. 180, P.R. 89. Kaptan also provided additional supporting documentation showing that the contracts were binding and could not be changed. Sec. C QR at Exh. C-6.b, C.R. 48-49, P.R. 61 (providing POR contracts and invoices); Supp. A-C QR at Exhs. S1-40, S1-41, C.R 186, P.R. 90. In its Supplemental Sections A-C Response, Kaptan again explained that, "there were no post-contract amendments or other changes to the material terms of sale after the contract date," consistent with an explicit directive from Kaptan's Board of Directors, [

].

Supp. A-C QR at 27-29, C.R. 186, P.R. 90. The record evidence provided by Kaptan established that "the material terms of Kaptan's sales are set on the contract date and are consistent with the final invoice, within permissible tolerances," Sec. C QR at C-20, Exhs. 6.a, 6.b, C.R. 48-49, P.R. 61, and "invoiced price and overall quantity for sales under Kaptan's contracts in effect during the POR did not change outside the permissible tolerances provided." Supp. A-C QR at 3, C.R. 186, P.R. 89.

Kaptan provided record evidence enabling Commerce to calculate an adjustment for differences in merchandise based on unindexed submitted per unit costs. Specifically, Kaptan accurately reported its monthly per unit costs for each CONNUM in this review. 3rd&4th Supp. QR at Exh. S4-4 (kaptan_ar2122_copmon03), C.R. 336, P.R. 117.

On August 1, 2023, Commerce issued its preliminary results in which it assigned Kaptan an individual rate of 29.30 percent. *Steel Concrete Reinforcing Bar From the Republic of Turkey*, 88 Fed. Reg. 50100, 50101 (Dep't Commerce Aug. 1, 2023) (prelim. AD results; 2021-2022) ("*Preliminary AD Results*"), P.R. 127, and accompanying Decision Memorandum ("*PDM*"), P.R. 120. In the *Preliminary AD Results*, although Kaptan reported the contract date as the date of sale and provided record evidence demonstrating that the material terms of sale did not change after the contract date, Commerce relied on the invoice date as the date of sale for U.S. sales. *See PDM* at 9, P.R. 120. Commerce also calculated the DIFMER adjustment based on a weight average of Kaptan's indexed monthly costs.  Memorandum from B. Ballesteros to The File, re: Preliminary Results Analysis Memorandum for Kaptan Demir Celik Endustrisi Ve Ticaret A.S./Kaptan Metal Dis Ticaret Ve Nakliyat A.S. at Attach. IX (July 26, 2023) ("Prelim. Analysis Memo"), C.R. 359 & 361, P.R. 121.

Kaptan submitted a case brief to Commerce on August 31, 2023. *See* Kaptan's Case Brief (Aug. 31, 2023) ("Kaptan Case Br."), C.R. 377, P.R. 136. In its case brief, Kaptan provided ample record evidence and precedent demonstrating that this 2021-2022 review of the rebar from Turkey order is different from prior reviews and that the appropriate U.S. date of sale for Kaptan was the contract date (i.e., contract date). *Id.* at 22-27. Kaptan demonstrated that there were no changes to the material terms of sale after the contract date, and that all parties agree in the contract that there will be no changes to the terms of the sale. *Id.* at 16. Kaptan argued that

6

Commerce improperly ignored its obligation to review the unique circumstances and factual evidence on the record of this review when making its date of sale determination. Given the unique facts of this review cycle, in which the contracts did not change prior to the invoice date for Kaptan and were, in fact, unable to be changed based on a new Board resolution, Commerce should have relied on contract date as the date of U.S. sales because that was the date on which material terms of U.S. sales were fixed. *Id.* at 17. With regards to the DIFMER adjustment, Kaptan argued that Commerce's weight averaging and indexing of Kaptan's reported monthly costs introduced timing-related distortions unrelated to the physical characteristics of the merchandise. *Id.* at 31. Kaptan argued that Commerce should calculate a monthly DIFMER adjustment using Kaptan's unindexed submitted per unit costs, which reflect the true cost differences and are not impacted by timing differences. *Id.* at 33.

On September 11, 2023, Kaptan submitted a rebuttal brief. *See* Kaptan's Rebuttal Brief (Sept. 11, 2023), C.R. 379, P.R. 138.

On December 28, 2023, Commerce issued its *Final AD Results*, in which Kaptan received a 25.86% rate and Icdas received the 25.86% assigned to companies not selected for individual review. *See Final IDM* at 13-21, P.R. 150. In the *Final AD Results*, Commerce continued to find that Kaptan had not demonstrated that the material terms of sale were finalized at the contract date and, and relied on invoice date for Kaptan's U.S. date of sale. *Id.* at 13. It also continued to weight average and index Kaptan's reported costs in applying the DIFMER adjustment. *Id.* at 22-23.

The *Final AD Results* are unsupported by substantial evidence on the record and are otherwise not in accordance with law with respect to the matters set forth below.

7

## IV.    STANDARD OF REVIEW

This Court "shall hold unlawful any determination, finding or conclusion found . . . to be unsupported by evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). When reviewing whether Commerce's actions are unsupported by substantial evidence, the Court assesses whether the agency action is "unreasonable" given the record as a whole. *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006). Substantial evidence represents "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *DuPont Teijin Films USA, LP v. United States*, 407 F.3d 1211, 1215 (Fed. Cir. 2005), quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

In making its judgment, the Court "reviews the record as a whole,  including any evidence that fairly detracts from the substantiality of  the evidence," *Gallant Ocean (Thailand) Co. v. United States*, 602 F.3d  1319, 1323 (Fed. Cir. 2010) (internal quotation marks and citation  omitted), and determines "whether the evidence and reasonable inferences from the record support {the agency's} finding." *Daewoo Elecs. Co. v. Int'l Union of Electronic Elec., Tech., Salaried & Mach. Workers, AFL-CIO*, 6 F.3d 1511, 1520 (Fed. Cir. 1993) (internal  quotation marks and citation omitted). This Court has found Commerce's determinations unlawful "where Commerce has failed to carry out its duties properly, relied on inadequate facts or reasoning, or failed to provide an adequate basis for its conclusions." *Rhone-Poulenc, Inc. v. United States*, 927 F. Supp. 451, 454 (Ct. Int'l Trade 1996); *see also Asociacion Colombiana de Exportadores de Flores v. United States*, 6 F. Supp. 2d 865, 880 (Ct. Int'l Trade 1998). Commerce must provide a "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962), and the "reasons for the choices made {by Commerce} among various potentially acceptable alternatives

usually need to be explained." *Bando Chem. Indus. v. United States*, 787 F. Supp. 224, 227 (Ct.

Int'l Trade 1992), *aff'd* 26 F.3d 139 (Fed. Cir. 1994).

In all cases, Commerce's determinations must be consistent with the governing statute

and the agency's regulations. When reviewing Commerce's statutory interpretations, the Court

applies the standard articulated by the Supreme Court of the United States in *Loper Bright*

*Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), which overruled *Chevron, U.S.A., Inc. v.*

*N.R.D.C., Inc.*, 467 U.S. 837 (1984). Commerce's interpretations of statutory provisions are not

entitled to deference by this Court. Instead, "{c}ourts must exercise their independent judgment

in deciding whether an agency has acted within its statutory authority," *Loper Bright*, 144 S. Ct.

at 2273, and whether the agency's interpretation reflects "the best reading of the statute{.}" *Id.* at

2266.

## V.    ARGUMENT

## A.    Invoice Date or Shipment Date Is Not The Appropriate Date Of Sale For Kaptan's U.S. Sales

In the *Final AD Results*, Commerce relied on the earlier of shipment or invoice date as

the date of sale, despite the fact that Kaptan reported the contract date as the date of sale for its

U.S. sales. *Final IDM* at 13, 20-21, P.R. 150. Though Commerce alleges that "Kaptan's U.S.

sales contracts on the record contain language that continue to allow changes to the material

terms of sale," *id.* at 16, this statement ignores important revisions to Kaptan's sales process

whereby the contact terms are now binding on Kaptan's U.S. sales. Supp. A-C QR at Exh. S1-40,

C.R. 186, P.R. 90.  The material terms of the contract cannot and did not change during the POR.

