NON-CONFIDENTIAL VERSION

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| |
|---|
| **KAPTAN DEMIR CELIK ENDUSTRISI VE TICARET A.Ş.,** |
| **Plaintiff,** |
| **and** |
| **ICDAS CELIK ENERJI TERSANE VE ULASIM SANAYI A.Ş.,** |
| **Plaintiff-Intervenor,** |
| **v.** |
| **UNITED STATES,** |
| **Defendant,** |
| **and** |
| **REBAR TRADE ACTION COALITION,** |
| **Defendant-Intervenor.** |

Before: Hon. Jane A. Restani,
    Senior Judge

Court No. 24-00018

<u>NON-CONFIDENTIAL VERSION</u>

Business Proprietary Information
Removed from Pages: 7-11, 26, 28-31

<u>**REBAR TRADE ACTION COALITION'S RESPONSE TO PLAINTIFF'S
MOTION FOR JUDGMENT ON THE AGENCY RECORD**</u>

Alan H. Price, Esq.
John R. Shane, Esq.
Maureen E Thorson, Esq.
Stephen A. Morrison, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the Rebar Trade Action Coalition*

Dated: September 20, 2024

## TABLE OF CONTENTS

Page

I.    INTRODUCTION ..................................................................................................1

II.   RULE 56.2 STATEMENT .....................................................................................1

      A.    Administrative Determination Under Appeal ...........................................1

      B.    Issues of Law Presented ...........................................................................2

      C.    Request for Court Order and Relief Sought..............................................2

III.  LEGAL AND FACTUAL BACKGROUND .........................................................2

      A.    Kaptan's Date of Sale ...............................................................................2

            i.    The Importance of the Date of Sale in Antidumping Duty
                  Calculations.................................................................................. 2

            ii.   Kaptan's U.S. Date of Sale .......................................................... 7

      B.    Commerce's DIFMER Application ..........................................................11

            i.    Legal Background ...................................................................... 11

            ii.   Factual Background .................................................................... 15

IV.   STANDARD OF REVIEW ..................................................................................16

V.    SUMMARY OF ARGUMENT ............................................................................17

VI.   ARGUMENT........................................................................................................19

      A.    Commerce's Date of Sale Selection is Supported by Substantial
            Evidence and is Otherwise in Accordance with Law ............................19

            i.    The Supreme Court's Decision in *Loper Bright* Does Not
                  Apply to Commerce's Determination .......................................... 19

            ii.   Even if *Loper Bright* Applies, Commerce's Interpretation
                  "Date of Sale" is in Accordance with Law ................................ 20

            iii.  Commerce's Determination to Use the Invoice Date as the
                  Date of Sale is Supported by Substantial Evidence .................. 27

            iv.   Commerce's Date of Sale Determination Did Not Yield
                  Absurd Results ........................................................................... 32

      B.    Commerce's Calculation of the DIFMER Adjustment to Account
            for High Inflation is Supported by Substantial Evidence and is
            Otherwise in Accordance with Law........................................................34

VII.  CONCLUSION.....................................................................................................41

Ct. No. 24-00018                                              NON-CONFIDENTIAL VERSION

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied Tube and Conduit Corp. v. United States,*
    24 CIT 1357, 127 F. Supp. 2d 207 (2000) .................................................................... *passim*

*Ceramica Regiomontana, S.A. v. United States,*
    810 F.2d 1137 (Fed. Cir. 1987) ................................................................................ 17

*Chevron U.S.A., Inc. v. N.R.D.C., Inc.,*
    467 U.S. 837 (1984) ........................................................................................... 17, 20

*Consolo v. Fed. Mar. Comm'n,*
    383 U.S. 607 (1966) ............................................................................................ 16

*CP Kelco US, Inc. v. United States,*
    24 F. Supp. 3d 1337 (Ct. Int'l Trade 2014) ............................................................ 16

*F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States,*
    216 F.3d 1027 (Fed. Cir. 2000) ............................................................................ 20

*Dongtai Peak Honey Indus. Co. v. United States,*
    777 F.3d 1343 (Fed. Cir. 2015) ............................................................................ 16

*Hynix Semiconductor, Inc. v. United States,*
    424 F.3d 1363 (Fed. Cir. 2005) ............................................................................. 5

*I.N.S. v. Elias-Zacarias,*
    502 U.S. 478 (1992) ......................................................................................... 16, 26

*Loper Bright Enters. v. Raimondo,*
    144 S. Ct. 2244 (2024) ........................................................................................ *passim*

*Matsushita Elec. Indus. Co. v. United States,*
    750 F.2d 927 (Fed. Cir. 1984) ............................................................................ 16, 26

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ............................................................................................. 17

*Nakornthai Strip Mill Pub. Co. v. United States,*
    32 CIT 553, 558 F. Supp. 2d 1319 (Ct. Int'l Trade 2008) ...................................... 20

*Nucor Corp. v. United States,*
    33 CIT 207, 612 F. Supp. 2d 1264 (Ct. Int'l Trade 2009) .................................. 22, 23

*Sac Endustrisi A.S. v. United States*,
   256 F. Supp. 3d 1260 (Ct. Int'l Trade 2017) ................................................4, 18, 27

*Sac Endustrisi A.S. v. United States*,
   348 F. Supp. 3d 1321 (Ct. Int'l Trade 2018) ...........................................................19

*Smith-Corona Grp. v. United States*,
   713 F.2d 1568 (1983).................................................................................................20

*Thai Pineapple Canning Indus. Corp. v. United States*,
   273 F.3d 1077 (Fed. Cir. 2001)................................................................................12

*Tibbi Gazlar Isithal Ensutrisi A.S. v. United States*,
   33 CIT 695, 625 F. Supp. 2d 1339 (Ct. Int'l Trade 2009).......................................30

*Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*,
   693 F. Supp. 3d 1368 (Ct. Int'l Trade 2024) ..........................................6, 25, 27, 28

*Universal Camera Corp. v. N.L.R.B.*,
   340 U.S. 474 (1951)..................................................................................................16

*Viraj Group, Ltd. v. United States*,
   162 F. Supp. 2d 656 (Ct. Int'l Trade 2001) .............................................................33

*Viraj Grp., Ltd. v. United States*,
   343 F.3d 1371 (Fed. Cir. 2003)................................................................................33

*Yieh Phui Enter. Co. v. United States*,
   35 CIT 1122, 791 F. Supp. 2d 1319 (2011) ...............................................................4

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i).............................................................................................16

19 U.S.C. § 1677b-1 .............................................................................................................3

19 U.S.C. § 1677b-1(a) .........................................................................................................3

19 U.S.C. § 1677b(a)(6)(C)(ii) ......................................................................................13, 34

19 U.S.C. § 1677b(b)(3)(A) ................................................................................................12

19 U.S.C. § 1677f-1(d) ...................................................................................................2, 11

19 U.S.C. § 3512(d) .........................................................................................................3, 17

19 U.S.C. § 1677b(a)(1) ..................................................................................................2, 11

19 U.S.C. § 1677b(a)(1)(A) ..................................................................................................3

Ct. No. 24-00018                                          NON-CONFIDENTIAL VERSION

**Regulations**

19 C.F.R. § 351.401(i) ................................................................................4, 21, 23

19 C.F.R. § 351.411 ........................................................................................13, 34

**Administrative Materials**

*Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296
(Dep't Commerce May 19, 1997) ................................................................4, 10, 21

*Certain Cold Rolled Steel Flat Products From the Republic of Korea*,
84 Fed. Reg. 24,083 (Dep't Commerce May 24, 2019) .......................................12

*Certain Corrosion-Resistant Steel Products From the Republic of Korea*,
84 Fed. Reg. 10,784 (Dep't Commerce Mar. 22, 2019) .......................................40

*Certain Cut-to-Length Carbon Steel Plate from Romania*,
72 Fed. Reg. 6,522 (Dep't Commerce Feb. 12, 2007)..........................24, 25, 26, 28

*Certain Hot-Rolled Steel Flat Products From the Republic of Korea*,
84 Fed. Reg. 32,720 (Dep't Commerce July 9, 2019) ..........................................40

*Circular Welded Carbon Steel Pipes & Tubes From Thailand*,
77 Fed. Reg. 61,738 (Dep't Commerce Oct. 11, 2012)..........................24, 25, 28

*Circular Welded Carbon Steel Pipes and Tubes From Thailand*,
78 Fed. Reg. 65,272 (Oct. 31, 2013).....................................................................21

*Circular Welded Carbon Steel Standard Pipe and Tube Products from Turkey*,
86 Fed. Reg. 15,190 (Dep't Commerce Mar. 22, 2021) .............................12, 14, 37

*Honey from Argentina*,
73 Fed. Reg. 24,220 (Dep't Commerce May 2, 2008) .................................5, 6, 28

*Large Diameter Welded Pipe From Greece*,
84 Fed. Reg. 6,364 (Dep't Commerce Feb. 27, 2019)............................................5

*Oil Country Tubular Goods From Korea*,
65 Fed. Reg. 13,364 (Dep't Commerce Mar. 13, 2000) ......................................6, 28

*Polyethylene Terephthalate Resin From the Sultanate of Oman*,
87 Fed. Reg. 75,594 (Dep't Commerce Dec. 9, 2022) ............................................5

*Raw Honey From Argentina*,
87 Fed. Reg. 22,179 (Dep't Commerce Apr. 14, 2022)........................14, 15, 34, 39

*Silicomanganese From Brazil*,
    69 Fed. Reg. 13,813 (Dep't Commerce Mar. 24, 2004) ..........................................................37

*Steel Concrete Reinforcing Bar From the Republic of Turkey*,
    88 Fed. Reg. 89,663 (Dep't Commerce Dec. 28, 2023) ........................................1, 10, 15, 41

*Steel Concrete Reinforcing Bar From the Republic of Turkey*,
    88 Fed. Reg. 50,100 (Dep't Commerce Aug. 1, 2023)................................................... *passim*

*Steel Concrete Reinforcing Bar From the Republic of Turkey*,
    88 Fed. Reg. 7,941, 7,942 (Dep't Commerce Feb. 7, 2023)..................................................32

*Steel Concrete Reinforcing Bar From the Republic of Turkey*,
    87 Fed. Reg. 7,118, 7,119 (Dep't Commerce Feb. 8, 2022)..................................................32

*Steel Concrete Reinforcing Bar From the Republic of Turkey*,
    86 Fed. Reg. 28,574, 28,575 (Dep't Commerce May 27, 2021) ...........................................32

*Steel Concrete Reinforcing Bar From the Republic of Turkey*,
    85 Fed. Reg. 15,765, 15,766 (Dep't Commerce Mar. 19, 2020) ...........................................32

*Welded Line Pipe From the Republic of Korea*,
    83 Fed. Reg. 33,919 (Dep't Commerce July 18, 2018) ........................................................28

## Other Authorities

Uruguay Round Agreements Act, Statement of Administrative Action,
    H.R. Doc. No. 103-316, vol. 1, (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040 .............. *passim*

Import Admin. Policy Bulletin No. 92.2 (July 29, 1992) ...........................................13, 14, 15, 34

## I.    **INTRODUCTION**

On behalf of the Rebar Trade Action Coalition ("RTAC"),[1] we respectfully submit the following response to the opening brief filed by plaintiff Kaptan Demi Celik Endustrisi ve Ticaret A.S. ("Kaptan") and plaintiff-intervenor Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. ("Icdas"). *See* Confid. Pl.'s Mot. for J. on the Agency R. and Accompanying Mem. of P. & A. Pursuant to Rule 56.2 (July 23, 2024), ECF No. 42 ("Kaptan's Br.").