Commerce's finding that "Kaptan made changes to the sales contract after the buyer agreed to

the sales terms" *Final IDM* at 17, P.R. 150, has no basis in the record. No such changes were

made.  The Court should remand this issue to Commerce so that Commerce can use the contract

date as the appropriate date of sale.

1.    **Statutory Guidance Regarding Date of Sale Is Ambiguous And Commerce's Interpretation Has Been Inconsistently Applied**

a.    **The Statute Does Not Clearly Define The Date of Sale**

In selecting the appropriate date of sale, the statute – 19 U.S.C. § 1677a(a) – provides

only that the export price "means the price at which the subject merchandise is first sold (or

agreed to be sold)." As the U.S. Court of International Trade ("CIT") has recognized, this

provision does not define the terms "sold" or "agreed" to be sold, which had meant "leav{ing}

the precise definition of 'date of sale' to the agency." *Nakornthai Strip Mill Pub. Co. v. United*

*States*, 558 F. Supp. 2d 1319, 1325 (Ct. Int'l Trade 2008).  Where, as here, the "provision does

not determine whether the date of sale is the contract date or invoice date; it could be either," and

the statute therefore "is ambiguous," the CIT historically "defer{red} to Commerce's reasonable

interpretation of the statute." *Id.* (citing *Chevron*, 467 U.S. at 837; *see also USEC, Inc. v. United*

*States*, 498 F. Supp. 2d 1337, 1348 (Ct. Int'l Trade 2007) (applying *Chevron* deference to

Commerce's date of sale methodology).  However, consistent with the decision of the U.S.

Supreme Court in *Loper Bright*, the Court can no longer presume that this statutory silence or

ambiguity is an "implicit delegation{ }" to Commerce.  *Loper Bright*, 144 S. Ct. at 2265.

Instead, we now look to the Court to "resolve the resulting interpretive question." *Id.*

Though "courts must exercise independent judgment in determining the meaning of

statutory provisions," the "courts may . . . seek aid," including through "interpretations issued

contemporaneously with the statute at issue{.}" *Id.* at 2262.  Here, the trade agreements adopted

by the World Trade Organization and incorporated into U.S. law, provide that "{n}ormally, the

date of sale would be the date of contract, purchase order, order confirmation or invoice,

*whichever establishes the material terms of sale.*" *Nucor Corp. v. United States*, 612 F. Supp. 2d 1264, 1300 (Ct. Int'l Trade 2009) (emphasis in the original) (quoting Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade 1994, Art. 2.4.1 n.8).  The Statement of Administrative Action ("SAA") accompanying the Uruguay Round Agreements Act likewise defines the "date of sale" as the "date when the material terms of sale are established."  H.R. Rep. No. 103-316, vol. 1, at 810 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4153. "Through the Uruguay Round Agreements Act and the Statement of Administrative Action, Congress thus 'expressed its intent that, for antidumping purposes, the date of sale be *flexible* so as to accurately reflect the true date on which the material elements of sale were established.'" *Nucor*, 612 F. Supp. 2d at 1300 (quoting *Allied Tube & Conduit Corp. v. United States*, 127 F. Supp. 2d 207, 219 (Ct. Int'l Trade 2000) ("*Allied Tube I*")).

In past cases, the CIT has recognized that "rather than endorsing a mechanistic methodology conclusively establishing invoice date as the date of sale . . . , Congress instead 'expressed its intent that, for antidumping purposes, the date of sale be flexible so as to accurately reflect the true date on which the material elements of sale were established.'"  *Nucor*, 612 F. Supp. 2d at 1307-08 (quoting *Allied Tube I*, 127 F. Supp. 2d at 219).  To that end, the CIT has noted that Commerce's "duty is to determine when a meeting of the minds took place," *Rebar Trade Action Coalition v. United States*, Ct. No. 14-00268, 2016 WL 5122639, at *8 (Ct. Int'l Trade Sept. 21, 2016) (citation omitted), and found that "the date at which no further changes were realistically possible would seem to be determinative."  *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 426 F. Supp. 3d 1395, 1403 (Ct. Int'l Trade 2020); *see also*, *Allied Tube & Conduit Corp. v. United States*, 132 F. Supp. 2d 1087, 1090 (Ct. Int'l Trade 2001). Though recognizing Commerce's interpretation of the statute to apply a

AFDOCS:200673155.1

"'rebuttable presumption' in favor of the invoice date," *Eregli Demir ve Çelik Fabrikalari T.A.Ş. v. United States*, 308 F. Supp. 3d 1297, 1306 (Ct. Int'l Trade 2018) (citations omitted), as detailed below, the CIT has confirmed that "neither Congress nor the agency in its regulations expresses any 'preference' at all on the matter." *Nucor*, 612 F. Supp. 2d at 1304.  As such, the CIT has historically acknowledged that "the invoice date in fact is merely the starting point of Commerce's analysis" and is not "intended to foreclose{} the possibility that another date could be chosen as the date of sale." *Id.* at 1307 (internal quotations omitted) (citation omitted).

**b.     Commerce's Definition of The Date of Sale Is Not the "Best Meaning" Of the Statute Which Allows for Either Invoice Date (When the product is Sold) or Contract Date (When the Product is Agreed to be Sold)**

The "best" interpretation of the statute requires that Commerce determine the date of sale based on an independent analysis of the circumstances present in each period of review. Commerce's presumption in favor of invoice date is contrary to the statute and the Court owes no deference to Commerce's interpretation. To make such a determination, Commerce must fully review the facts on the record without prejudice to determine when the "subject merchandise is first sold (or agreed to be sold)."  19 U.S.C. § 1677a(a).  The statute expresses no preference for use of "invoice" or "contract" date, so Commerce should comprehensively review evidence on the record in each review segment to determine the date on which price (or other material terms, as defined by the exporter/producer's records kept in the ordinary course of business) are set without a presumption in favor of a specific date. *See SAA*, H.R. Rep. No. 103-316, vol. 1, at 810, *reprinted in* 1994 U.S.C.C.A.N. at 4153 (providing that Commerce should consider when the material terms are set as part of Congress's explanation of the statutory language); *see also Nucor*, 612 F. Supp. 2d at 1304 ("{N}either Congress nor the agency in its regulations expresses any "preference" at all on the matter—"strong" or otherwise.").

AFDOCS:200673155.1

As the CIT has recognized, "Commerce's interpretation {of the statute} is contained in its regulations," *Nakornthai*, 558 F. Supp. 2d at 1325, which state:

> In identifying the date of sale of the subject merchandise or foreign like product, the Secretary *normally* will use the date of invoice, as recorded in the exporter or producer's records kept in the ordinary course of business. However, *the Secretary may use a date other than the date of invoice if the Secretary is satisfied that a different date better reflects the date on which the exporter or producer establishes the material terms of sale*.

19 C.F.R. § 351.401(i) (emphasis added).  The use of the word "normally" in Commerce's regulations indicates that there are necessarily times when use of the invoice date is not appropriate. In those instances, the regulations establish that Commerce has the discretion to use a different date of sale based on when the material terms were established by the parties.  *Id.*

In the "*Preamble*" to Commerce's regulations, Commerce explains that the date of sale is the first point at which the sales terms are fixed, which is most commonly "when the seller demands payment (*i.e.*, when the sale is invoiced)."  *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27296, 27349 (Dep't Commerce May 19, 1997) (final rule) ("*Preamble*"); *see also* 19 C.F.R. § 351.401(i).  However, Commerce again acknowledges that, where it "is presented with satisfactory evidence that the material terms of sale are . . . established on a date other than the date of invoice, {Commerce} *will* use that alternative date as the date of sale."  *Id.* (emphasis added). Commerce specifically explains its date of sale methodology as follows:

> In some cases, it may be inappropriate to rely on the date of invoice as the date of sale, because the evidence may indicate that, for a particular respondent, the material terms of sale usually are established on some date other than the date of invoice. . . . {W}e had intended this type of flexible approach through our use of the word "normally."