## II.    **RULE 56.2 STATEMENT**

### A.    **Administrative Determination Under Appeal**

This action arises from the 2021-2022 administrative review of the antidumping duty order on steel concrete reinforcing bar ("rebar") from Turkey. *See Steel Concrete Reinforcing Bar From the Republic of Turkey*, 88 Fed. Reg. 89,663 (Dep't Commerce Dec. 28, 2023) (final results of antidumping duty admin. rev.; 2021-2022), P.R. 154[2] ("*Final Determination*"), and accompanying Issues and Decision Memorandum, P.R. 150 ("I&D Memo"). Kaptan was selected as one of two mandatory respondents in the review. *See* Letter from Robert Copyak, Senior Int'l Trade Compliance Analyst, AD/CVD Operations, Off. VII and Jose Rivera, Int'l Trade Compliance Analyst, AD/CVD Operations, Off. VII, through Lana Nigro, Program Manager, AD/CVD Operations, Off. VII, to Shawn Thompson, Acting Senior Director, AD/CVD Operations, Off. VII, re: *Respondent Selection Memorandum for Administrative Review of the Antidumping Duty Order*

---

[1]    The individual members of the Rebar Trade Action Coalition are Byer Steel Group, Inc., Commercial Metals Company, Gerdau Ameristeel U.S. Inc., Nucor Corporation, and Steel Dynamics, Inc.

[2]    References made herein to the confidential administrative record ("C.R.") and public administrative record ("P.R.") correspond to the document numbers as filed by the U.S. Department of Commerce ("Commerce") with the court on Apr. 4, 2024.  *See* Administrative Record Index (Apr. 4, 2024), ECF Nos. 29-1 and 29-2.

1

*on Steel Concrete Reinforcing Bar from the Republic of Turkey; 2021-2022* (Oct. 7, 2022), C.R.

5, P.R. 29.

### B.    Issues of Law Presented

This appeal presents the following issues:

1.  Whether Commerce's decision to use the earlier of the invoice or shipment date as
    Kaptan's date of sale was lawful, where the decision was supported by substantial
    record evidence, consistent with agency practice, and otherwise in accordance with
    law; and

2.  Whether Commerce's Differences-in-Merchandise ("DIFMER") analysis was
    supported by substantial record evidence and consistent with agency practice.[3]

### C.    Request for Court Order and Relief Sought

RTAC respectfully requests that the court deny Kaptan and Icdas's motion for summary

judgment and affirm Commerce's final results.

## III.    LEGAL AND FACTUAL BACKGROUND

### A.    Kaptan's Date of Sale

####     i.    The Importance of the Date of Sale in Antidumping Duty Calculations

In calculating antidumping duty margins, Commerce compares the above-cost prices for

goods sold in the respondent companies' home market (*i.e.*, "normal value") with the prices that

they charge for the same or similar goods in the U.S. market (*i.e.*, "export price"). 19 U.S.C.

§ 1677f-1(d); *see also id.* § 1677a(a); § 1677b(a)(1). The Tariff Act of 1930 ("the Act"), as

amended through the Uruguay Round Agreements Act ("URAA"), directs that "normal value" for

---

[3]    Plaintiffs also raise the question of whether, should the margin for Kaptan be redetermined
pursuant to this appeal, Icdas's margin as a company not selected for individual examination
should be redetermined accordingly. Kaptan's Br. at 35-36. RTAC does not dispute this point.
However, as discussed herein, Commerce acted lawfully in calculating the margin for Kaptan,
such that there is no basis for any change to Icdas's margin.

purposes of such comparisons must reflect the "time of the sale" used to determine "export price." *Id.* § 1677b(a)(1)(A).[4]

In *Allied Tube and Conduit Corp. v. United States*, 24 CIT 1357, 127 F. Supp. 2d 207 (2000), this court observed that while the Act, as amended by the URAA, does not define the phrase "time of the sale,"[5] 19 U.S.C. § 3512(d) nonetheless states that the Statement of Administrative Action ("SAA") accompanying the URAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the {URAA and the Act} in any judicial proceeding in which a question arises concerning interpretation or application." *Allied Tube*, 24 CIT at 1368, 127 F. Supp. 2d at 216-17. Relevantly to the question of when a sale is deemed to occur under the statute, the URAA states that normally, "the date of sale would be the date of contract, purchase order, order confirmation or invoice, whichever establishes the material terms of sale." *Id.* at 1368, 127 F. Supp. 2d at 217 (quoting *Agreement on the Implementation of Article VI of the General Agreements on Tariffs and Trade 1994*, Article 2.4.1 n.8). In this regard, the SAA specifies that a sale occurs on the "date when the material terms of sale are established." *Id.* (quoting Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 810 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4153). Accordingly, Commerce is required under the law to treat a sale as occurring when material terms are established. *Id.* at 1368-70, 127 F. Supp. 2d at 217-19.

---

[4]    Separately, 19 U.S.C. § 1677b-1(a), regarding currency conversions, states that such conversion are to be made using the exchange rate in effect "on the date of sale" of the subject merchandise.

[5]    Neither does the amended Act define the phrase "date of sale" as used in 19 U.S.C. § 1677b-1.

To implement the unambiguous statutory directive, Commerce has promulgated regulations stating that that the agency "normally will use the date of invoice" as the "date of sale of the subject merchandise," unless it "is satisfied that a different date better reflects the date on which the exporter or producer establishes the material terms of sale." 19 C.F.R. § 351.401(i). In promulgating its regulation, Commerce explained that the date of sale is not intended to be the date on which material terms are first established, but the date on which they are finally, firmly established and thus no longer changeable. *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,348-49 (Dep't Commerce May 19, 1997) (final rule) ("*Preamble*") (noting that "the date on which the terms of a sale are first agreed is not necessarily the date on which those terms are finally established," but often "remain negotiable" through invoicing). As such, Commerce will use a date other than invoice date only if it is "presented with satisfactory evidence that the material terms of sale are finally established on a date other than the date of invoice." *Id.* at 27,349. The agency has cautioned that:

> A preliminary agreement on terms, even if reduced to writing, in an industry where renegotiation is common does not provide any reliable indication that the terms are truly "established" in the minds of the buyer and seller. This holds even if, for a particular sale, the terms were not renegotiated.

*Id*. Further, because the party advocating for a non-invoice date of sale must present satisfactory evidence that the non-invoice date better reflects the final and firm material sales terms, a party appealing Commerce's reliance on invoice date must show that the proposed alternative is the only reasonable choice for the date of sale. *Toscelik Profil ve Sac Endustrisi A.S. v. United States*, 256 F. Supp. 3d 1260, 1263 (Ct. Int'l Trade 2017); *Yieh Phui Enter. Co. v. United States*, 35 CIT 1122, 1126, 791 F. Supp. 2d 1319, 1324 (2011).

In assessing claims that a date other than the invoice date should be used, Commerce looks to whether material terms remain "change{able}" through invoice date. *See* Issues and Decision

4

Memorandum accompanying *Polyethylene Terephthalate Resin From the Sultanate of Oman*, 87 Fed. Reg. 75,594 (Dep't Commerce Dec. 9, 2022) (final results of antidumping duty admin. rev.; 2020-2021) at cmt. 1 (quoting Issues and Decision Memorandum accompanying *Honey from Argentina*, 73 Fed. Reg. 24,220 (Dep't Commerce May 2, 2008) (final results of antidumping duty admin. rev. and deter. not to revoke in part) at cmt. 2 ("*Honey from Argentina* IDM") ("The relevant question in this case, as in any date of sale determination, is whether the material terms of sale were subject to change as of contract date, not whether the terms actually changed after contract date . . . .")); Issues and Decision Memorandum accompanying *Large Diameter Welded Pipe From Greece*, 84 Fed. Reg. 6,364 (Dep't Commerce Feb. 27, 2019) (final deter. of sales at less than fair value) at cmt. 2 n.60 (adhering to invoice date after noting that the respondent "was unable to provide a definitive time at which it no longer accepted changes and the purchase order became final").

The date of sale, as indicated above, influences the comparison of home market and U.S. sales. The date of sale also controls which U.S. and home-market sales are treated as having occurred within a specific period of review ("POR"), and thus subject to that POR's administrative review. *See, e.g.*, *Hynix Semiconductor, Inc. v. United States*, 424 F.3d 1363, 1368-69 (Fed. Cir. 2005) (upholding Commerce's practice of calculating dumping margins based on sales made during a particular POR). For example, where invoice date is used, goods contracted for before the POR but invoiced within the POR will be treated as subject to the review. Where contract date is used, goods invoiced after the POR but contracted for before the POR's end will be treated as subject to the review. As a result, to the extent that the agency switches between dates of sale for the same respondent across immediately successive reviews, sales may completely escape the antidumping calculation (as when invoice date is used in one POR, but contract date in the next),

or, alternatively, be double-counted across reviews (as when contract date is used in one POR, but invoice date in the next). *See* Issues and Decision Memorandum accompanying *Oil Country Tubular Goods From Korea*, 65 Fed. Reg. 13,364 (Dep't Commerce Mar. 13, 2000) (final results of antidumping duty admin. rev.) at cmt. 1 ("*Korea OCTG* IDM") ("To avoid . . . double-counting or omitting sales, {Commerce} must be particularly cautious about changing a long-standing date-of-sale determination.").