*Id.* Commerce further states that "in situations . . . in which the parties engage in formal negotiation and contracting procedures, {Commerce} *usually* will use a date other than the date

13

of invoice," provided "the terms of sale {are} firmly established and not merely proposed." *Id.*

(emphasis added).

Read together, the statute, legislative history, and Commerce's regulations are clear that Commerce's objective, as dictated by Congress and the law, is to determine when all sales terms are finalized for purposes of reporting the correct universe of sales. That sales universe is necessarily specific to the period of review. In practice, however, Commerce has applied its date of sale methodology inconsistently. As this Court has previously acknowledged, with regards to contract terms in particular:

> Prior caselaw is filled with examples of Commerce considering contracts that allow for minor changes between the contracting and invoicing stages. *Commerce has decided cases both ways*, sometimes finding the material terms were established despite an allowance for tolerances and sometimes determining the presence of tolerances meant the material terms were not established.

*Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*, 693 F. Supp. 3d 1368, 1375 (Ct. Int'l Trade 2024) (emphasis added).[1] In certain cases, Commerce notes that it has a "'well-established and long-standing practice' of looking beyond the invoice date to the parties' actual course of conduct, as well as the parties' expectations concerning the transaction," to determine

---

[1] As detailed below, there is no support in the case law cited by the Court to support a finding that the mere existence of tolerances in a steel contract means the material terms are not established. Each case cited deals with a *change* to or failure to meet the contact tolerances, not the existence of the tolerances themselves. *See Nakornthai Strip Mill Pub. Co. v. United States*, 614 F. Supp. 2d 1323 (Ct. Int'l Trade 2009) (elimination of line item contract tolerances); *Eregli Demir*, 308 F. Supp. 3d at 1312 (failure to meet tolerance threshold); *Certain Cut-to-Length Carbon Steel Plate from Romania*, 72 Fed. Reg. 6522 (Dep't Commerce Feb. 12, 2007) (final AD results & partial rescission), and accompanying Issues and Decision Memorandum at 7-8 (single sale with a quantity discrepancy outside the specified tolerance levels), ("*CTL Plate from Romania IDM*"). Both Commerce and the reviewing courts have consistently recognized that "within tolerance differences do not constitute changes to the material terms of sale." *Sahaviriya Steel Indus. Pub. Co. v. United States*, 714 F. Supp. 2d 1263, 1281 (Ct. Int'l Trade 2010), *aff'd*, 649 F.3d 1371 (Fed. Cir. 2011).

AFDOCS:200673155.1

the appropriate date of sale.[2] In other cases, including this one, Commerce has found the

presumption in favor of the invoice date (or shipment date) to be effectively un-rebuttable,

despite record evidence that the material terms are set in the contract and cannot change. *Final

IDM* at 16-17, P.R. 150.

Commerce has been contradictory in its definition of what is and is not a "material" term

of sale. While Commerce and the reviewing courts appear to agree that the material terms

necessarily include price and quantity, *id.* at 14 ("{P}rice and quantity" are "terms determined to

be material both by {the CIT} and Commerce.") (alterations in original) (citations omitted); *see,

e.g.*, *Corus Staal BV v. United States*, 502 F.3d 1370, 1376 (Fed. Cir. 2007) ("Neither a sale nor

an agreement to sell occurs until there is mutual assent to the material terms (price and

quantity).""), Commerce has also, on occasion, found delivery terms, payment terms, and even

product mix to be material. *Nakornthai*, 558 F. Supp. 2d at 1326-27; *see also Final IDM* at 14

("Commerce's interpretation of the material terms of sale has evolved over time, and material

terms can also include delivery terms and payment terms."). Other times, these same terms are

---

[2] *Nucor*, 612 F. Supp. 2d at 1308; *see also Circular Welded Non-Alloy Steel Pipe From the Republic of Korea*, 63 Fed. Reg. 32833, 32836 (Dep't Commerce Jun. 16, 1998) (final AD results) ("*Circular Welded Pipe From Korea*") (finding that, where the material terms of sale are "set on the contract date and any subsequent changes are usually immaterial in nature or if material, rarely occur," use of the contract date as the date of sale is appropriate); *White Grape Juice Concentrate From Argentina*, 87 Fed. Reg. 66269 (Dep't Commerce Nov. 3, 2022) (prelim. affirm. LTFV determ., postponement of final deter., ext. of provisional measures), and accompanying Decision Memorandum at 10 (finding the contract date to be the appropriate date of sale where the respondent reported that "the material terms of sale were established by the contract and did not change at the invoice date" and the information on the record confirmed that "the material terms of sale remain fixed from the contract date"); *1,1,1,2-tetrafluoroethane (R-134a) From the People's Republic of China*, 88 Fed. Reg. 27861 (Dep't Commerce May 3, 2023) (prelim. AD results, partial rescission, and prelim. determ. of no shipments; 2021-2022), and accompanying Decision Memorandum at 17 (finding the date of contract to "better reflect{} the date on which the material terms of the sale are established than the invoice date" where "the 'material terms of sale did not change once {the respondent} signed the sales contract with the unaffiliated customer").

AFDOCS:200673155.1

not material, with Commerce, having found the price and quantity terms of a sale to be established, "concluding that other matters did not constitute essential terms." *Atar, S.r.l. v. United States*, 637 F. Supp. 2d 1068, 1077 (Ct. Int'l Trade 2009) For example, in past cases, Commerce has found that "differences in line item quantities, so long as the overall quantity is within the overall quantity tolerance level, are not significant," *Nakornthai*, 614 F. Supp. 2d at 1332, while in other cases even insignificant "deviations from the line-item tolerances" are evidence that "the material terms are not settled until the invoice date." *Kaptan*, 693 F. Supp. 3d at 1376.

Commerce has also been inconsistent in its interpretation of what constitutes a material change. The CIT has recognized that "Commerce's practice is to disregard changes that are not significant" in determining the date of sale. *Nakornthai*, 614 F. Supp. 2d at 1333. To that end, even where there are minor changes to the quantity between the contract and invoice date, Commerce has still found the contact date to be the appropriate date of sale where "no information on the record indicat{es} that the material terms of sale change frequently enough on U.S. sales so as to give both buyers and sellers any expectation that the final terms will differ from those agreed to in the contract."[3] Yet other times, as in this case, Commerce had

---

[3] *Circular Welded Carbon Steel Pipes & Tubes From Thailand*, 77 Fed. Reb. 61738 (Dep't Commerce Oct. 11, 2012) (final AD results), and accompanying Issues and Decision Memorandum at 3. (quoting *Circular Welded Pipe From Korea* , 63 Fed. Reg. at 32836); *see also Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, From Germany*, 66 Fed. Reg. 11557 (Dep't Commerce Feb. 26, 2001) (final AD results), and accompanying Issues and Decision Memorandum at Cmt. 1 ("While the change in the specifications at issue did result in a minor change in price and the corresponding payment, the Department has determined that the changes did not materially affect the terms of the original contract."); *CTL Plate from Romania IDM* at 6-9 (Issue 1) (accepting the order acknowledgement date, rather than invoice date, as the date of sale based on evidence that quantities and prices were fixed at the date of order acknowledgement, notwithstanding some minor differences between the ordered quantity and the invoiced quantity).

overlooked that the terms did not change between the invoice and contract date, focusing instead of whether "the material terms of sale were *subject to change*{.}" *Final IDM* at 19 (emphasis added), P.R. 150.