   Thus, while each review has its own record, the selection of a respondent's date of sale in a given review has implications for succeeding reviews and the administration of an antidumping duty order as a whole. This is not to say that a respondent's sales process or experience can never change so significantly between reviews as to justify a change in the approach to date of sale. But where the record does not reflect changes in overall selling processes from past reviews, for example, it is reasonable for the agency to continue to use the date of sale it used in past reviews. *Honey from Argentina* IDM at cmt. 2 ("Typically, the Department does not change its date of sale methodology for a given respondent unless it finds that a prior date of sale determination was made erroneously, or the respondent changed its business practices."); *Korea OCTG* IDM at cmt. 1 ("The date of sale determination should not be changed from review to review without evidence of changes in a company's business or marketing practices."). Nor is the agency bound to discontinue reliance on invoice date where the record of a specific review shows that, as in prior reviews, material sales terms remained changeable through invoicing or were, in fact, altered through the date of invoicing. *See, e.g.*, *Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*, 693 F. Supp. 3d 1368, 1374-75 (Ct. Int'l Trade 2024).

### ii.    Kaptan's U.S. Date of Sale

In this review, Kaptan reported, as it had in previous reviews, that the date of its U.S. sales during the POR was the contract date. *See* Letter from ArentFox Schiff LLP to Sec'y Commerce, re: *Steel Concrete Reinforcing Bar from the Republic of Turkey: Kaptan's Response to the Department's Section A Questionnaire* (Nov. 7, 2022), C.R. 7-17, P.R. 45 at A-20 ("AQR"). While reporting that parties could amend material terms of sale post-contracting, including the size breakdown and quantity of the order, *id.* at A-23, Kaptan also claimed that no changes to material terms of sale in fact occurred for any of its U.S. sales after contracts were signed. *See* Letter from ArentFox Schiff LLP to Sec'y Commerce, re: *Steel Concrete Reinforcing Bar from the Republic of Turkey: Kaptan's Resp. to the Department's Section C Questionnaire* (Dec. 8, 2022), C.R. 48-50, P.R. 61 at C-19–C-20 ("CQR").

Kaptan later informed Commerce that prior to the POR, Kaptan's board of directors had amended its export sales procedures to [                                                    ]. *See* Letter from ArentFox Schiff LLP to Sec'y Commerce, re: *Steel Concrete Reinforcing Bar from the Republic of Turkey: Kaptan's Response to the Department's Supplemental Sections A-C Questionnaire* (June 1, 2023), C.R. 180-195, P.R. 89-90 at 27 and Exhibit S1-40 ("SACQR"). In support of this claim, Kaptan submitted a copy of the board resolution stating that "[


]." *Id.* at 28 and Exhibit S1-40. Along with this resolution, Kaptan submitted a copy

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

of a board approval for a U.S. sale of [                                        ],

pursuant to [                         ]. *Id.*[6]

Notwithstanding the board resolution, the terms of [                    ] and

other contracts that Kaptan submitted for the record contained language expressly stating that

[                                   ]. *See* CQR at Exhibit C-6.b ([

    ]). Further, Kaptan submitted [                              ]. CQR

at Exhibit C-6.b; AQR at Exhibit A-7 (providing a copy of a contract [

                                        ]). In [

        ] the [              ] stated [                             ], while [

    ], the [                              ]. *Compare* AQR at Exhibit

A-7, *with* CQR at Exhibit C-6.b; *see also* Memorandum from Benito Ballesteros, Int'l Trade

Compliance Analyst, Enf't & Compliance, through Robert Copyak, Program Manager, Off. IX,

Enf't & Compliance, to The File re: *Antidumping Duty Administrative Review of Steel Concrete*

*Reinforcing Bar from the Republic of Turkey: Final Results of Analysis Memorandum for {Kaptan}*

(Dec. 20, 2023), C.R. 382, P.R. 151 at 2-3 ("Kaptan Final Analysis Memo"). While Kaptan stated

that [

---

[6]    Kaptan later submitted copies of additional board approvals pertaining to certain other
contracts. *See* Letter from ArentFox Schiff LLP to Sec'y Commerce, re: *Steel Concrete*
*Reinforcing Bar from the Republic of Turkey: Kaptan's Responses to the Department's Third and*
*Fourth Supplemental Questionnaires* (July 20, 2023), C.R. 332-336, P.R. 117 at 11-12 and Exhibit
S3-14 ("July 20 QR"). While Kaptan claims to have submitted the board approvals for "every U.S.
export sale," Kaptan's Br. at 28 (emphasis removed), this does not appear to be true based on the
documents that it cites for the proposition. SACQR at Exhibit S1-40 (providing board approval for
[                        ]); July 20 QR at 11-12 and Exhibit S3-14 (providing board
approvals for [              ]; *see also* CQR at Exhibit C-6.a (identifying [
        ]) and Exhibit C-6.b ([                                    ]).

], SACQR at 29, [

                                        ]. AQR at Exhibit A-7; CQR at Exhibit C-6.b.

The record was also unclear as to [

                                    ]. The [                    ] Kaptan placed on the record

for this contract states that [

            ]. SACQR at Exhibit S1-40. Nor did the [

            ].[7] *Id.* Tellingly, the [



                        ]. *Id.*

    The page numbering of the [                                        ] and the page

numbering of the related [                ] also indicated that the [            ] was [

                                            ]. [



                            ]. AQR at Exhibit A-7; CQR at Exhibit C-6.b. [



        ] indicating that the [

                    ] were not prepared [                ]. AQR at Exhibit A-7; CQR at

Exhibit C-6.b.

---

[7]      The approval document is in the form of a [

                                    ]. SACQR at Exhibit S1-40. The [
                                                ]. RTAC notes that
[                                        ] have the date [
                                    ]. AQR at Exhibit A-7; CQR at Exhibit C-6.b.

**BUSINESS PROPRIETARY INFORMATION HAS BEEN DELETED**

Further, [                                    ] reference the sale/purchase of

[                                                              ], but did not

detail [

            ]. AQR at Exhibit A-7; CQR at Exhibit C-6.b. By contrast, the [


                                                ]. CQR at Exhibit C-

6.b.

Finally, the record was not clear regarding when [

        ] was signed. [                ] were dated [

                            ]. AQR at Exhibit A-7; CQR at Exhibit C-6.b. Other

record documents indicated that the [                                    ] did not

necessarily [                        ]. For example, Contract [                ] had the date

[

        ]. *See* CQR at Exhibit C-6.b. Several other contracts on the record had such discrepancies

as well, indicating that the [                        ] was not conclusive as to when the parties

agreed to the terms of the contract. *See id.*

In its *Final Determination*, Commerce treated invoice date (or shipment date, whichever

was earlier) as Kaptan's U.S. date of sale, notwithstanding the company's arguments in favor of

selecting contract date. *See* I&D Memo at 13-21. Commerce explained the rationale behind its

preference, enshrined in its regulations, for using the earlier of the shipment or invoice date as the

date of sale. *Id.* at 13 (referencing the *Preamble*, 62 Fed. Reg. at 27,348-49). Commerce then

explained that the record did not contain satisfactory evidence that the contract date was the

appropriate date of sale. Commerce first noted the discrepancy between Kaptan's Section A and

Section C responses, in which it stated that the parties could amend the shipment date, size breakdown, and quantity of U.S. sales through the date of invoicing/shipment, *id.* at 15, and Kaptan's supplemental questionnaire response, in which Kaptan averred that due to its board of directors' modification to Kaptan's export sales process, its U.S. sales contracts established all material terms and could not be changed. *Id.* at 16. Commerce also noted that the record lacked evidence that the change in Kaptan's export sales process was communicated to U.S. customers, and that the sales contracts themselves contained language contemplating changes to material terms of sale after signing. *Id.* Further, Commerce noted that the record contained evidence that the material terms of sale were not established on the contract date because the size breakdown was not always included with the contract. *Id.* Thus, Commerce determined that, despite Kaptan's board resolution stating that [                                                                    ], the record demonstrated that changes to the material terms of these contracts still could, and in fact *did* occur, during the POR. *See id.* at 16-17.

### B.    Commerce's DIFMER Application

#### i.    Legal Background

As noted above, Commerce calculates dumping margins by comparing normal value – the above-cost prices for goods sold in the respondent companies' home market – with export price, *i.e.*, the prices that respondents charge for the same or similar goods in the U.S. market. 19 U.S.C. § 1677f-1(d); *see also id.* § 1677a(a); § 1677b(a)(1).

Because normal value excludes below-cost sales, Commerce must determine whether any of a respondent's home-market sales during the POR fell below the cost of production ("COP"). The agency must therefore determine the COP of the goods that the respondent sold in its home market. While the URAA and statute do not specify exactly the time period over which Commerce

is to calculate COP, they nonetheless require Commerce's calculation to reflect "a period which would ordinarily permit the production of that foreign like product in the ordinary course of business." 19 U.S.C. § 1677b(b)(3)(A); *see also Thai Pineapple Canning Indus. Corp. v. United States*, 273 F.3d 1077, 1083-88 (Fed. Cir. 2001).

The agency's typical practice is to calculate a weighted average COP for each product model or "CONNUM,"[8] sold by the respondents across the entire POR, with production quantity as the weighting factor. *See, e.g.*, Issues and Decision Memorandum accompanying *Certain Cold Rolled Steel Flat Products From the Republic of Korea*, 84 Fed. Reg. 24,083 (Dep't Commerce May 24, 2019) (final results of antidumping duty admin. rev.; 2016-2017) at cmt. 3; Letter from Lana Nigro, Program Manager, AD/CVD Operations, Office VII, to Kaptan Demir Celik Endustrisi ve Ticaret A.S. and Kaptan Metal Dis Ticaret Ve Nakliyat A.S., re: *Administrative Review of the Antidumping Duty Order Steel of Concrete Reinforcing Bar from the Republic of Turkey: Initial Questionnaire for Kaptan* (Oct. 7, 2022), P.R. 30 at D-1 – D-2 ("IQR").

However, in countries experiencing high inflation, Commerce's practice is to calculate the COP on a monthly basis, as POR-wide increases in nominal costs could otherwise distort its calculations. *See, e.g.*, Issues and Decision Memorandum accompanying *Circular Welded Carbon Steel Standard Pipe and Tube Products from Turkey*, 86 Fed. Reg. 15,190 (Dep't Commerce Mar. 22, 2021) (final results of antidumping duty admin. rev. and final deter. of no shipments; 2018-2019) at 9-10 ("*Turkish Pipe* IDM"); *see also* Letter from ArentFox Schiff LLP to Sec'y

---

[8]     Commerce often refers to individual product models as "CONNUMs." *See* I&D Memo at 23. This is an abbreviation of "control number." *Id.* at 2. Individual "control numbers" are determined for each distinct model of subject merchandise sold in the home and U.S. markets based on the relevant product characteristics for the goods subject to an order. *See, e.g.*, CQR at C-9 – C-10 (instructing Kaptan to identify each model of goods sold in the U.S. market based on specific, rank-ordered physical characteristics).