With regards to quantity, Commerce has found the material terms of sale to be "finalized within a quantity tolerance (*i.e.*, plus or minus 10 percent or one plate), {where} all but one small sale fell within the tolerance," *CTL Plate from Romania IDM* at 7, but also found that the mere "presence of a tolerance in contract language implies that changes to quantity regularly occur and that the material terms are not settled until the invoice date." *Kaptan*, 693 F. Supp. 3d at 1376. Though Commerce has rejected a rigid date of sale policy where "even a single change to a material term in a single transaction—without regard to the nature of the change or the circumstances surrounding it—may require an across-the-board use of invoice date as the date of sale for all sales to all customers{,}" *Nucor*, 612 F. Supp. 2d at 1302, it has also accepted use of invoice date as the date of sale where "the material term of quantity for at least one specification changed between the date of contract and the corresponding date of invoice." *ArcelorMittal USA LLC v. United States*, 302 F. Supp. 3d 1366, 1376–78 (Ct. Int'l Trade 2018).

In short, though CIT precedent confirms that Commerce is not "free to arbitrarily choose to use as the date of sale some date other than the date when the material terms of sale were established," *Nucor*, 612 F. Supp. 2d at 1304, Commerce has done exactly that. While Commerce's inconsistent interpretation of the statute may be "permissible," it is not certainly not the "single, best meaning." *Loper Bright*, 144 S. Ct. at 2266. Indeed, a standard so full of contradictions, and which causes so much uncertainty for participants like Kaptan, does nothing to "resolve the ambiguity" in the statute. *Id.* As the CIT has recognized, the interpretation of "Commerce's date of sale regulation is a *legal* issue{.}" *Nakornthai*, 558 F. Supp. 2d at 1327.

AFDOCS:200673155.1

The Court thus has an obligation to "decide {this} legal question{}" by applying their own

judgment." *Loper Bright*, 144 S. Ct. at 2261.

**c.**    **To The Extent The Statute Delegates Authority, Commerce Has Acted Outside Of That Delegated Authority**

The Supreme Court has recognized that an ambiguous "statute's meaning may well be

that the agency is authorized to exercise a degree of discretion" or to "leav{e} agencies with

flexibility." *Id.* at 2263 (internal citations omitted).  Indeed, the CIT has recognized

"{f}lexibility in Commerce's date of sale analyses {as} more than a mere regulatory preference;

it rises to the level of a statutory mandate." *Nucor*, 612 F. Supp. 2d at 1307 (citing *Allied Tube I*,

127 F. Supp. 2d at 216–17). However, the CIT must still "fi{x} the boundaries of the delegated

authority, and ensur{e} the agency has engaged in reasoned decisionmaking within those

boundaries." *Loper Bright*, 144 S. Ct. at 2263 (internal quotations omitted) (citation omitted).

Even under the *Chevron* deference standard, the CIT acknowledged the bounds of

Commerce's discretion in this area, noting that "{c}ertainly no court in any international trade

case . . . has held that Commerce has 'absolute,' unbridled discretion to apply invoice date as the

date of sale across-the-board, with no regard for the record evidence{.}" *Nucor*, 612 F. Supp. 2d

at 1303-04. Now that *Chevron* has been overruled by the Supreme Court, *Loper Bright*, 144 S.

Ct. at 2247, the legal question of what constitutes the date of sale should, at most, be entitled

only to *Skidmore* deference whereby an agency's interpretation may be "especially informative,"

but "cannot bind a court." *Id.* (quoting *Bureau of Alcohol, Tobacco and Firearms v. FLRA*, 464

U.S. 89, 98 n.8 (1983)).

Here, Commerce has acted outside any delegated authority in adopting a date of sale

standard that is unpredictable, inconsistent, and includes a "rebuttable" presumption that, in

many cases, including this one, has become prohibitive to use of anything other than invoice

date. At present, Commerce imposes a circuitous analysis where "a sale exists when the parties

reach final agreement upon the material terms of sale" and "what constitutes the material terms

of sale {are determined} on a case-by-case basis." *Final IDM* at 14, P.R. 150.  Without a

reliable definition of what constitutes a sale, a material term of a sale, and a final agreement, *i.e.*

the absence of any material change to those terms, Commerce's interpretation of the statute

cannot be viewed as "the best," or even a "permissible," interpretation.  *Loper Bright*, 144 S. Ct.

at 2266.

Indeed, Commerce's results-driven analysis in this case is not even "especially

informative." Commerce's interpretation dismisses certified record evidence establishing that no

material terms are determined (let alone changed) after the contract date consistent with a clear

and explicit directive from Kaptan's Board of Directors, [

]. Supp. A-C QR at 29,

C.R. 180, P.R. 89.  Commerce did not review the evidence on the record in order  to ascertain

whether the contracting parties reached a binding agreement. It did not examine the parties'

expectations about what was to be purchased, how much would be purchased, and how long it

would take to produce. It did not consider whether the parties understood that they were bound

by the terms of contract, nor the actual actions of the parties pursuant to the contract at all.

Instead, under Commerce's restrictive definition, even the possibility of a single change

to a single, immaterial term, in a single transaction necessitates use of the invoice date or

shipment date as the date of sale for all sales to all customers. The CIT has found this type of

"superficial, black-and-white, all-or-nothing determination" to be "fundamentally at odds with

the antidumping statute and regulations{.}" *Nucor*, 612 F. Supp. 2d at 1302-03.  Consistent with

the Supreme Court's decision, we therefore urge the Court to "exercise {its} independent

judgment in deciding whether {Commerce} has acted within its statutory authority," rather than simply "defer{ing} to {Commerce's} interpretation of the law" in this case. *Loper Bright*, 144 S. Ct. at 2273.

**2.    The Material Terms of Kaptan's U.S. Sales Were Set in the Contract and Did Not Change**

As the CIT has recognized, "the 'key element to consider' in determining date of sale is which date best reflects the point at which the parties had a meeting of the minds on the material terms of sale—not whether there is evidence of even a single change in a single material term of a single contract." *Nucor*, 612 F. Supp. 2d at 1307.  As consistently reported by Kaptan in this proceeding, the "correct date of sale for U.S. sales during the current POR is the contract date" because it is the first point at which the terms of sale are fixed. Sec. A QR at A-20, C.R. 7, P.R. 45; Sec. C QR at C-19, C.R. 48, P.R. 61.

During the relevant period, there were no changes in the material terms of the sale, including the volume, price, delivery date, and latest date of shipment, between the contract and invoice date.  Sec. A QR at A-20; Sec. C QR at C-19-20, C.R. 48, P.R. 61.  Each of those material terms were finalized on the date of the contract and did not change between the invoice, shipment, and contract date.  Sec. C QR at C-19-20 and Exh. C-6.a, C.R. 48, P.R. 61.  Indeed, as documented on the record, the invoiced price, quantity of individual sizes, and overall quantity for sales under Kaptan's contracts in effect during the POR did not change outside the permissible tolerances provided in the initial contract.  Sec. A QR at A-20, C.R. 7, P.R. 45; Sec. C QR at C-20 and Exh. C-6.a-b, C.R. 48-49, P.R. 61; Supp. A-C QR at 3, C.R. 180, P.R. 89.  In

all cases, the material terms of the sale were thus established with Kaptan's customer when the contract was signed.[4]

The binding nature of Kaptan's contracts is inherent in the structure of its U.S. sales, which differ substantially from its sales in the home market. For home market sales, Kaptan reported its date of sale as the earlier of date of shipment or date of invoice because "the material terms of sale were set on that date. During the POR, Kaptan made [      ] home market sales. Sec. B QR at Exh. B-2, C.R. 29, P.R. 60.  Each of these were relatively small, filled out of Kaptan's existing inventory, and invoiced on an actual weight basis.  Sec. A QR at A-16 and A-21, C.R. 7, P.R. 45 ("For home market sales, Kaptan tries to maintain an inventory for most frequently sold products."); *see also id.* at A-29; Sec. B QR at B-27, C.R. 29, P.R. 60 ("Invoicing in the home market is on an actual weight basis, and the home market sales listing is in accordance with the invoicing practice.").  As it reported, "in the home market Kaptan does not sign contracts with its customers."  Sec. A QR at A-23.  Instead, Kaptan described its sales process as follows:

---

[4] In the CIT's previous review of Kaptan's sales process, Kaptan argued that shipments *outside* the stated line-item tolerances in the contract did not constitute a material term where the overall contract volume was within the contract tolerance. *Kaptan*, 693 F. Supp. 3d at 1376 ("Respondents argue that the material terms of the contract did not change as the aggregate quantity remained stable."). The Government argued "that there were changes to line-item quantities that exceeded the tolerances specified in the contract." *Id.* No party argued that "the *presence* of tolerances meant the material terms were not established," *id.* at 1375 (emphasis added), and to the extent the CIT made such a finding that the inclusion of tolerances are evidence of a material change, even where all shipments are within that tolerance, we strongly disagree. The existence of established "tolerance ranges" is standard practice in the steel industry and are even included in the American Society for Testing and Materials (ASTM) international voluntary consensus standards. *See, e.g.*, *ArcelorMittal Stainless Belg. N.V. v. United States*, 694 F.3d 82, 85 & 87 n.7 (Fed. Cir. 2012). The CIT has previously recognized that "within tolerance differences do not constitute changes to the material terms of sale." *Sahaviriya*, 714 F. Supp. 2d at 1281. In any event, in this review, there were no such changes to either the line item quantity or to the overall contact quantity outside the agreement.

> Price inquiries from customers are received usually by phone or e-mail. Kaptan sends a price offer to the customer. When the customer confirms, an order form is created in the company's system and this is sent to the customer for written confirmation.

*Id.* at A-21.  Importantly, because home market sales are made primarily from inventory, "{d}elivery is performed generally *within 10 days* of the order confirmation." *Id.* (emphasis added).

By contrast, Kaptan had far fewer U.S. sales ([      ] sales), but each of those sales was larger in volume.  Sec. C QR at Exh. C-2, C.R. 48, P.R. 60.  Merchandise that Kaptan sold to the U.S. market was generally manufactured to order, invoiced on a theoretical weight basis per customer instructions, and subject to other special requirements not applicable to Kaptan's home market sales.  Sec. A QR at A-29, C.R 7, P.R. 45.Specifically, Kaptan's U.S. sales are produced pursuant to a customer's request for "quantity, quality, sizes, payment terms, shipment requirements, and latest acceptable shipment date."  *Id.* at A-20.  As a result of the longer lead time required to produce, pack, and ship each order to the United States, *all* of Kaptan's U.S. sales are made according to purchase contracts executed by the parties.  *Id.* at A-23.  Production of merchandise begins only once the contract has been signed, at which point "the export department will issue internal order through the ERP system to notify the production-planning department to include the new order in the production plan." *Id.* at A-21.

The formal written contract process for Kaptan's U.S. sales affords protection to both parties by memorializing the material terms of the sale before production even begins. With regards to quantity, this both ensures that Kaptan has a customer for the specified quantity of customized merchandise it produces and that the U.S. buyer has sufficient supply to fill customer orders. With regards to price, this ensures that Kaptan receives payment for its export sales sufficient to cover its imports of scrap purchased to produce the merchandise sold to customers

in the United States. Supp. A-C QR at 27, C.R. 180, P.R. 89.  This certainty is essential given the longer lead times associated with export sales than home market sales. *Id.*  Whereas delivery of merchandise in the home market from inventory generally is performed within 10 days of the order, Sec. A QR at A-21, U.S. sales necessarily have a longer lead time as merchandise is produced to order, packaged, and shipped to the United States.

The fixing of price at the time of the contract has become particularly important for Kaptan due to the longer lead times associated with U.S. sales and the fluctuations in steel prices from month to month over the past several years. Kaptan sets it prices based, in part, on the cost of input scrap.[5] The price of scrap varied significantly from month to month during the POR. *See* Prelim. Analysis Memo at Attach. 1, C.R. 360, P.R. 121.  Given that there was a difference of more than [      ] between the invoice date and the contract date for certain POR U.S. sales, the variance in the price of scrap between the date of contract and the date of invoice can be substantial. Case Brief at Exh. 1, C.R. 377, P.R. 136.  The variation between scrap price (and relatedly, rebar price) at the time of the contract versus the time of the invoice ranges from [      ] percent. *Id.*  If Kaptan were to allow changes to the material terms of the contract, *i.e.* the price or quantity, between the contract and invoice date, there would thus be a [      ] percent "mismatch" between the cost of the material used to produce rebar and the final price of rebar sold in the United States. *Id.*  Because it must purchase the raw materials at the price available on

---

[5] There is a strong correlation between the price of scrap and the price of rebar. *Compare* Sec. D QR at Exh. D-3, C.R. 71, P.R. 62 (showing price of scrap), *with* Supp. Sec. D QR at Exh. S2-52, C.R. 254, P.R. 101 (showing price of rebar). Commerce acknowledged this correlation in its quarterly cost test, which analyzed the "change in cost of [
        ]." Prelim. Analysis Memo at 2-3 and Attach. 1, C.R. 359, 360, P.R. 121. Though "the cost of scrap did not exceed 25 percent between quarters" to warrant an alternative cost reporting methodology, Commerce's analysis reveals that the raw material prices did fluctuate significantly. *Final IDM* at 21, P.R. 150.

23

the contract date, Kaptan must necessarily set the price and quantity at the time of the contract to ensure consistency between the raw materials price and the finished rebar sold in the U.S.

These implications of steel price volatility resulted in an amendment to Kaptan's sales process in the current POR following a massive increase in steel prices, during which the price of rebar and scrap increased by nearly 45%, creating significant uncertainty and confusion among the suppliers and customers in the market. Supp. A-C QR at 27, C.R. 180, P.R. 89. To prevent negative impacts on its business due to changes "in raw material supply, production planning, and sales scheduling processes, due to frequent requests for renegotiation," Kaptan's Board of Directors amended its export sales procedures to provide that:

    i.  [
                                    ];
    ii. [
                                    ]; and
    iii. [
                                        ].

*Id.*; *see also* Case Br. at 20, C.R. 377, P.R. 136.  The amendment explicitly stated that

[




        ] Supp. A-C QR at Exh. S1-40 (emphasis added), C.R. 186, P.R. 89.  Consistent with this resolution, which took effect on

[                    ], each contract in effect during the POR was [

                    ] were approved in accordance with the

resolution.  3rd&4th Supp. QR at Exh. S3-14, C.R. 335, P.R. 117.

In past cases, Commerce has found a company's "deci{sion} to fix the U.S. sales terms with the order acknowledgment to guarantee price stability for its U.S. sales" as the basis, in part, for its finding that the invoice date was not the appropriate date of sale. *CTL Plate from Romania IDM* at 8.  Moreover, where, as here, a respondents' "export sales process differs from the domestic sales process in that: 1) orders are always in written form; 2) a contract is signed after confirmation of the order; 3) merchandise is sold on a theoretical-weight basis; and 4) merchandise is always produced to order," the contract date has been found to be the appropriate date of sale.  *Nucor*, 612 F. Supp. 2d at 1301 (citation omitted).  This is because neither the respondent, nor its "buyers could have had any reasonable expectation that the material terms of sale for the made-to-order rebar . . . sold to the U.S. would vary in any respect from those specified in the parties' contracts." *Id.* at 1310.

Here, the Commerce similarly "failed to justify its use of the same date of sale for both . . . home market sales and its U.S. sales, given that the sales and production processes used for the two markets 'differ markedly'" *id.* at 1311, and in light of the binding nature of Kaptan's contracts. Sec. C. QR at Exh. C-6.a, C.R. 48, P.R. 61; Supp. A-C QR at Exh. S1-40, C.R. 186, P.R. 89.  Use of contract date as the date of sale in this instance is a neutral approach, consistent with the terms of the Board resolution. In instances where the price of raw materials used to produce rebar rises sharply, the fixing of price at the date of the contract benefits Kaptan's U.S. customers. Where the price of raw materials declines, however, Kaptan benefits from the price being determined at the contract date. The intent of Kaptan's Board in adopting this policy was to balance the risk of steel price volatility between the contracting parties. The Court should direct Commerce to do the same in adopting the contract date as the date of sale.