Commerce, re: *Steel Concrete Reinforcing Bar from the Republic of Turkey: Kaptan's Response to the Department's Section D High Inflation Questionnaire* (Dec. 8, 2022), C.R. 71, P.R. 62 at D-1 – D-3 ("DQR").

Regardless of whether the agency is calculating COP using its typical POR-wide approach, or based on monthly indexed costs, the agency will then compare the COP that it has calculated to the respondent's home-market sales prices for those goods. Sales prices that fall below the COP are dropped from consideration; those that remain form the basis for normal value. At this point, Commerce moves on to comparing the normal value with export prices.

Where the respondent sold the same CONNUMs in both markets, Commerce will simply compare the normal value for the CONNUM with export prices for the CONNUM. But where the respondent sold different goods in the two markets, the agency must determine which home-market CONNUMs are most like those sold in the United States. As part of this analysis, the agency seeks to understand what cost differences between similar-but-not-identical home-market and U.S. CONNUMs arise from the distinct physical differences in the products. It will then adjust the home-market CONNUM's normal value to account for these differences, so that these differences do not distort its comparison. *See* 19 C.F.R. § 351.411; 19 U.S.C. § 1677b(a)(6)(C)(ii); Import Admin. Policy Bulletin No. 92.2 (July 29, 1992), *available at* https://access.trade.gov/Resources/policy/bull92-.txt ("Policy Bulletin").

Typically, this "differences-in-merchandise" or "DIFMER" analysis, and any corresponding adjustments to normal value, are based on the variable production costs for each product model produced during the review period. *See* Policy Bulletin; 19 C.F.R. § 351.411.[9] If

---

[9]    In particular, if the variable costs of the U.S.-market CONNUM are higher than the home-market CONNUM, a reduction equal to the difference will be made to the normal value of each

Commerce determines that the DIFMER adjustment exceeds 20% of manufacturing cost, it will find that the two CONNUMS are too dissimilar to permit reasonable comparisons of normal value and export price, and will seek to match the home-market CONNUM with a different U.S. CONNUM. If there are no CONNUMS that pass the 20% test, the agency will abandon normal value for the home-market CONNUM, and instead proceed to determine a constructed value for the U.S. CONNUM, which will then be compared with export price. *See* Policy Bulletin.

Just as Commerce makes adjustments to its typical COP calculations in cases involving high-inflation economies, the agency also adjusts its approach to the DIFMER analysis. *See* Issues and Decision Memorandum accompanying *Raw Honey From Argentina*, 87 Fed. Reg. 22,179 (Dep't Commerce Apr. 14, 2022) (final deter. of sales at less than fair value and final affirm. deter. of critical circumstances) at 27 ("*Raw Honey from Argentina Investigation* IDM"). In such cases, the agency determines dumping margins by comparing normal value and export prices for sales made within the same month. *See, e.g.*, Preliminary Decision Memorandum accompanying *Steel Concrete Reinforcing Bar From the Republic of Turkey*, 88 Fed. Reg. 50,100 (Dep't Commerce Aug. 1, 2023) (prelim. results of antidumping duty admin. rev.; 2021-2022), P.R. 120 at 7, 19-20 ("PDM").

But where non-identical products are sold in the home and U.S. markets, inflation can distort the comparisons to the extent that home-market and/or U.S. CONNUMs are sold in a different month than they are produced. Further, in economies experiencing high inflation, nominal costs across months cannot be reasonably compared unless they are restated into similar currency values. *See, e.g.*, *Turkish Pipe* IDM at 9-10. Further, because the DIFMER analysis is based on

---

home-market sale of that CONNUM. If the variable costs are lower, a corresponding addition will be made to the normal value of each home-market sale of that CONNUM.

variable cost differences among non-identical product models, the DIFMER analysis should comport with the way that variable costs (which form part of COP) are calculated. *See* Policy Bulletin; *Raw Honey from Argentina Investigation* IDM at 27-28. Accordingly, consistent with its approach to the overall calculation of COP in countries experiencing high inflation, Commerce's practice is to perform its DIFMER adjustments with respect to such countries using costs indexed on a monthly rather than a POR basis.

### ii. Factual Background

In the *Preliminary Determination*, Commerce found that Turkey experienced high inflation during the POR. PDM at 19-20. To avoid distortions caused by high inflation, it calculated a POR average cost by inflating reported nominal monthly COP data to the end of the POR using the Turkish Producer Price Index ("PPI"), and then restated the POR-average COP to the PPI-level of each month during the POR to obtain monthly indexed COPs. *See id.* at 19. Commerce used these monthly indexed COPs in conducting its DIFMER analysis.

In its case brief, Kaptan argued that Commerce's high inflation cost methodology created timing-related distortions in the DIFMER analysis. *See* Letter from ArentFox Schiff LLP to Sec'y Commerce, re: *Steel Concrete Reinforcing Bar from the Republic of Turkey: Kaptan's Case Brief* (Aug. 31, 2023), C.R. 377, P.R. 136 at 31-33. In the *Final Determination*, Commerce responded that it was unable to calculate a monthly DIFMER from unindexed per unit costs. I&D Memo at 23. Commerce explained that just as costs are affected by high inflation, "DIFMER is likewise affected by this high inflation since the DIFMER adjustment is calculated as the difference in the variable costs between similar CONNUMs." *Id.* Commerce further explained that in countries experiencing high inflation, the nominal value of production costs increase over time, even where

those costs remain constant in real terms, and that this was true for all production costs used in the agency's sales-below-cost test and margin calculations, including DIFMER. *Id.*

## IV.    **STANDARD OF REVIEW**

The U.S. Court of International Trade reviews Commerce's decisions in antidumping duty proceedings to determine whether those decisions are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 477 (1951). It is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966); *see Dongtai Peak Honey Indus. Co. v. United States*, 777 F.3d 1343, 1349 (Fed. Cir. 2015). The courts have framed the substantial evidence standard as a review for "reasonableness," in which "the{e} court's function is merely to ascertain 'whether there was evidence which could reasonably lead to the {agency's} conclusion.'" *CP Kelco US, Inc. v. United States*, 24 F. Supp. 3d 1337, 1344-45 (Ct. Int'l Trade 2014) (quoting *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984)).

The court does not re-weigh the evidence on the record and decide the case for Commerce anew. *See Matsushita Elec.*, 750 F.2d at 933. Rather, factual findings by Commerce are afforded considerable deference. *See I.N.S. v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992) (stating that in fact-intensive situations, agency conclusions should be reversed only if the record contains evidence "so compelling that no reasonable factfinder" could reach the same conclusion). And the court must "uphold a decision of less than ideal clarity if the agency's path may reasonably be

discerned." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Ceramica Regiomontana, S.A. v. United States*, 810 F.2d 1137, 1139 (Fed. Cir. 1987). As such, Commerce need only "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43.

The court will uphold a determination that is consistent with the agency's statutory authority. Where Commerce's regulations and actions are consistent with Congressional intent, the court will uphold Commerce's determinations. *See Allied Tube*, 24 CIT at 1367-71, 127 F. Supp. 2d at 216-19. Where Congress's intent "is clear, that is the end of the matter," and the court will interpret the statute accordingly. *See Chevron U.S.A., Inc. v. N.R.D.C., Inc.*, 467 U.S. 837, 842 (1984); *see also Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2263 (2024) (specifying that the goal of statutory interpretation is to "effectuate the will of Congress").

## V.    <u>SUMMARY OF ARGUMENT</u>

Kaptan and Icdas challenge three aspects of Commerce's final results: (1) the use of invoice/shipment date as Kaptan's U.S. date of sale, (2) the agency's calculation of Kaptan's DIFMER adjustment and (3), on the basis that the prior two issues are in error, the agency's calculation of Icdas's margin as a respondent not selected for individual examination.

Kaptan challenges Commerce's determination to use the earlier of invoice/shipment date as Kaptan's U.S. date of sale on three grounds. First, Kaptan argues that Commerce's definition of "date of sale" does not reflect the best meaning of the term, and that the court should interpret the statute independently. Kaptan's Br. at 10-20. But as prior case law observes, Commerce's definition reflects Congress's "authoritative expression" of intent regarding the term's meaning. *See Allied Tube*, 24 CIT at 1368, 127 F. Supp. 2d at 217 (quoting 19 U.S.C. § 3512(d)). For that matter, Kaptan does not put forward any alternative interpretation; rather, it attempts to address

substantial evidence questions under the guise of arguing about statutory interpretation. In any event, Commerce's interpretation of the term "date of sale," as reflected in its regulations, is in accordance with law.

Second, Kaptan argues that Commerce's reliance on invoice/shipment date is unsupported by substantial record evidence. Kaptan's Br. at 20-31. To prevail on this claim, however, Kaptan must show that no reasonable reading of the record supports Commerce's selection. *See, e.g.*, *ArcelorMittal*, 302 F. Supp. 3d at 1375-76; *Toscelik*, 256 F. Supp. 3d at 1263. Kaptan has failed to meet this burden. Instead, Commerce reasonably interpreted the information on the record of this review to find that Kaptan post-contracting changes could and did affect material terms of sale during the POR.

Third, Kaptan argues that Commerce's use of the invoice date in this review led to absurd results, *i.e.*, a margin that was higher than what Kaptan received in prior reviews. Kaptan's Br. at 31-33. Kaptan fails to show that it is facially "absurd" for a respondent in an antidumping duty proceeding to receive a higher margin in a particular segment of that proceeding than in other segments. Nor does it establish that the margin here was driven uniquely by the date-of-sale determination. Even if it could do so, this would not render a margin that is calculated consistently with the statute and on the basis of substantial record evidence "absurd."

Kaptan also challenges Commerce's calculation of the DIFMER adjustment, arguing that it creates distortive timing differences that are not in line with Commerce's established practice. *Id.* at 33-36. But agency precedent, upheld by this court, shows that Kaptan's claim is patently incorrect.

Because Commerce did not err in either its date of sale selection or calculation of the DIFMER adjustment, Icdas's challenge to its margin calculation as a company not selected for individual examination also fails.