3.      **Commerce's Determination Is Unsupported By Record Evidence**

Even though the material terms of Kaptan's U.S. sales were established in the contract, Commerce found the earlier of shipment or invoice date to be the appropriate date of sale.  *Final IDM* at 13, P.R. 150.  As an initial matter, while Commerce notes that its determination is "in accordance with Commerce's practice," as detailed above, Commerce's practice with regards to date of sale has been inconsistently applied and should not be given deference by this Court.  *Id.* at 21.

In support of its determination, Commerce cites four primary factors, each of which is contradicted by record evidence and should be dismissed:

First, Commerce takes issue with the fact that "Kaptan never stated that its export sales process changed or provided documentation to demonstrate a change in its sales process" until Commerce "requested that Kaptan 'provide a detailed explanation of any changes in Kaptan's sales process since the prior administrative review.'" *Id.* at 16 (citation omitted).  But because the date of sale is a factual determination, Commerce has stated that its finding in one review is not binding on a subsequent review and reliance on determinations in a prior segment alone would be antithetical to Commerce's longstanding practice of treating each review as an independent, separate proceeding.  *See Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1385 (Fed. Cir. 2014) ("Our review is limited to the record before Commerce in the particular review proceeding at issue{.}").  There is nothing in the regulations to suggest that Commerce can or should rely on a prior segment of a proceeding to determine date of sale in a later segment of a proceeding, *see* 19 C.F.R. § 351.401(i), and Commerce is not bound by findings in the previous review where "the facts in the instant review and the previous review are not identical." *CTL Plate from Romania IDM* at 9; *see also Polyethylene Terephthalate Resin From the Sultanate of Oman*, 87 Fed. Reg. 75594 (Dep't Commerce Dec. 9, 2022) (final AD results; 2020-2021), and

accompanying Issues and Decision Memorandum at 3. ("{D}ate of sale determinations in previous segments of a proceeding are not binding on subsequent segments of the proceeding."). The facts on *this* record support a decision different from prior reviews. Commerce previous findings that Kaptan's material terms of sale are subject to change up to the date of invoice or shipment were premised on Kaptan's "post-contract amendments after the written contracts" and on "more than one instance of the material terms of sale changing after the contract date," neither of which occurred in the instant case. *Steel Concrete Reinforcing Bar From the Republic of Turkey*, 87 Fed. Reg. 7118 (Dep't Commerce Feb. 8. 2022) (final AD results & determ. no shipments; 2019-2020) ("*19-20 Rebar Final Results*"), and accompanying Issues and Decision Memorandum at 20; *Steel Concrete Reinforcing Bar From the Republic of Turkey*, 88 Fed. Reg. 7941 (Dep't Commerce Feb. 7, 2023) (final AD results & no shipments determ.; 2020-2021) ("*20-21 Rebar Final Results*"), and accompanying Issues and Decision Memorandum at 10 ("*20-21 Rebar from Turkey IDM*"). Moreover, to the extent "the fact that there had been no change to sales processes which had previously resulted in using the invoice date, although not determinative itself, supports the presumption of using the invoice date as the date of sale," *Kaptan*, 693 F. Supp. 3d at 1374–75. Commerce has acknowledged changes to Kaptan's sales process in the instant POR "to require that export sales contracts be approved by the board." *Final IDM* at 16, P.R. 150. Commerce's findings in the previous review periods are thus not relevant in this POR.

Second, Commerce claims that "the record does indicate that the board's internal resolution [                    ] material terms of the sale." Memorandum from B. Ballesteros to The File, re: Final Results Analysis Memorandum for Kaptan Demir Celik Endustrisi Ve Ticaret A.S./Kaptan Metal Dis Ticaret Ve Nakliyat A.S. at 2 (Dec. 20, 2023), C.R.

27

382, P.R. 151 ("Final Analysis Memo").  This finding is contradicted by the facts on the record

in this case. The language in the Board resolution explicitly prohibits changes from occurring to

the material terms of sale after the contract date such that all material terms of sale are set in the

contract. Commerce misinterprets that language in the Board resolution, which provides that

"[

],," to mean that the "internal resolution allows [

]. *Id.* As detailed above, however, [

], with the latter periodically constituting a material

term by Commerce, while the former never has.  *See,* Footnotes 1 & 4, *supra*. Commerce also

erroneously claims that "Kaptan has not provided any evidence that this change was

communicated to its U.S. customers." *Final IDM* at 16, P.R. 150.  But the language in the

resolution itself provides that the [

].  Supp. A-C QR at 27 and Exh. S1-40, C.R. 180, 186, P.R. 89-90.  It also

ignores that Kaptan provided the Board approval for *every* U.S. export sale, and for a scrap

purchase contract, necessarily indicating that the change was communicated and actionable for

Kaptan's U.S. sales during the POR.  *Id.*; 3rd&4th Supp. QR at Exh. S3-14, C.R. 335, P.R. 117.

Kaptan's contracts during the POR were binding and there were no post contract amendments or

other changes to the material terms of sale after the contract date because such amendments were

prohibited.[6] Sec. C QR at Exh. C-6.b, C.R. 48-49, P.R. 61; Supp. A-C QR at Exh. S1-40, C.R.

186, P.R. 89-90.

---

[6] Though Commerce seemingly takes issue with the fact that Kaptan did not present this
document until its supplemental questionnaire response, Commerce cannot ignore relevant facts
Kaptan timely placed on the record. *Final IDM* at 16, P.R. 150. Contrary to Commerce's claims,
the record does not contain "contradicting statements," but additional information to clarify and
better support Kaptan's initial statement that "during the POR, all major terms of sale, including

Third, Commerce alleges that "the record does not indicate that the contract date represents the date on which the parties had a true meeting of the minds because Kaptan's sales contracts continue to include language indicating to its buyers that changes could be made." Final Analysis Memo at 2, C.R. 382, P.R. 151.  As support, Commerce cites form language in Kaptan's sales contracts, which provides that [


]. *Id.* (citation omitted). Commerce has previously found such standard, boilerplate language in contracts to be "of no real significance." *Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States*, 625 F. Supp. 2d 1339, 1376 (Ct. Int'l Trade 2009).  Regardless, Commerce's conclusion that this "language continue{s} to allow changes to the material terms of the sale," Final Analysis Memo at 2, ignores the plain language of the Board resolution, which explicitly provides that [

] and that any [

] Supp. A-C QR at Exh. S1-40, C.R. 186, P.R. 89-90.  Read in combination with the provision identified by Commerce in Kaptan's sales contracts, which requires signed approval for any modification, it is clear any requested change to the material terms of the contract will be denied. Commerce's *Final AD Results* puts form over substance, and does not accord proper weight to all of the record evidence. As the CIT has recognized, Commerce's designation of the invoice date as the date of sale does not comport with the record where, as here, "none of the material terms could change after the initial purchase order was executed without all parties' consent." *Borusan*, 426 F. Supp. 3d at 1403.

---

the price, quantity, size breakdown, and the latest date of shipment, were finalized on the date of the contract and did not change between the invoice and contact date." *Id.* at 16; Sec. C QR at C-19-20, C.R. 48, P.R. 61.