## VI.    ARGUMENT

### A.    Commerce's Date of Sale Selection is Supported by Substantial Evidence and is Otherwise in Accordance with Law

Kaptan challenges Commerce's use of the earlier of invoice/shipment date as the company's U.S. date of sale on three grounds. First, relying on the recent decision of the U.S. Supreme Court in *Loper Bright Enterprises v. Raimondo*, it argues that the agency's interpretation of the term "date of sale" does not reflect the term's best meaning, and that the court should independently construe the term. Second, it argues that Commerce's date of sale selection is not supported by substantial record evidence. Third, it argues that the agency's selection produced absurd results. As detailed below, none of these arguments is compelling.

### i.    The Supreme Court's Decision in *Loper Bright* Does Not Apply to Commerce's Determination

Contrary to Kaptan's assertions, the U.S. Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024) is inapposite here. Commerce's selection of the appropriate "date of sale" in this case arose from the agency's resolution of a question of fact as to when material terms of Kaptan's U.S. sales were firmly and finally established, rather than its interpretation of a statute. *See, e.g.*, I&D Memo at 13-21; PDM at 7-9. The reasonableness of Commerce's selection accordingly hinges on whether that selection is supported by substantial record evidence. *See, e.g.*, *Toscelik Profil ve Sac Endustrisi A.S. v. United States*, 348 F. Supp. 3d 1321, 1326 (Ct. Int'l Trade 2018).

As further detailed in Section (ii) below, to the extent that Commerce's selection of the date of sale involved any interpretation of the URAA and/or the Act, that interpretation reflected Congress's "unambiguous{ly}" expressed intent that the date of sale must reflect the "date when the material terms of sale are established." *See Allied Tube*, 24 CIT at 1367-74, 127 F. Supp. 2d at 216-21; *see also* SAA at 810, 1994 U.S.C.C.A.N. at 4153. While *Loper Bright* stands for the proposition that it is the courts' prerogative to interpret statutes, that purpose of such interpretation is to "effectuate the will of Congress." *Loper Bright*, 144 S. Ct. at 2263. Here, there is no need for the court to construe the statute anew, as Congress has "authoritatively" expressed its intent and the agency's date of sale regulations and selection of a date of sale based on the record evidence conform with that intent. *See Allied Tube*, 24 CIT at 1367-74, 127 F. Supp. 2d at 216-21.

Finally, even if it were not clear that any statutory interpretation that Commerce may have made here was entirely consistent with Congress's will, Commerce's "special expertise makes it the 'master' of the anti-dumping law, entitling its decisions to great deference from the courts." *F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000); *see also Smith-Corona Grp. v. United States*, 713 F.2d 1568, 1571 (1983) (stating that Commerce is entrusted with responsibility for implementing trade laws and "has broad discretion in executing the law"). This deference to Commerce's expertise has been long established and pre-dates "*Chevron* deference." *See Smith-Corona Grp.*, 713 F.2d at 1568 (pre-dating *Chevron U.S.A. Inc. v. N.R.D.C.*, 467 U.S. 837 (1984)). Commerce's treatment of a sale as occurring at the time that material terms of sale are finally established, I&D Memo at 14, deserves deference.

### ii.    Even if *Loper Bright* Applies, Commerce's Interpretation "Date of Sale" is in Accordance with Law

The term "date of sale" is not explicitly defined in the Act, as amended by the URAA. *See, e.g., Allied Tube*, 24 CIT at 1367, 127 F. Supp. 2d at 216. *Nakornthai Strip Mill Pub. Co. v. United*

*States*, 32 CIT 553, 559-60, 558 F. Supp. 2d 1319, 1325 (Ct. Int'l Trade 2008). However, the SAA expresses Congress's intent that this date reflect the date on which the parties established the material terms of sale. SAA at 810, 1994 U.S.C.C.A.N. at 4153. Recognizing that the date on which material terms of sale are established will vary with the facts of each case, Commerce's regulations contemplate that the date of sale will be determined on a case-by-case basis. *See Preamble*, 62 Fed. Reg. at 27,349; *see also* 19 C.F.R. § 351.401(i).

In promulgating 19 C.F.R. § 351.401(i), Commerce understood that "as a matter of commercial reality, the date on which the terms of sale are first agreed is not necessarily the date on which those terms are finally established" and that price and quantity are often negotiated until a sale is invoiced. *Preamble*, 62 Fed. Reg. at 27,348-49. Commerce noted that in its experience, material sales terms often remained flexible until the invoice was issued. *Id.* at 27,349. However, Commerce realized that this would not always be the case and thus contemplated that parties might place evidence on the record establishing that the material terms of the sale were established prior to the invoice date. *Id.* Thus, Commerce's regulations provide that where substantial evidence supports the finding that material terms were finally established on a date other than invoice date, Commerce will select that date as the date of sale. *See, e.g.*, 19 C.F.R. § 351.401(i); *Preamble*, 62 Fed. Reg. at 27,349; Issues and Decision Memorandum accompanying *Circular Welded Carbon Steel Pipes and Tubes From Thailand*, 78 Fed. Reg. 65,272 (Oct. 31, 2013) (final results of antidumping duty admin. rev.; 2011-2012) at cmt. 6 (finding contract date or amended contract date, as applicable, to be the date of sale).

Beyond this, Commerce's regulatory presumption that the invoice date reflects the best sales date is in accordance with law. While Kaptan characterizes the "best meaning" of the statute as allowing for selection of either invoice date or contract date, Kaptan's Br. at 12, this is exactly

what Commerce's date of sale regulation permits. As the courts have stated, Commerce's date of sale regulation does not "tie {Commerce's} hands" with respect to selecting the invoice date — the invoice date "is merely the starting point of Commerce's analysis," consistent with the "statutory mandate" that the agency select the date that reflects when material sales terms were set. *Nucor Corp. v. United States*, 33 CIT 207, 258, 612 F. Supp. 2d 1264, 1307 (Ct. Int'l Trade 2009) (citing *Allied Tube*, 24 CIT at 1367-69, 127 F. Supp. 2d at 216-17). Commerce's regulation recognizes that the agency must determine the date of sale based on the record evidence regarding when material terms of sale are set, and expressly contemplates that parties may place on the record evidence compelling the conclusion that material terms are set on a date other than invoice date. *Allied Tube*, 24 CIT at 1369-71, 127 F. Supp. 2d at 1218-19 (finding Commerce's regulatory presumption in favor of invoice date consistent with Congressional intent because it does not foreclose the possibility of relying on a non-invoice date and expressly permits the parties to offer evidence to rebut the presumption, which the agency must assess in the same way that it considers all record evidence).

Against this background, Kaptan seems to want to have it both ways. On one hand, Kaptan takes issue with Commerce's date of sale regulation, arguing that Commerce's date of sale regulation is too inflexible because it states that Commerce "normally will use the date of invoice" as the date of sale, and thus Commerce has created a "rebuttable" presumption that the invoice date is the date of sale. *See* Kaptan's Br. at 12-13. On the other hand, Kaptan argues that Commerce has taken too much of a case-by-case approach in determining when material terms are set, characterizing Commerce's application of its date of sale methodology as inconsistent. *See id.* at 14-17. It is clear, however, that Commerce's regulation and its practice comply with the URAA and SAA's mandate that Commerce determine the date of sale based on the "date when the material

terms of sale are established." SAA at 810, 1994 U.S.C.C.A.N. at 4153. Commerce may, as a

baseline, rely on the invoice date as the date of sale, *Nucor*, 33 CIT at 257-59, 612 F. Supp. 2d at

1307, but its regulations and practice both reflect Congress's intent that it determine when material

terms are set based on the record before it in each particular case. *See Allied Tube*, 24 CIT at 1369-

71, 127 F. Supp. 2d at 218-19. Commerce's date of sale methodology is therefore not

"inconsistent," it is just fact-specific – as the statute requires.

      For similar reasons, to the extent that Kaptan challenges Commerce's interpretation of what

constitutes a "material" term of sale, or a "material" change in such a term as inconsistent in

general, or as would seem more pertinent to its statutory argument, with the Act/URAA, Kaptan's

Br. at 15-16, Kaptan does not establish that there is any legal error. Rather, what constitutes a

"material" term of sale, or a "material" change to such a term, will necessarily reflect the nature

of the sales and the parties' practices in each case. *See* I&D Memo at 14 ("{W}hen defining the

material terms of sale, Commerce normally focuses on when the price and quantity for a particular

product are set, but it determines what constitutes the material terms of sale on a case-by-case

basis."). And while Congress used the phrase "material terms of sale" in the SAA, it did not explain

or define what terms were to be considered material, or limit the agency to only treating specified

terms as material regardless of the record before it. SAA at 810, 1994 U.S.C.C.A.N. at 4153. Nor

is there anything in the agency's date of sale regulation that requires it to treat only certain terms

as material regardless of the record. 19 C.F.R. § 351.401(i). Likewise, neither the statute nor the

regulation require Commerce to hew to a uniform approach, irrespective of the record before it, in

analyzing the degree to which changes in material terms of sale indicate that those terms have not

yet been established. SAA at 810, 1994 U.S.C.C.A.N. at 4153; 19 C.F.R. § 351.401(i). Rather, the

regulation and the agency's case-by-case analysis of these issues are consistent with Congress's

intent that the agency have flexibility to select the date of sale based on the record evidence regarding when material terms are set. SAA at 810, 1994 U.S.C.C.A.N. at 4153; *Allied Tube*, 24 CIT at 1369-71, 127 F. Supp. 2d at 1218-19.

Kaptan's argument that Congress intended for Commerce to create "a reliable definition," to be used across cases, of what constitutes a "sale," a "material term of sale," a "final agreement," and/or "the absence of any material change to {a material term of sale')" fails for the same reason. Kaptan's Br. at 18-19. While couched as a statutory argument, the true nature of Kaptan's complaint is that the agency did not in this case properly support its determination that Kaptan had not rebutted the presumption in favor of invoice date. *Id.* Especially telling as to this point is that Kaptan itself does not propose any specific "single, best meaning" of the terms that it complains that Commerce has not reliably defined. *Id.* at 17-20 (quoting *Loper Bright*, 144 S. Ct. at 2266).