Finally, Commerce alleges that "a material term of sale was not established on the contract date" because sales contract [                    ] "was signed [

                    ]." Final Analysis Memo at 2-3, C.R. 382, P.R. 151.  This statement is misleading and ignores record evidence provided by Kaptan showing that the size breakdown was established in the contract. Though, as Commerce notes, the draft version of contract [                    ] initially provided in Kaptan's Section A response states that the size breakdown [                         ], Sec. A QR at Exh. A-7, C.R. 7, P.R. 45, the final version of the contract provided in Kaptan's Section C response indicates that the size breakdown is [                    ] Sec. C QR at Exh. C-6.b, C.R. 48-49, P.R. 61.  As Kaptan explained, this discrepancy is simply due to the form of the contract initially provided – [

                    ]. Supp. A-C QR at 29, C.R. 180, P.R. 89.  Regardless, both versions of the contract provided to Commerce include an attached size breakdown list,  Sec. A QR at Exh. A-7; Sec. C QR at Exh. C-6.b, and shipment quantities for the individual sizes specified in the attachment and the overall contract quantity were within the tolerance of the contract. Sec. C QR at Exh. C-6.a, C.R. 48, P.R. 61.  As Kaptan has clearly stated and certified to Commerce officials, "{t}he size breakdown of Kaptan's U.S. sales is *not* determined after the contract date." Supp. A-C QR at 29; Case Br. at 26, C.R. 377, P.R. 136 (emphasis in original). Commerce has ignored this clarification in finding that "the size breakdown is not always included with the sales contract [                    ]." Final Analysis at 2-3.  There is thus no evidence on the record to support Commerce's conclusion that "a material term of sale was not established on the contract date."  *Id.* at 3; *see also, Final IDM* at 16.

The record before Commerce and the Court is clear: all material terms of sale for all POR sales were finalized on the date of the contract and were *always* consistent with the final invoice, within permissible tolerances. Sec. C QR at Exh. C-6a-b, C.R. 48-49, P.R. 61.  Though Commerce seems to impute significance to the fact "Kaptan's sales contracts terms and conditions allow for revisions and/or modifications," *Final IDM* at 16, as detailed above, such

[                                                      ] and Kaptan's Board of Directors has

[

]. Supp. A-C QR at Exh. S1-40, C.R. 186, P.R. 89-90.  The CIT has rejected the exact type of "hypothetical reasoning that {a} contractual change {could} potentially allo{w a respondent} to manipulate the 'product mix'" Commerce provides as rationale for its date of sale finding.  *Nakornthai*, 614 F. Supp. 2d at 1332.  Commerce cannot "use speculative or hypothetical reasoning to support its conclusions" where, as here, "there was no actual breach of contract." *Id.*

Because the invoiced price and overall quantity for all U.S. sales during the POR did not and could not change from the agreed upon terms in the contract, the contract date is the appropriate date of sale.

## 4.    The Chosen Date of Sale Methodology Yields An Absurd Result

The CIT has found that "{m}ere compliance with regulations cannot trump what appears to be an absurd result." *Viraj Grp., Ltd. v. United States*, 162 F. Supp. 2d 656, 662 (Ct. Int'l Trade 2001).  Commerce's improper and unreasonable use of the invoice date, rather than the contract date, in this review results in an antidumping margin that is nearly 7 percent higher than

the rates in the previous four administrative reviews combined.[7] While the average of Kaptan's

margin in each of the four previous administrative reviews is 4.73 percent, *id.*, the margin

calculated for Kaptan in the instant review has increased by more than 20 percent to 25.86

percent. *Final AD Results*, 88 Fed. Reg at 89663, P.R. 154. This dramatic increase is directly

correlated to the changes in the price of input scrap at the time of order versus the time of

invoice, as detailed above. *See* Case Brief at Exh. 1, C.R. 377, P.R. 136 (showing differences

from [       ] percent between scrap price at the time of the contract versus the time of the

invoice).  Though, as Commerce emphasizes, these "raw material costs did not fluctuate to the

extent that would warrant an alternative cost reporting methodology," *Final IDM* at 21, P.R. 150,

they have a distortive impact on the margin where the invoice date is used as the date of sale.

Commerce's methodology puts the full burden of scrap price volatility on Kaptan, which does

not comport with the record or commercial reality. Kaptan makes a decision to sell rebar at a

specific price point based on the price of scrap at that time, not when the invoice is issued more

than [          ] later.[8] *See* Case Brief at Exh. 1.

---

[7] *20-21 Rebar Final Results*, 88 Fed. Reg. at 7942 (Dep't Commerce Feb. 7, 2023) (calculating a final margin for Kaptan of 5.51 percent); *19-20 Rebar Final Results*, 87 Fed. Reg. at 7119 (calculating a final margin for Kaptan of 1.02 percent); *Steel Concrete Reinforcing Bar From the Republic of Turkey*, 86 Fed. Reg. 28574, 28574 (Dep't Commerce May 27, 2021) (final AD restuls & no shipments determ.; 2018-2019) (calculating a final margin for Kaptan of 12.41 percent); *Steel Concrete Reinforcing Bar From the Republic of Turkey*, 85 Fed. Reg. 15765, 15766 (Dep't Commerce Mar. 19, 2020) (final AD results; 2017-2018) (calculating a final margin for Kaptan of 0.00 percent).

[8] In its *Final AD Results*, Commerce claims that Kaptan's home market sales, which are generally made from inventory, "would presumably be affected by the price of input scrap at the time of production versus the time of invoice after sitting in inventory{.}" *Final IDM* at 21. However, the average inventory turnover for Kaptan is only [       ]. *See* Sec. B QR at Exhibit B-11, C.R. 29, P.R. 60.

Both the CIT and the CAFC have consistently held that Commerce is under a duty to determine dumping margins as accurately as possible. *See, e.g.*, *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995); *Allied Tube I*, 127 F. Supp. 2d at 218. As the CIT has confirmed, "flexibility in Commerce's date of sale analysis is a natural corollary of Commerce's overarching obligation to determine dumping margins as accurately as possible." *Nucor*, 612 F. Supp. 2d at 1308. Commerce's date of sale methodology in the *Final AD Results* leads to the calculation of inaccurate and absurd margins for Kaptan and should be rejected by the Court.

**B.    Commerce's Calculation of the DIFMER Adjustment Creates Distortive Timing Impacts**

It is longstanding Commerce practice that the per unit cost differences for the reported cost of production for different CONNUMs should only reflect differences between product characteristics and should not be impacted by other factors, particularly timing differences. *See, e.g.*, *Certain Carbon and Alloy Steel Cut-To-Length Plate From Belgium*, 85 Fed. Reg. 3028 (Dep't Commerce Jan. 17, 2020) (final AD results; 2017-2018), and accompanying Issues and Decision Memorandum at 25. This ensures that the DIFMER adjustment is properly calculated and is particularly important where the dumping margin is calculated primarily by comparing prices of similar, rather than identical CONNUMs, as is the case in this proceeding.

For example, in *Certain Hot-Rolled Steel Flat Products From the Republic of Korea*, 84 Fed. Reg. 32720 (Dep't Commerce Jul. 9, 2019) (final AD results; 2016-2017), and accompanying Issues and Decision Memorandum, Commerce applied a methodology to ensure that "the DIFMER adjustment . . . reflect the physical characteristics of the products whose sales prices are used in Commerce's dumping calculations." *Id.* at 11, 67. Likewise in *Certain Corrosion-Resistant Steel Products From the Republic of Korea*, 84 Fed. Reg. 10784 (Dep't

Commerce Mar. 22, 2019) (final AD results; 2016-2017), and accompanying Issues and

Decision Memorandum, Commerce found that "CONNUM cost differences {were} affected by

processing and timing differences," and "smooth{ed} costs across certain physical

characteristics" as a result. *Id.* at 44.

Though, neither of these cases involve high inflation, it does not inherently follow, as

Commerce concludes, that reliance on them is "misplaced." *Final IDM* at 23, P.R. 150.  Unlike

the regular COP/CV reporting, Commerce's instruction in the high inflation Section D

questionnaire is to report <u>monthly</u> per unit costs for each CONNUM. *See generally* Sec. D QR,

C.R. 71-97, P.R. 62.  Because the weight averaging is done by using these reported monthly

costs, the month to month differences in production quantities between a U.S. CONNUM and a

matching similar comparison market CONNUM skew the cost difference. Where, as here, the

U.S. CONNUM is produced in higher volumes in the months where the unit cost is higher

compared to the comparison market CONNUM, the per unit cost of the U.S. CONNUM

increases and the DIFMER adjustment is significantly inflated.