Further, the cases that Kaptan describes in arguing that the agency has violated the law only underscore the true nature of its complaint, *i.e.*, a substantial evidence challenge. Kaptan avers that in some cases, Commerce has considered whether material terms of sale frequently change between the contract and invoice date. *See* Kaptan's Br. at 15-16 (discussing Issues and Decision Memorandum accompanying *Circular Welded Carbon Steel Pipes & Tubes From Thailand*, 77 Fed. Reg. 61,738 (Dep't Commerce Oct. 11, 2012) (final results of antidumping duty admin. rev.) at 3 ("*CWPT from Thailand* IDM") and Issues and Decision Memorandum accompanying *Certain Cut-to-Length Carbon Steel Plate from Romania*, 72 Fed. Reg. 6,522 (Dep't Commerce Feb. 12, 2007) (notice of final antidumping duty deter. and final partial rescission) at 6-9 ("*CTL Plate from Romania* IDM")). Kaptan also avers that in others – and specifically the case at bar – Commerce has rejected contract date based on a finding that material terms were "subject to change" after contracting. Kaptan's Br. at 16-17 (quoting I&D Memo at 19). These are faulty comparisons that

establish no inconsistency with Congressional intent. At most, they demonstrate that the agency has analyzed distinct records in distinct ways.

In both *CWPT from Thailand* and *CIL Plate from Romania*, Commerce found that there was no evidence of changes in the material terms based on the records before it. In *CWPT from Thailand*, Commerce noted that only one sale during the period of review had a change in quantity, within the specified tolerance, and that the sale "occurred under unusual circumstances." *CWPT from Thailand* IDM at 3. Furthermore, in that case, Commerce had, in past reviews, consistently used the contract date as the date of sale for the respondent, *id.*, further supporting the fact that the contract date was the date on which the material terms were set, *see Kaptan*, 693 F. Supp. 3d at 1374-75 (holding that Commerce could rely on past determinations to supports its date of sale determination). In *CIL Plate from Romania*, although Commerce found that one small sale changed outside of the contractual tolerance, the record confirmed that the order acknowledgement (*i.e.*, contract date) was the date at which the material terms of sale were agreed upon. *CIL Plate from Romania* IDM at 7. Specifically, Commerce found at verification that the order acknowledgement stated explicitly that all parties agreed that there could be no changes in the terms of sale. *Id.* Moreover, the record contained affidavits from U.S. customers declaring that order acknowledgments were understood to be the final agreement on material terms. *Id.*

The records on which these determinations were made are thus significantly different from the record in this case. Unlike *CWPT from Thailand*, here Commerce found that there was evidence that material terms (in particular, the size breakdown) were subject to change. Indeed, as discussed in depth below, the record showed that for at least one contract, the size breakdown, which the CIT has found to be a material term, *Kaptan*, 693 F. Supp. 3d at 1376-77, was not finalized until after the contract date. Furthermore, unlike in *CWPT from Thailand*, in which Commerce had

consistently used the contract date as the date of sale across review periods, in this case it has been Commerce's practice to use the invoice date as Kaptan's date of sale across review periods. And, unlike in *CTL Plate from Romania*, the record here fails to demonstrate that *both* contracting parties were aware of Kaptan's position that the contract terms were binding. While Kaptan placed on the record its internal board resolution that stated [                    ] after the contract date, the terms of the customer-signed contracts that Kaptan submitted for the record contained language expressly stating that [

]. *See* CQR at Exhibit C-6.b ([          ]). For that matter, the [


]. SACQR at S1-40; *see also* July 20 QR at Exhibit S3-14.

      Finally, it bears repeating that even if the records of these cases were not so dissimilar, under the substantial evidence standard of review, it is completely possible for the agency to reach different conclusions so long as a reasonable mind could have reached the same conclusion. *See I.N.S.*, 502 U.S. at 483-84. Commerce's factual determinations under the substantial evidence standard are not required to reflect "best" interpretation of the record, and it is not the court's place to re-examine the factual evidence. *See Matsushita Elec.*, 750 F.2d at 933. Kaptan cannot turn a substantial evidence challenge into a statutory one simply by waving *Loper Bright* at the court. In any event, this court has already found that Commerce's date of sale regulation and its case-by-case assessment of the date on which material terms are set reflect not merely "permissible" interpretations of the statute, but Congress's unambiguous intent. *See Allied Tube*, 24 CIT at 1367-74, 127 F. Supp. 2d at 216-21. There is accordingly nothing for the court to construe anew. *Loper*

*Bright*, 144 S. Ct. at 2263 (specifying that the goal of statutory interpretation is to "effectuate the will of Congress.").

### iii.    Commerce's Determination to Use the Invoice Date as the Date of Sale is Supported by Substantial Evidence

Kaptan challenges Commerce's reliance on invoice date as unsupported by substantial record evidence, arguing that Commerce was required to rely on the contract date as Kaptan's U.S. date of sale in this review, and that the record evidence cited by Commerce is contradicted by the record. Kaptan's Br. at 26. However, as detailed below, Kaptan fails to show that no reasonable mind could have chosen the invoice date as the date of sale. *See Toscelik*, 256 F. Supp. 3d at 1263 (finding that, to invalidate Commerce's date of sale choice under the substantial evidence standard, Plaintiff must show "that a reasonable mind has one, and only one, date of sale choice"); *Allied Tube*, 24 CIT at 1371, 127 F. Supp. 2d at 220 ("Plaintiff, therefore, must demonstrate that it presented Commerce with evidence of sufficient weight and authority as to justify its {date of sale} as the only reasonable outcome."). In making its claim, Kaptan selectively ignores record evidence that Commerce relied on. Furthermore, as in its prior appeal of the 2020-2021 administrative review, Kaptan relies on a narrow view of materiality, in which it assumes that the only material terms of sale are total price and quantity. However, as this court held in that appeal, Commerce may reasonably treat line-item quantity tolerances for the goods being sold as a material term of sale. *See Kaptan*, 693 F. Supp. 3d at 1374-75.

Kaptan first argues that Commerce improperly relied on information from the immediately preceding administrative review to make its determination in this case. *See* Kaptan's Br. at 26-27. However, Commerce did not rely on the prior review to the exclusion of analyzing the record here. Rather, it noted that, in the prior review, material terms were subject to change after the contract date. *See* I&D Memo at 16. Commerce referenced this fact not to come to its determination, but to

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED    **NON-CONFIDENTIAL VERSION**

place into context Kaptan's contradictory statements about its export sales process in the review at bar. *Id.* at 15-16. As this court has previously explained, Commerce may rely on evidence from prior administrative reviews to place into context, and support, its determinations. *See Kaptan*, 693 F. Supp. 3d at 1374-75. In fact, given the potential for changes in date of sale determinations across reviews to result in double-counting or omission of sales, it is common agency practice to explain its date of sale selection in the context of its determination in prior reviews. Commerce has explained that, absent information demonstrating that a respondent's material terms of sale were firmly and finally established on a different date than in prior reviews, it will not change the date of sale. *See Korea OCTG* IDM at cmt. 1; *see also Honey from Argentina* IDM at cmt. 2. As such, while past determinations are not controlling, the agency routinely considers its past date of sale determinations for a particular respondent in assessing requests to deviate from its prior-established treatment of that respondent. Issues and Decision Memorandum accompanying *Welded Line Pipe From the Republic of Korea*, 83 Fed. Reg. 33,919 (Dep't Commerce July 18, 2018) (final results of antidumping duty admin. rev.; 2015-2016) at 36 (comparing sales process in review against sales process in investigation); *CTL Plate from Romania* IDM at 8-9 (contrasting sales process in review against prior-used sales process); *Honey from Argentina* IDM at cmt. 2 (comparing prior review sales process with current review process); *Korea OCTG* IDM at cmt. 1 (explaining importance of comparing past and current review processes and noting no changes); *CWPT from Thailand* IDM at 4 (noting that the current decision as to date of sale was consistent with past determinations as to that same respondent's date of sale).

Kaptan next attempts to reweigh record evidence regarding the date of sale. Kaptan first argues that Commerce's determination that the record did not definitively indicate that Kaptan's internal board resolution [                    ] the material terms of the sale is contradicted by

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

record evidence. Kaptan's Br. at 27-31. Kaptan argues that when the board resolution is read in combination with its sales contracts, it is clear that any changes that its customers proposed to the material terms of its contracts would have been denied. *Id.* at 29.[10] Kaptan also argues that the record demonstrates that all sales contracts included a size breakdown at the time the contract was signed. *Id.* at 30-31. However, the record evidence Kaptan points to does not compel the conclusion that the record could only reasonably read in support of the selection of the contract date, such that Commerce's reliance on the invoice date was in error. Instead, Kaptan relies on a narrow view of what constitutes material terms of sale and ignores the record evidence detracting from its position that the contract date is the only reasonable date of sale.

First, Kaptan does not persuade that the agency was required to weigh the company's board resolution in the way that Kaptan desired. Kaptan suggests that the board resolution, read in tandem with the language of its sales contracts, conclusively proves that it would have rejected any proposed changes to the material terms of its sales contracts. Kaptan's Br. at 29. But as Commerce noted, the contracts themselves contain language that contemplate changes to the material terms of sale. I&D Memo at 16; *see also* Kaptan Final Analysis Memo at 2. Nor did Kaptan place any evidence on the record to demonstrate that the board's resolution was actually communicated to U.S. customers (whether by email, letter, or any other form of communication). *See* I&D Memo at 16. To the contrary, the fact that Kaptan's post-resolution contracts continued to reflect language allowing for changes suggests that this change was *not* communicated to Kaptan's U.S. customers.

---

[10]     Kaptan also accuses Commerce of misinterpreting the language of the board resolution by finding that it "allows [                              ]," rather than only [                              ]. Kaptan's Br. at 28; Kaptan Final Analysis Memo at 2. But Commerce's use of "[                              ]" appears to be a typo, given that it goes on to observe that the board resolution [                              ] *other* material terms of sale." *Id.* (emphasis added).

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

*See* Kaptan Final Analysis Memo at 2.[11] And if this were not enough, Commerce found that there was at least one contract made during the POR that pre-dated the board resolution. *See id.*

Likewise, Kaptan's insistence that sales contract [                    ] contained the [                    ] on the signature date is belied by the record. *See* Kaptan's Br. at 30. As Commerce observed, the record contained a signed version of this contract with an annotation noting that [                                        ]. *See* Kaptan Final Analysis Memo at 2-3. Although Kaptan argues that this was only a draft and not a final version of the contract, *see* Kaptan's Br. at 30, a reasonable mind could conclude otherwise given that the supposed draft was signed by the parties, [

             ]. Kaptan Final Analysis Memo at 2; AQR at Exhibit A-7; CQR at Exhibit C-6.b.