This is especially evident in high inflation situations where the costs increase

dramatically month to month, as shown in the price comparison between U.S. CONNUM [

] and the matching similar CM CONNUM [          ] below:

- The reported DIFMER for U.S. CONNUM [              ] and HM similar
  CONNUM [          ] pair range from [          ] of the reported
  U.S. CONNUM TOTCOM but after averaging and indexing, this ratio goes up to
  [     ] more than five times the initially reported *highest* DIFMER;

- The reported DIFMER for U.S. CONNUM [              ] and HM similar
  CONNUM [          ] pair range from [              ] of the reported
  U.S. CONNUM TOTCOM but after averaging and indexing, this ratio goes up to
  [     ] more than ten times the initially reported *highest* DIFMER.

Case Brief at Exh. 2, C.R. 377, P.R. 136. Here, in the initially reported monthly costs, the

DIFMER is *negative,* which has the impact of decreasing the normal value. However, after

averaging and indexing, the DIFMER turns positive. This highly distortive impact, which is nonsensical and has no basis in the record or market reality, is caused purely by timing and has nothing to do with the differences in physical characteristics.

Though Commerce maintains that its "intent, whether smoothing costs or implementing the high inflation methodology, is to be consistent in conducting the sales-below-cost test and calculating CV and the DIFMER," *Final IDM* at 24, this singular focus ignores the "overriding purpose of Commerce's administration of antidumping laws{, which} is to calculate dumping margins as accurately as possible." *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1379 (Fed. Cir. 2013) (citing *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990)).  Commerce's desire to avoid "a piecemeal approach to {its} high inflation method," *Final IDM* at 23, cannot trump its statutory obligation to determine dumping margins as accurately as possible.  *See, e.g.*, *NTN Bearing*, 74 F.3d at 1208; *Allied Tube I*, 127 F. Supp. 2d at 218.  As Commerce admits, "the difference in costs between products may not be large," *Final IDM* at 23, but, as shown above, the distortions Commerce has introduced in trying to account for those costs are. Instead, Commerce should simply calculate and use a monthly DIFMER adjustment from <u>unindexed</u> submitted per unit costs, which reflect the true cost differences and are not impacted by timing differences. Case Brief at Exh. 3, C.R. 377, P.R. 136.

## C.    Commerce Should Recalculate Icdas's Assigned Dumping Margin If Kaptan's Rate Changes Pursuant to Litigation

Icdas hereby adopts and incorporates by reference the arguments related to date of sale and DIFMER adjustment filed by Kaptan to the extent they challenge or impact the determination of the all-others' rate.

To the extent that Commerce recalculates Kaptan's rates as a result of this litigation, it must redetermine the "all-others" rate applied to Icdas and other non-selected respondents in

accordance with the statute. *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, Consol. Court No. 19-00056, 2020 WL 2613345, *5 (Ct. Int'l Trade May 22, 2020) ("Pursuant to 19 U.S.C. § 1673d(c)(5)(A), Commerce may set the all-others rate when a 'mandatory respondent{'s} rate{} change{s} in the course of judicial review'") (quoting *U.S. Steel Corp. v. United States*, 348 F. Supp. 3d 1248, 1254 (Ct. Int'l Trade 2018)); *Linyi Chengen Imp. & Exp. Co. v. United States*, 391 F. Supp. 3d 1283, 1297 (Ct. Int'l Trade 2019) ("Because the court remands the *Final Determination* with respect to Commerce's calculation of {respondent's} rate, as stated above, the court grants the Separate Rate Respondents' Rule 56.2 motions for judgment on the agency record . . . {and} Commerce is instructed on remand to reconsider the rate applied to the Separate Rate Respondents based on any changes to {respondent's} margin on remand."); *see also* 19 U.S.C. § 1673d(c)(5)(A)(i) ("{T}he estimated all-others rate shall be an amount equal to the weighted average of the estimated weighted average dumping margins established for exporters and producers individually investigated, excluding any zero and de minimis margins," or margins based entirely on facts available).

Icdas reserves the right to comment further on the all-others' rate if the rates for the mandatory respondent or the all-others' rate are recalculated on remand based on this litigation.

## VI.    CONCLUSION

For the reasons set forth above, Kaptan and Icdas request that this Court:

1. Hold that Commerce's *Final AD Results* were not in accordance with law or were not supported by substantial evidence with respect to the date of sale and DIFMER adjustment issues set forth above;

2. Remand the *Final AD Results* to Commerce with instructions to reconsider the date of sale for U.S. sales, recalculating Kaptan's AD rates as appropriate;

3.  Remand the *Final AD Results* to Commerce with instructions to recalculate the DIFMER adjustment and Kaptan's AD rates as appropriate; and

4.  Instruct Commerce to reconsider the "all-others" rate applied to non-selected respondents to the extent that the rates for the mandatory respondents change as a result of this litigation.

5.  Grant such additional relief as the Court may deem just and proper.

Respectfully submitted,

**/s/ Leah N. Scarpelli**

Leah N. Scarpelli
Jessica R. DiPietro
Matthew M. Nolan

ArentFox Schiff LLP
1717 K Street, NW
Washington, DC 20006
Tel: (202) 857-6013

*Counsel for Kaptan Demir Celik Endustrisi ve Ticaret A.S.* and *Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S.*

July 23, 2024

37

## CERTIFICATE OF COMPLIANCE

Pursuant to the Court's Standard Chamber Procedure 2(b)(1), the undersigned certifies that Plaintiffs' Brief in Support for Their 56.2 Motion for Judgment on the Agency Record filed on July 23, 2024 complies with the word limitation requirement. The word count for Plaintiffs' Brief, as computed by Arent Fox LLP's word processing system is 12,194.


**/s/ Leah N. Scarpelli**
Leah N. Scarpelli

*Counsel for Kaptan Demir Celik Endustrisi ve Ticaret A.S.* and *Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S.*

AFDOCS:200673155.1

## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE JANE A. RESTANI

| | |
|---|---|
| KAPTAN DEMIR CELIK ENDUSTRISI VE TICARET A.S., | ) ) ) |
| *Plaintiff*, | ) ) ) |
| ICDAS CELIK ENERJI TERSANE VE ULASIM SANAYI, A.S., | ) ) ) |
| *Plaintiff-Intervenor*, | ) ) ) |
| HABAS SINAI VE TIBBI GAZLAR ISTIHSAL ENDUSTRISI A.S., | ) ) Court No. 24-000018 |
| *Proposed Plaintiff-Intervenor*, | ) ) |
| v. | ) ) |
| THE UNITED STATES, | ) ) |
| *Defendant*, | ) ) |
| and | ) ) |
| REBAR TRADE ACTION COALITION, | ) ) |
| *Defendant-Intervenor*. | ) ) |

### <u>ORDER</u>

Upon consideration of the motion of Plaintiff Kaptan Demir Celik Endustrisi ve Ticaret A.S. ("Kaptan") and Plaintiff-Intervenor Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. ("Icdas") (collectively, "Plaintiffs") for Judgment upon the agency record pursuant to USCIT Rule 56.2, and upon consideration of all other papers and proceedings herein, it is hereby

**ORDERED** that the motion of Plaintiffs' is granted; and it is further

**ORDERED** that, on remand, the U.S. Department of Commerce is instructed to reconsider the date of sale with respect to U.S. Sales, recalculating Kaptan's AD rates as appropriate; and it is further

**ORDERED** that, on remand, the U.S. Department of Commerce is instructed to recalculate the DIFMER adjustment and Kaptan's AD rates as appropriate; and it is further

**ORDERED** that, on remand, the U.S. Department of Commerce is instructed to reconsider the "all-others" rate applied to non-selected respondents to the extent that the rates for the mandatory respondents change as a result of this litigation.

**SO ORDERED**.

_____
                    Jane A. Restani, Judge

Date: _____, 2024
          New York, New York