Kaptan further argues that regardless of the discrepancy between the two versions of sales contract [                    ] that it placed on the record, both versions include the size breakdown list, proving that the size breakdown was established at the time of contract signature, notwithstanding the fact that one of the signed contracts states that the [

             ], *see* Kaptan's Br. at 30; *compare* CQR at Exhibit C-6.b, *with* AQR at Exhibit A-7. However, [                    ] on the size breakdown included in either Exhibit A-7 or Exhibit C-6.b; further, the page numbering of the [

---

[11]    Kaptan also suggests that standard, boilerplate language contained in contracts is "of no real significance." Kaptan's Br. at 29 (citing *Habas Sinai ve Tibbi Gazlar Isithal Ensutrisi A.S. v. United States*, 33 CIT 695, 739, 625 F. Supp. 2d 1339, 1376 (Ct. Int'l Trade 2009)). However, in *Habas Sinai*, apart from the boilerplate contractual language, there was "no evidence to the contrary" that Habas or its U.S. customer had changed the contract. *Id.* at 738, 625 F. Supp. 2d at 1375-76. As noted above, here, Commerce has pointed to substantial evidence suggesting that Kaptan *did* modify material terms of its contract after the contract date.

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

] and the page numbering of the related [                    ] indicate that the [

] was [                                                                ].

[

                                                        ]. AQR at Exhibit A-7;

CQR at Exhibit C-6.b. [

                                        ] indicating that the [

                                        ] were not prepared [                    ].

AQR at Exhibit A-7; CQR at Exhibit C-6.b.

Finally, Kaptan argues that Commerce ignored that, in addition to the version of [

                        ] that it characterized as a draft, Kaptan provided a version that it described

as finalized. Kaptan's Br. at 30. This argument is not tenable. In rejecting Kaptan's argument that

the version included in Exhibit A-7 of the AQR was only a draft, the agency cited the company's

response to a question included in the agency's supplemental questionnaire, in which the agency

expressly acknowledged that the record contained two versions of the contract – both the alleged

draft and the allegedly "final" version. Kaptan Final Analysis Memo at 2 n.9; *see also* SACQR at

28-29 (Question 43.a and response). Commerce was clearly aware of both versions; it simply

rejected the argument that the version included in Exhibit A-7 was a draft, given that it was signed.

In sum, Kaptan fails to show that Commerce's only reasonable choice for date of sale,

given the record in this case, was the contract date. Indeed, there is ample record evidence for a

reasonable mind to interpret this record exactly as Commerce did. And while Kaptan placed

evidence on the record showing that their sales practice changed, the record does not demonstrate

that this sales practice was always adhered to. Indeed, record evidence showed that changes to the

size breakdown were made between the contract date and invoice date. *See* AQR at Exhibit A-7;

CQR at Exhibit C-6.b. Given the inconsistencies between Kaptan's responses to whether it had changed its sales practice, and the record evidence demonstrating that material terms of sale (size breakdown) were not always established as of contract date, it is clear that a reasonable mind could have come to the conclusion that Commerce did here.

### iv.    Commerce's Date of Sale Determination Did Not Yield Absurd Results

Kaptan also argues that Commerce's selection of the invoice date, rather than the contract date, yields an absurd result because its dumping margin increased by more than 20 percent from the average of the previous four reviews. Kaptan's Br. at 31-33. This increase in the margin does not establish that Commerce's selection of the invoice date was unlawful here or leads to an absurd result.

As an initial matter, Commerce used the invoice date as the date of sale in each of the previous four reviews on which Kaptan's comparison is based.[12] It is unclear how Commerce's continued use of the invoice date here suddenly yields an absurd result – particularly where the use of the invoice date is otherwise supported by the record, consistent with Congressional intent.

Further, Kaptan's dumping margin has not remained constant or near-constant over the life of the proceeding, such that a 26 percent margin is inherently anomalous. Kaptan's rate over the prior four reviews has fluctuated between zero percent and 12.41 percent. *See* Kaptan's Br. at 32

---

[12]    *Steel Concrete Reinforcing Bar From the Republic of Turkey*, 88 Fed. Reg. 7,941, 7,942 (Dep't Commerce Feb. 7, 2023) (final results of antidumping duty admin. rev. and final deter. of no shipments; 2020-2021); *Steel Concrete Reinforcing Bar From the Republic of Turkey*, 87 Fed. Reg. 7,118, 7,119 (Dep't Commerce Feb. 8, 2022) (final results of antidumping duty admin. rev. and final deter. of no shipments; 2019-2020); *Steel Concrete Reinforcing Bar From the Republic of Turkey*, 86 Fed. Reg. 28,574, 28,575 (Dep't Commerce May 27, 2021) (final results of antidumping duty admin. rev. and final deter. of no shipments; 2018-2019); *Steel Concrete Reinforcing Bar From the Republic of Turkey*, 85 Fed. Reg. 15,765, 15,766 (Dep't Commerce Mar. 19, 2020) (final results of antidumping duty admin. rev. and final deter. of no shipments; 2017-2018).

n.7. More to the point, margins are based on the record information provided in each review. The fact that a party had low margins or even no margins (*i.e.*, was not dumping) in a prior review does not mean that that party will not dump merchandise in future reviews. To hold as much would be counter to the purpose of the antidumping laws and the need to calculate an accurate dumping margin based on the record information in the *current* POR.

Kaptan relies on *Viraj Group, Ltd. v. United States*, 162 F. Supp. 2d 656, 662 (Ct. Int'l Trade 2001) for the proposition that "{m}ere compliance with regulations cannot trump what appears to be an absurd result." Kaptan's Br. at 31. But the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") overturned this decision in *Viraj*, disagreeing that that the accuracy of the dumping margin took precedence over the clear statutory mandate that Commerce calculate the exchange rate on the date of sale of subject merchandise. *See Viraj Grp., Ltd. v. United States*, 343 F.3d 1371, 1377 (Fed. Cir. 2003). The Federal Circuit instead expressly noted that "accuracy concerns cannot trump a specific statutory provision." *Id.* at 1378. Here, Congress has unambiguously directed that the agency treat the date on which material terms are established as the date of sale; further, the agency's factual determination that those terms were not set as of contract date is supported by substantial record evidence.

Finally, while Kaptan assumes that Commerce's selection of the date of sale has uniquely driven Kaptan's margin, many factors go into calculating margins. Further, as Commerce found, Kaptan had not provided evidence to support its claim that variation in scrap pricing between contracting and invoice date for its U.S. sales meant that there was a "mismatch" between costs and prices, or that this "mismatch" was what produced the margin here. I&D Memo at 20-21. Commerce elaborated that it had analyzed the record regarding changes in scrap prices over the review period, and found that they were insufficient to justify changes to its costing methodology.

*Id.* Given that the scrap price changes that Kaptan experienced over the POR were not otherwise sufficient to support alterations in the dumping calculations, Commerce reasoned that those changes were likewise insufficient to justify a departure from the statutorily-sound and record-consistent use of invoice date as Kaptan's date of sale. *Id.* Rather than producing an absurd result, Commerce's selection of invoice date was therefore consistent with its treatment of scrap pricing, as well as with the record evidence, the agency's statutory mandate to base its date of sale selection in the record, and prior reviews in which the agency had treated invoice date as Kaptan's date of sale.

**B.    Commerce's Calculation of the DIFMER Adjustment to Account for High Inflation is Supported by Substantial Evidence and is Otherwise in Accordance with Law**

In calculating dumping margins, Commerce applies its DIFMER test to make reasonable allowances for differences in the cost of goods sold to the U.S. and home markets that arise from physical differences between the goods sold in each market. *See* 19 C.F.R. § 351.411; 19 U.S.C. § 1677b(a)(6)(C)(ii); Policy Bulletin. Typically, the "DIFMER" analysis, and any corresponding adjustments to the normal values being compared with export values, are based on the variable production costs for each CONNUM produced during the review period. *See* Policy Bulletin. As with its overall calculation of COP, where the subject country is experiencing high inflation, Commerce's practice is to calculate any DIFMER adjustments with respect to such countries using monthly indexed costs. *See Raw Honey from Argentina Investigation* IDM at 27.

Commerce followed this practice in this review. Specifically, because Turkey's economy experienced high inflation during the POR, Commerce used monthly inflation indices to restate Kaptan's reported monthly costs into a constant inflation-index level (equal to the end-of-period inflation-index level). I&D Memo at 23; PDM at 19-20. Commerce used those restated costs to

calculate the annual weighted-average cost for each product model produced during the POR, before restating the annual weighted-average production cost for each model into the respective inflation-index level for each month of the POR. I&D Memo at 23.; PDM at 19-20.

Just as it calculated overall COP using its high-inflation methodology, Commerce used the same methodology in conducting its DIFMER analysis and calculating the DIFMER adjustment. *See* I&D Memo at 23. In doing so, Commerce explained that just as overall costs are affected by high inflation, "DIFMER is likewise affected by this high inflation since the DIFMER adjustment is calculated as the difference in the variable costs between similar CONNUMs." *Id.* Commerce further explained that in countries experiencing high inflation, nominal value of production costs increase over time, even where those costs remain constant in real terms, and that this was true for all production costs relevant to the margin calculations, including the variable costs relevant to the DIFMER analysis and adjustments. *Id.*

Kaptan nonetheless argues that Commerce's practice of using indexed costs in the DIFMER analysis/adjustment was inappropriate, because it inappropriately injected timing differences into an analysis meant to measure the cost impact of physical dissimilarities between CONNUMs. Kaptan's Br. at 33-35. Kaptan argues that, as originally reported – pre-indexing – the variable costs for two of its U.S. CONNUMs were lower than those of the corresponding home-market CONNUMS, a situation that would call for a corresponding addition to the normal values of sales of the home-market CONNUMs (and, one presumes, some reduction in the dumping margins calculated for those U.S. sales of those CONNUMs). *Id.* at 34; *see also* n.9, *supra*. But after monthly indexing, the variable costs of the two U.S. CONNUMS were higher than the variable costs of the corresponding home-market CONNUMs. *Id.* at 34-35. As a result, the normal values determined for sales of the home-market CONNUMs was decreased. *See id.*

Kaptan argues that only the unindexed monthly costs are appropriate for use in calculating the DIFMER adjustment, as these reflect the "true cost differences" arising from the distinct physical characteristics of the rebar sold in the home market, rather than timing differences. *Id.* at 35. Kaptan's claim is not compelling. As an initial matter, it is not entirely clear whether it perceives the alleged timing-related distortions in the DIFMER analysis/adjustments as arising from Commerce's (1) indexing of Kaptan's reported monthly per-unit costs for the similar-but-not-identical CONNUMs to reflect inflation, (2) weight-averaging the indexed monthly costs by production quantity in calculating a POR-wide average cost for each CONNUM, or (3) both. *See id.* at 33-35 (first appearing to identify the issue as arising from the weight averaging of the as-reported (unindexed) monthly costs, and then as arising from "averaging and indexing."). Regardless, Kaptan is wrong in characterizing the agency's methodology as either "nonsensical" or "distortive." *Id.* at 35. Rather, the agency has altered its standard approach to the DIFMER analysis only as necessary to ensure that the analysis reflects real, inflation-adjusted prices.

In this regard, it is important to understand how Commerce calculates COP outside of an inflationary context. In the typical, non-inflationary situation, the respondent is asked to report its CONNUM-specific costs on a weight-averaged, POR-wide basis, with production quantity as the weighting factor. IQR at D-1 – D-2,[13] Calculating POR-wide average costs for each CONNUM has two benefits. First, it smooths out any in-CONNUM cost differences attributable to non-macroeconomic factors like the respondent's use of multiple production facilities with different cost structures. Second, it ensures that even if the respondent did not produce a specific CONNUM in every month in which that CONNUM was sold, the agency nonetheless has a cost to which it

---

[13]    Commerce issued Kaptan a standard, non-inflationary Section D questionnaire before the agency identified Turkey as facing high inflation during the POR.

can compare individual home-market sales prices for purposes of determining whether the sales were made below-cost.

In a high-inflationary context, however the nominal value of production costs increases over time, even where such costs, expressed in real terms, remain constant. *See* I&D Memo at 23. As the agency has recognized, inflation stands to distort its calculations given its typical practice of comparing POR-wide average COP values to transaction-specific prices in determining whether sales are below cost:

> As an illustration of this distortion, consider a sales-below-cost analysis where real production costs remain constant but, because of high inflation, nominal costs rise throughout the POR. Under this scenario, a period-average COP figure based on monthly nominal cost amounts would tend to be higher than the individual home-market sale prices at the beginning of the period but lower than the prices at the end of the period. Depending on the timing of the home-market sales, this could result in an excessive quantity of below-cost sales at the beginning of the period or, conversely, an overstatement of the number of above-cost sales at the end of the period.

*Turkish Pipe* IDM at 10 (quoting Issues and Decision Memorandum accompanying *Silicomanganese From Brazil*, 69 Fed. Reg. 13,813 (Dep't Commerce Mar. 24, 2004) (final results of antidumping duty admin. rev.) at cmt. 4).

To address the distortion, the agency collects CONNUM-specific cost data on a monthly average basis, rather than an annual average basis. *See* I&D Memo at 23; DQR at D-1 – D-3. It restates these monthly costs to a constant inflation-index level reflecting the end of the POR. I&D Memo at 23. Then, "Commerce follows its normal practice of calculating an annual weighted average cost for each CONNUM produced during the POR," before restating those annual weight-average costs for each CONNUM into the inflation-index level appropriate to that month. *Id.*

The overall result is two-fold. First, the restated monthly costs reflect real, inflation-adjusted values, while continuing to smooth in-CONNUM cost differences arising from factors like the

respondent's use of different production facilities with varying cost structures to make different units of the same CONNUM, or different production run quantities. Second, the calculation of a POR-wide average that is then restated into monthly values also fills any gaps in the COP calculations arising from the sale of goods in months in which they were not produced. In the hyperinflationary context, where a CONNUM was sold in a month that it was not produced, there is no corresponding monthly overall cost to compare with the sale price for purposes of the below-cost test, or corresponding monthly variable cost which can be used in the DIFMER analysis. By calculating the inflated annualized costs for each CONNUM and then indexing them back on a monthly basis, Commerce fills the gap for those months that have sales but no costs. This ensures a fair comparison between prices because it (1) allows Commerce to test home-market sales in every month to see if they are below that month's COP; and (2) separately, for those sales above the monthly COP, allows the agency to calculate appropriate adjustments, such as DIFMER adjustments, before comparing normal value to export price. Importantly, to the extent that the finally restated monthly costs can be said to reflect "timing differences" corresponding with Kaptan's choice to produce more or less of particular CONNUMs at different times in the POR, Kaptan's Br. at 33, they reflect such differences no more nor less than they do outside of the high-inflationary context, where the POR-wide CONNUM-specific COP values reflect production-quantity-specific weight averaging.

The use of the averaged, indexed monthly values in the DIFMER analysis thus does not inappropriately inject timing differences into the evaluation of how the costs to produce non-identical goods vary with those goods' physical dissimilarities. Instead, it ensures that such differences are *not* injected – and certainly does a better job of doing so than Kaptan's proposal that the agency use "unindexed per unit costs" – which would reflect both timing differences and

inflation – in making any DIFMER adjustments. To say nothing of the fact that Kaptan's proposal would involve using unindexed variable costs to adjust normal values that were calculated on the basis of indexed/averaged costs (including variable costs) – a mismatched and "piecemeal" approach. I&D Memo at 23.

Commerce's adjustment of the DIFMER analysis in this case was also consistent with the agency's practice. In *Raw Honey from Argentina*, a respondent proposed that rather than use monthly indexed costs in its DIFMER analysis, the agency should use its more typical period-wide average costs, without indexing. *Raw Honey from Argentina Investigation* IDM at cmt. 5. The respondent claimed that this would "properly limit the DIFMER to physical characteristics rather than timing differences." *Id.* at 28. Commerce rejected the respondent's "piecemeal" approach to high inflation, recognizing that "in countries experiencing high inflation, the nominal value of production costs increases over time, even where such costs, expressed in real terms remain constant." *Id.* Just as a respondent's costs in general are affected by high inflation (where such inflation exists), any "differences in variable costs among non-identical merchandise models" are affected by such inflation. *Id.* Conducting the DIFMER analysis on the basis of monthly, inflation-indexed costs thus does not improperly inject timing-based differences into the analysis. Rather, it ensures that the DIFMER adjustments reflect real pricing values.

The two agency precedents on which Kaptan relies are not to the contrary. As Commerce observed, neither case involved high inflation or any adjustments made to reflect such inflation. Kaptan's Br. at 33-34; I&D Memo at 23-24. Nor, indeed, did they relate – except very indirectly, inasmuch as the cases involved overall cost adjustments – to any DIFMER analysis. Instead, they involved a distinct issue from that present here. Specifically, notwithstanding the use of POR-wide weight-averaging in the calculation of CONNUM-specific COP in those cases, the resulting per-

unit COPs for physically similar CONNUMS sold in the respondent's home-market varied significantly. *See* Issues and Decision Memorandum accompanying *Certain Corrosion-Resistant Steel Products From the Republic of Korea*, 84 Fed. Reg. 10,784 (Dep't Commerce Mar. 22, 2019) (final results of antidumping duty admin. rev.; 2016-2017) at 42-45 ("*CRS Korea* IDM"); Issues and Decision Memorandum accompanying *Certain Hot-Rolled Steel Flat Products From the Republic of Korea*, 84 Fed. Reg. 32,720 (Dep't Commerce July 9, 2019) (final results of antidumping duty admin. rev.; 2016-2017) at 10-11, 65-57 ("*HRS Korea* IDM"). The differences were not from the physical distinctions in these products – which were very similar – but from peculiarities of the respondents' accounting systems (including when those systems captured specific costs), differences in production run quantity, combining of costs from multiple production facilities, etc. *See CRS Korea* IDM at 43-45; *HRS Korea* IDM at 10-11, 65-67.

Recognizing the potential for these differences to distort its calculations in much the same manner that cost differences *within* a CONNUM might distort the calculations if not otherwise smoothed through the creation of a CONNUM-specific average cost, Commerce calculated an average, blended cost for these physically similar CONNUMS, in some measure "collapsing" what would have otherwise been independent CONNUMs to smooth their costs. *See CRS Korea* IDM at 43-45; *HRS Korea* IDM at 10-11, 65-67. This is an entirely different issue than whether the DIFMER analysis in a high-inflationary context should be conducted consistently with the underlying cost calculations. Certainly, neither case suggests that cost adjustments applied to COP generally should not be carried over into the DIFMER analysis, or that the agency should take no steps to address the impact of high inflation on its calculations. And given these cases' emphasis on enhanced averaging to "smooth" costs, they appear particularly unsupportive of Kaptan's

proposal that the agency use unindexed monthly costs, without any averaging and restatement, in its DIFMER analysis. Kaptan's Br. at 34-35.

In sum, Kaptan fails to persuade that Commerce acted unreasonably or inconsistently with its practice in conducting the DIFMER analysis and making corresponding adjustments based on inflation-indexed monthly prices. Rather, Commerce appropriately made those adjustments to ensure that the DIFMER analysis/adjustment, like COP, reflected the economy-wide factor of high inflation.

## VII.    CONCLUSION

For the reasons detailed above, this court should sustain Commerce's *Final Determination*.

Respectfully submitted,

*/s/ John R. Shane*
Alan H. Price, Esq.
John R. Shane, Esq.
Maureen E Thorson, Esq.
Stephen A. Morrison, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the Rebar Trade Action Coalition*

Dated: September 20, 2024

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Amended Scheduling Order (July 8, 2024), ECF No. 34, the undersigned certifies that this brief complies with the word limitation requirement. The word count for the Response to Plaintiff's Motion for Judgment on the Agency Record, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 13,219 words.

<u>*/s/ John R. Shane*</u>
(Signature of Attorney)

<u>John R. Shane</u>
(Name of Attorney)

<u>Rebar Trade Action Coalition</u>
(Representative Of)

<u>September 20, 2024</u>
(Date)

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

<table>
<tr><td>

**KAPTAN DEMIR CELIK ENDUSTRISI VE TICARET A.Ş.,**

Plaintiff,

and

**ICDAS CELIK ENERJI TERSANE VE ULASIM SANAYI A.Ş.,**

Plaintiff-Intervenor,

v.

**UNITED STATES,**

Defendant,

and

**REBAR TRADE ACTION COALITION,**

Defendant-Intervenor.

</td>
<td>

Before: Hon. Jane A. Restani, Judge

Ct. No. 24-00018

</td></tr>
</table>

<u>**PROPOSED ORDER**</u>

Upon consideration of the complaint and USCIT R. 56.2 motion filed in this matter challenging the final results of the United States Department of Commerce regarding *Steel Concrete Reinforcing Bar From the Republic of Turkey*, 88 Fed. Reg. 89,663 (Dep't Commerce Dec. 28, 2023) (final results of antidumping admin. rev.; 2021-2022) ("*Final Results*"), and all other papers and pleadings in this action, it is hereby

ORDERED that that Commerce's *Final Results* are SUSTAINED.

SO ORDERED.

Date: _____, 2024

_____
Hon. Jane A. Restani, Judge