## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| KAPTAN DEMIR CELIK ENDUSTRISI VE TICARET A.S., | ) ) ) |
| *Plaintiff*, | ) ) |
| And | ) ) |
| ICDAS CELIK ENERJI TERSANE VE ULASIM SANAYI, A.S., | ) ) ) |
| *Plaintiff-Intervenor*, | ) ) Court No. 24-00018 |
| v. | ) ) |
| THE UNITED STATES, | ) ) |
| *Defendant*, | ) ) |
| And | ) ) |
| REBAR TRADE ACTION COALITION, | ) ) |
| *Defendant-Intervenor*. | ) ) |

## <u>ORDER</u>

Upon consideration of plaintiff's motion for judgment upon the agency record, defendant's and defendant-intervenor's responses thereto, plaintiff's reply, the administrative record, and all other pertinent papers, it is hereby

ORDERED that plaintiff's motion is DENIED; and it is further

ORDERED that the Department of Commerce's determination is sustained; and it is further

ORDERED that judgment is entered in favor of the United States.

Dated:_____, 2024      _____
        New York, New York                          JUDGE

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| KAPTAN DEMIR CELIK ENDUSTRISI VE TICARET A.S., | ) |
| *Plaintiff,* | ) |
| And | ) |
| ICDAS CELIK ENERJI TERSANE VE ULASIM SANAYI, A.S., | ) |
| *Plaintiff-Intervenor,* | ) |
| v. | ) |
| THE UNITED STATES, | ) |
| *Defendant,* | ) |
| And | ) |
| REBAR TRADE ACTION COALITION, | ) |
| *Defendant-Intervenor.* | ) |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S
MOTION FOR JUDGMENT ON THE AGENCY RECORD**

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

L. MISHA PREHEIM
Assistant Director

OF COUNSEL:

DAVID RICHARDSON
Attorney
U.S. Department of Commerce
Office of the Chief Counsel for Trade
   Enforcement and Compliance
1401 Constitution Avenue, NW
Washington, D.C. 20230

JOSHUA W. MOORE
Trial Attorney
Commercial Litigation Branch
Civil Division, U.S. Department of Justice
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Telephone: (202) 305-2312
Email: Joshua.w.moore@usdoj.gov

September 20, 2024

*Attorneys for Defendant*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................................ iii

STATEMENT PURSANT TO RULE 56.2 .........................................................................2

I.       Administrative Determination Under Review ......................................................2

II.      Issues Presented For Review ...............................................................................2

STATEMENT OF FACTS ................................................................................................2

I.       Initial Administrative Proceedings .....................................................................2

II.      Preliminary And Final Results.............................................................................7

SUMMARY OF THE ARGUMENT ................................................................................11

ARGUMENT ..................................................................................................................12

I.       Standard Of Review...........................................................................................12

II.      Commerce's Decision To Use The Earlier Of The Invoice Date Or Shipment
         Date As The Date Of Sale Is Supported By Substantial Evidence And Otherwise
         In Accordance With Law ....................................................................................13

         A.      Relevant Legal Background................................................................13

         B.      *Loper Bright* Does Not Undermine Commerce's Decision To Use The
                 Earlier Of Shipping Date Or Invoice Date As The Date of Sale .........................15

                 1.      *Loper Bright* Framework ....................................................................15

                 2.      *Loper Bright* Does Not Undermine Commerce's Decision To Establish
                         A Rebuttable Presumption That The Date Of Sale Is The Invoice Date .........17

                 3.      Congress Delegated Authority and Discretion to Commerce..........................21

         C.      Substantial Record Evidence Supports Commerce's Determination That
                 Kaptan's Contract Date Was Not The Date of Sale................................24

III.     Commerce's Decision Use Indexed Annual Weighted-Average Costs For The
         Calculation Of The DIFMER Adjustment Is Supported By Substantial Record
         Evidence And Is Otherwise In Accordance With Law ........................................32

IV.    Commerce Agrees that Icdas Celik Enerji Tersane ve Ulasim Sanayi, A.S. Should Have The Results Of This Litigation Applied To Its Unliquidated Entries Subject To Its Injunction ................................................................................................................. 37

CONCLUSION ................................................................................................................. 37

CERTIFICATE OF COMPLIANCE ................................................................................ 39

# TABLE OF AUTHORITIES

**CASES**                                                              **PAGE(S)**

*Allied Tube & Conduit Corp. v. United States*,
   127 F. Supp. 2d 207 (Ct. Int'l Trade 2000)......................................................... passim

*Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States*,
   102 F.4th 1252 (Fed. Cir. 2024)........................................................................... 23

*Atl. Sugar, Ltd. v. United States*,
   744 F.2d 1556 (Fed. Cir. 1984)........................................................................... 13

*Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. Am. Cast Iron Pipe Co.*,
   5 F.4th 1367 (Fed. Cir. 2021)............................................................................. 21

*Bureau of Alcohol, Tobacco & Firearms v. FLRA*,
   464 U.S. 89 (1983)............................................................................................. 16

*CBOCS West, Inc. v. Humphries*,
   553 U.S. 442 (2008)........................................................................................... 17

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
   467 U.S. 837 (1984)........................................................................................... 15

*Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negots. v. United States*,
   66 F.4th 968 (Fed. Cir. 2023)............................................................................. 22

*Consol. Edison Co. v. NLRB*,
   305 U.S. 197 (1938)........................................................................................... 12

*Consolo v. Fed. Mar. Comm'n*,
   383 U.S. 607 (1966)........................................................................................... 12

*Dickerson v. United States*,
   530 U.S. 428 (2000)........................................................................................... 17

*Fujitsu Gen. Ltd. v. United States*,
   88 F.3d 1034 (Fed. Cir. 1996)............................................................................ 21

*Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States*,
   625 F. Supp. 2d 1339 (Ct. Int'l Trade 2009)............................................. 18, 28, 30

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014)........................................................................................... 17

*Kaptan Demir Celik Endustrisi v. Ticaret A.S.*,
   693 F. Supp. 3d 1368 (Ct. Int'l Trade 2024)............................................. 20, 24, 29

iii

*Loper Bright Enterprises v. Raimondo,*
    144 S. Ct. 2244, 219 L. Ed. 2d 832 (2024) .................................................................... passim

*Melamine Chems., Inc. v. United States,*
    732 F.2d 924 (Fed. Cir. 1984) ................................................................................. 22

*Nippon Steel Corp. v. United States,*
    458 F.3d 1345 (Fed. Cir. 2006) ............................................................................... 13

*Nucor Corp. v. United States,*
    34 C.I.T. 31 (2010) ....................................................................................... 28, 33

*Nucor Corp., et al., v. United States,*
    612 F. Supp. 2d 1264 (Ct. Int'l Trade 2009) ...................................................... 13, 20, 28

*Sahaviriya Steel Indus. Pub.c Co. Ltd. v. United States,*
    714 F. Supp. 2d 1263 (Ct. Int'l Trade 2010) ......................................................... 14

*Skidmore v. Swift & Co,*
    323 U.S. 134 (1944) .................................................................................. 15, 16

*Smith-Corona Grp. v. United States,*
    713 F.2d 1568 (Fed. Cir. 1983) ....................................................................... 22, 23

*Toscelik Profil ve sac Endustrici, A.S. v. United States,*
    256 F. Supp. 3d 1260 (Ct. Int'l Trade 2017) ......................................................... 14

*U.S. Steel Corp. v. United States,*
    953 F. Supp. 2d 1332 (Ct. Int'l Trade 2013) ......................................................... 14

*United States v. Eurodif S.A.,*
    555 U.S. 305 (2009) ...................................................................................... 12

*Yieh Phui Enter. Co. v. United States,*
    791 F. Supp. 2d 1319 (Ct. Int'l Trade 2011) ......................................................... 13

<u>Statutes</u>

5 U.S.C. § 706 ...................................................................................................... 15

19 U.S.C. § 1677b(a)(1)(A) ...................................................................................... 13

19 U.S.C. § 1516a(b)(1)(B) ........................................................................... 12, 24, 27

19 U.S.C. § 1675(c) ................................................................................................ 22

19 U.S.C. § 1677-2 ................................................................................................ 23

19 U.S.C. § 3512(d) ............................................................................................... 22

Regulations

19 C.F.R. § 351.401(i) ..................................................................................... passim

19 C.F.R. § 351.414(d)(3) .......................................................................................... 34

Other Authorities

Antidumping Duties; Countervailing Duties—Notice of Proposed Rulemaking and Request
 for Public Comments,
 61 Fed. Reg. 7,308 (Dep't of Commerce February 27, 1996) .................................... 19

Antidumping Duties; *Countervailing Duties: Final Rule,*
 62 Fed. Reg. 27,296, (Dep't of Commerce May 19, 1997) (Preamble) ............................ 13, 19

*Final Results of Antidumping Duty Administrative Review: Circular Welded Non-Alloy*
 *Steel Pipe from the Republic of Korea: 2012-2013,*
 80 Fed. Reg. 32937 (Dep't of Commerce June 10, 2015) ........................................ 35

*Initiation of Antidumping and Countervailing Duty Administrative Reviews,*
 87 Fed. Reg. 54,463 (Dep't of Commerce Sept. 6, 2022) ......................................... 2

*Raw Honey from Argentina: Final Determination of Sales at Less Than Fair Value and Final*
 *Affirmative Determination of Critical Circumstances,*
 87 Fed. Reg. 22179 (April 14, 2022) ......................................................... 34

*Steel Concrete Reinforcing Bar From the Republic of Turkey: Preliminary Results of*
 *Antidumping Duty Administrative Review; 2021–2022,*
 88 Fed. Reg. 50,100 (Dep't of Commerce Aug. 1, 2023) ......................................... 7

*Steel Concrete Reinforcing Bar From the Republic of Turkey,*
 88 Fed. Reg. 89,663 (Dep't of Commerce Dec. 28, 2023) (final results) ................................. 2

Uruguay Round Agreements Act, SAA, H.R. Doc. 103-316 (1994), *as reported in*
 1994 U.S.C.C.A.N. 40401994 ............................................................ 13, 22

**UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE JANE A. RESTANI, JUDGE

| | |
|---|---|
| KAPTAN DEMIR CELIK ENDUSTRISI VE TICARET A.S., | ) |
| | ) |
| *Plaintiff,* | ) |
| And | ) |
| | ) |
| ICDAS CELIK ENERJI TERSANE VE ULASIM SANAYI, A.S., | ) |
| | ) |
| *Plaintiff-Intervenor,* | ) |
| | ) |
| v. | ) |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| *Defendant,* | ) |
| | ) |
| And | ) |
| | ) |
| REBAR TRADE ACTION COALITION, | ) |
| | ) |
| *Defendant-Intervenor.* | ) |

**DEFENDANT'S RESPONSE TO PLAINTIFF'S
MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the United States Court of International Trade, defendant, the

United States, respectfully submits this response to the motion for judgement on the

administrative record filed by plaintiff, Kaptan Demir Celik Endustrisi Ve Ticaret A.S.

(Kaptan). Plaintiff contests two aspects of the United States Department of Commerce's

(Commerce) final results of the 2021-2022 administrative review of the antidumping duty order

covering steel concrete reinforcing bar (rebar) from the Republic of Turkey (Turkey). Because

Commerce's determination is supported by substantial record evidence and in accordance with

law, the Court should deny plaintiff's motion and enter judgment in favor of the United States.

## STATEMENT PURSUANT TO RULE 56.2

### I.     Administrative Determination Under Review

Plaintiff challenges the final results of the 2021-2022 administrative review of the antidumping duty order covering steel rebar from Turkey. *See Steel Concrete Reinforcing Bar From the Republic of Turkey*, 88 Fed. Reg. 89,663 (Dep't of Commerce Dec. 28, 2023) (final results) (P.R. 154), and accompanying Issues and Decision Memorandum (*Final IDM*) (P.R. 150).[1] The period of review is July 1, 2021, through June 30, 2022.

### II.    Issues Presented For Review

1. Whether Commerce's decision to use the earlier of the invoice date or shipment date as the date of sale for Kaptan is supported by substantial evidence and in accordance with law.

2. Whether Commerce's decision to use indexed annual weighted-average costs for calculating the DIFMER adjustment is supported by substantial record evidence and in accordance with law.

## STATEMENT OF FACTS

### I.     Initial Administrative Proceedings

On September 6, 2022, Commerce published the initiation notice for the 2021-2022 administrative review of the antidumping duty order covering steel rebar from Turkey. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 87 Fed. Reg. 54,463, 54473 (Dep't of Commerce Sept. 6, 2022) (P.R. 13). In relevant part, Commerce selected Kaptan as a mandatory respondent for individual examination. *See* Respondent Selection Memo at 1 (P.R. 29).

---

[1]     Citations to public documents from the administrative record are identified as "P.R. ___," while citations to confidential record documents are identified as "C.R. ___."

During its review, Commerce issued initial questionnaires to Kaptan.  *See* Initial Questionnaires (P.R. 30).  As part of the mandatory reporting of sales, the questionnaire requests respondents to report the date of sale.  The glossary of terms in Appendix I of the questionnaire defines the date of sale as follows:

> Because Commerce attempts to compare sales made at the same time, establishing the date of sale is an important part of the dumping analysis. ***Commerce will normally use the date of invoice, as recorded in the exporter or producer's records kept in the ordinary course of business. However, Commerce may use a date other than the date of invoice (e.g., the date of contract in the case of a long-term contract) if satisfied that a different date better reflects the date on which the exporter or producer establishes the material terms of sale (e.g., price, quantity)***. (Section 351.401(i) of the regulations.) If, for any specific sale, the date selected is after the shipment date for that sale, Commerce will use shipment date as the date of sale instead, but only for the sale in question.

*Id.* at I-5 to 6 (emphasis added).

Section B of the questionnaire—which concerns home and third-country sales—explains the significance of the date of sale and states "{b}ecause **contemporaneous sales** must be used to determine **normal value**, the reporting period for these sales depends on the dates of sale for the U.S. sales you report in response to section C of this questionnaire." *Id.* at B-1 (emphasis in original).  The questionnaire requests the respondent to report the invoice date, date of sale (if different from the invoice date), and date of shipment.  *Id.* at B-13, B-14.

Section C of the questionnaire—concerning U.S. sales—requires respondents to:

> {r}eport each U.S. sale of merchandise entered for consumption during the POR, except: (1) for EP sales, if you do not know the entry dates, report each transaction involving merchandise shipped during the POR; and (2) for CEP sales made after importation, report each transaction that has a **date of sale** within the POR. Do not report canceled sales. If you believe there is a reason to report your U.S. sales on a different basis, please contact the official in charge before doing so.

*Id.* at C-2.  Again, the questionnaire requests the respondent to report the invoice date, date of

sale (if different from the invoice date), and date of shipment.  *Id.* at C-12.

In its initial questionnaire response, Kaptan argued that, for U.S. sales, Commerce should

consider the date of sale to be the contract date, as there were allegedly no changes to the

material terms of the contracts, and any change in quantity was within contract tolerances.  *See*

Kaptan Section A Questionnaire Response at A-19-20 (P.R. 45).  In response to the question,

"(e) Describe the types of changes that occur after the initial agreement that affect the terms of

the sale other than delivery dates," Kaptan provided the following response:

> In the home market, deliveries are generally made according to
> the order and within ten days of the order date. *For U.S. sales,*
> *the parties may amend the latest shipment date, size breakdown,*
> *and, to a lesser extent, quantity until the goods are*
> *shipped/invoiced.* However, it appears that no such amendments
> occurred in the POR, during which the material terms for U.S.
> sales were set in the final contract.

*Id.* at A-22 to A-23 (emphasis added).  Specifically, for home market sales, Kaptan reported the

earlier of invoice or shipment date.  Kaptan Section B Questionnaire Response at B-22 (P.R.

60).  For U.S. sales, Kaptan reported the invoice date, the contract date, and the shipping date.

Kaptan Section C Questionnaire Response at C-18 to C-21 (P.R. 61).

Kaptan provided its contracts and a chart demonstrating no material terms of sale

actually changed during the period of review (POR).  Exhibit C-6.a. and C-6.b. (C.R. 48).  The

contracts also contain the following term, "[██████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████."]  *See e.g.*, Exhibit C-6.b. fr. 120, paragraph 7

(emphasis in original) (C.R. 48).

On October 21, 2022, Kaptan also informed Commerce that the annual inflation rate exceeded 25 percent during each month of the POR.  Notice of Inflation Rate Above 25 Percent at 1 and Attachment 1 (P.R. 37).  Commerce normally calculates costs on an annual basis, but in certain circumstances where there is high inflation, it will use quarterly costs.  On December 8, 2022, Kaptan submitted its response to Commerce's Section D High Inflation Questionnaire. Section D High Inflation Questionnaire, (P.R. 62).  In its response, Kaptan reported "the value of major materials used to produce the merchandise under consideration at the average purchase price during the month of consumption for each month in the period of review."  *Id*. at D-2.  In reporting its cost of manufacturing, Kaptan, as requested, submitted for the calculation of cost of production (COP) and constructed value (CV), its cost of manufacturing (COM) on a weighted average annual basis and also on a monthly basis.  *Id*. at D-4.  Kaptan also reported its major inputs purchases for scrap and billet on a monthly basis.  *Id*. at D-10, and Exhibit D-5 (C.R. 71).

On May 2, 2023, Commerce issued a supplemental questionnaire for section A, B and C. Supplemental Questionnaire, (P.R. 76).  Of particular relevance to this case, Commerce asked the following question:

> 40. For its U.S. sales, Kaptan reported the contract date as date of sale. However, in prior segments of this proceeding, Commerce used the earlier of shipment date or invoice date as the date of sale for Kaptan's U.S. sales. Therefore, provide a detailed explanation of any changes in Kaptan's sales process since the prior administrative review. If there have been no significant changes, revise your reporting of the date of sale for U.S. sales to use the earlier of shipment or invoice date.

Supplemental Questionnaire at 11-12, (Section C, Question 40) (P.R. 76).  Kaptan responded that due to a significant increase in steel prices of "nearly 45%," the board of directors, beginning in 2020, amended the export sales procedures to provide that:



Supplemental Questionnaire Response at 27-28 (C.R. 180).  Kaptan provided a document of the

board's decision and a sample of a board [████████████].  *Id.* at 28.  Commerce also

asked Kaptan the follow clarification question:

> 43. On page 19 of Kaptan's CQR, you stated that "the first point at which
> the material terms of POR sales were set was the contract date.
> Specifically, during the POR, all major terms of sale, including the price,
> quantity, size breakdown, and the latest date of shipment, were finalized
> on the date of the contract and did not change between the invoice and
> contact date." Sale contract [████████████ **],** in Exhibit A-7 of
> Kaptan's AQR, indicates that the size breakdown **[**██████████████
> ████████ **]**. However, the same sales contract **[**████████████
> ██████████, in Exhibit C-4 of Kaptan's CQR, indicates that the size
> breakdown **[**████████████████ **].**
>
> a. Explain this discrepancy and provide documentation to
>    substantiate your response.
> b. Is the size breakdown of Kaptan's U.S. sales determined
>    after the contract date?  Explain.

Supplemental Questionnaire at 12, (Section C, Question 43) (P.R. 76).  Kaptan responded that

there was a mistake and the first page of the contract [████████████████████

████████████████████████████████████████████

and that no material terms changed after signature.   Supplemental Questionnaire Response at

28-29 (C.R. 180).

The Rebar Trade Action Coalition (RTAC) responded to Kaptan's supplemental

questionnaire response on date of sale.  Deficiency Comments on Kaptan's Section A-C

Supplemental Questionnaire Response at 2-10 (C.R. 249).   RTAC argued that the record

evidence submitted by Kaptan shows the understanding of the parties was that the material terms

of the contract could change.   RTAC also argued that Commerce should not consider the board

document given the suspect circumstances in which Kaptan submitted it, but even if the board

document were valid, it does not change the date of sale because it does not supersede the sales

contract. *Id*. at 8-9.

## II.    <u>Preliminary And Final Results</u>

On August 1, 2023, Commerce published its preliminary review results.  *Steel Concrete

Reinforcing Bar From the Republic of Turkey: Preliminary Results of Antidumping Duty

Administrative Review; 2021–2022*, 88 Fed. Reg. 50,100 (Dep't of Commerce Aug. 1, 2023)

(P.R. 127) (preliminary results), and accompanying Decision Memorandum (*PDM*), (P.R. 120).

Regarding date of sale, Commerce found that while Kaptan's board amended its export sales

procedures, these changes were not reflected in the contracts.  Preliminary Results Analysis

Memorandum for Kaptan Demir Celik Endustrisi Ve Ticaret A.S./Kaptan Metal Dis Ticaret Ve

Nakliyat A.S. at Attach. IX (July 26, 2023) ("*Prelim. Analysis Memo*") at 3 (C.R. 359).  The

contracts provided that [ ██████████████████████████████████████████ ]

*Id*.  In addition, Commerce found that one signed sales contract provided that the size

breakdown for the sale ████████████████████████ ].  *Id*.  As a result,

Commerce found that "{g}iven that the terms of contracts allow [ ████████████

██████████ ], the material terms were not established on the contract date."[2]  *Id*.; *see also,*

*PDM* at 9 (P.R. 120).

_____

[2]   The actual sentence being cited in the Kaptan Preliminary Analysis Memorandum at
page 3, inadvertently contained a double negative, i.e., Commerce did "not" find the contract
terms were "not" set.  This statement, however, is proven an error by the discussion and analysis
on page 3 of the Kaptan preliminary analysis memorandum discussed above and Commerce's

Commerce also found that Turkey had experienced high inflation during the POR; however, it determined that using the quarterly cost methodology was not appropriate because the difference between the highest and lowest monthly average for [██████████████████████ ██████████████] did not meet the 25 percent threshold for using quarterly costs. *Prelim. Analysis Mem*. at 2-3 (C.R. 359). However, to adjust for the high inflation effect on costs and to "minimizes the extent to which calculated dumping margins may be overstated or understated due solely to inflation in the Turkish market," Commerce applied its "standard" approach which "calculated a POR average cost based on the respondents' reported monthly costs inflated to a common point in time, and then deflated that POR-average cost back to each month during the POR." *PDM* at 19-20 (P.R. 120).

After the preliminary review results were issued, the parties submitted administrative case and rebuttal briefs. Kaptan Admin. Case Brief, (C.R. 377, P.R. 136); Kaptan Rebuttal Admin. Brief, (C.R. 379, P.R. 138); RTAC Admin. Brief, (C.R. 378, P.R. 137); and RTAC Rebuttal Admin. Brief (C.R. 380, P.R. 139).

Regarding date of sale, Kaptan argued that the date of sale is the date on which the material terms are set, and Commerce has a practice of using the contract date when there are no changes in material terms between the date of the contract and the earlier of shipment or invoice date. Kaptan Admin. Brief at 2-13 (C.R. 377). Kaptan also argued that using invoice date results is an inaccurate dumping margin for Kaptan. *Id*. at 28-31. Finally, Kaptan argued that using DIFMER costs indexed to compensate for inflation has a distortive timing impact on its calculation. *Id*. at 31-33.

---

actual treatment of the date of sale as the earlier of either shipment date or invoice date, *PDM* at 9 (P.R. 120).

RTAC submitted a rebuttal to Kaptan's administrative case brief. RTAC Rebuttal Admin. Brief, (C.R. 380). RTAC reiterated the arguments it had made in its prior submissions and also argued that evidence supported the invalidity of the supplemental contract Kaptan submitted, including (1) the [███████████████████████████████████████ ███████████████████] based on analysis of the page numbering that [███████████ ████████████████████████████████████████████████████████ ██] (*Id.* at 5 and 13.); 2) [████████████████████████████████████] (*Id.* at 6); and 3) the fact that the size breakdowns were material terms of sale (*Id.* at 11-13). RTAC also addressed the administrative and judicial cases Kaptan relied on as authority for its version of Commerce's date of sale practice, and explained why they reinforce Commerce's broad discretion on a case-by-case basis to select a date of sale in which the material terms of sale are set. *Id.* at 14-17.

On December 28, 2023, Commerce issued its final results. *Final Results* (P.R. 154). Commerce found that the appropriate date of sale was the earlier of the invoice date or shipment date. *Final IDM* at 15 (P.R. 150). Commerce explained the standard for determining when the material terms of sale are set as "when the terms are truly 'established' in the minds of the buyer and seller." *Id.* at 14 (citing the preamble to Commerce's regulations). Commerce identified record evidence that demonstrated that the material terms of sale were not set at the contract date. *Id.* at 15. Commerce cited Kaptan's response to section A of the AD questionnaire (i.e., the section regarding general information), in which Kaptan stated that "{f}or U.S. sales, the parties may amend the latest shipment date, size breakdown, and, to a lesser extent, quantity until the goods are shipped/invoiced." *Id.* (quoting Section A Questionnaire Response at A-22 to A-23 (P.R. 45)). Commerce also found that there was evidence in the record "that the material

terms of sale were not established on the contract date because the size breakdown was not always included with the contract." *Id*. at 16.

Commerce found that the documentation provided by Kaptan as to the board of directors' changes to the export sales process did not actually result in contracts which could not be changed. *Id.* Rather, Commerce found that Kaptan's contracts allow parties to "revise and modify contracts after signature." *Id*., *citing* Kaptan contracts in C-6.b. which contain the following term: "█████████████████████████████████

████████████████████████████████████████

███████████] *See e.g.*, Exhibit C-6.b. fr. 120, paragraph 7 (emphasis in original) (C.R. 48). Furthermore, Commerce found that the terms of the contracts did not change after the board of directors' internal resolution. *Id*. at 16-17.

Finally, Commerce addressed Kaptan's argument that because of fluctuations in steel prices the terms of the sales contract could not be permitted to change because there would be a mismatch between the cost of material to produce the rebar and the final sales price of the rebar. *Id.* at 20-21. Commerce found that Kaptan had provided no evidence of such an effect. *Id*. at 21. Commerce explained that it had a high inflation methodology which would compensate for such concerns but that the circumstances of this case did not meet the threshold of significant cost changes requiring the use of quarterly costs instead of annual indexed weighted average costs. *Id*. at 21. Commerce concluded that the date of sale was the invoice date, not the contract date.

With regard to whether Commerce correctly calculated the DIFMER adjustment, Commerce continued to use the DIFMER calculated with indexed annual weighted-average costs. *Id.* at 22-24. Commerce explained that when high inflation exists during the POR,

Commerce "instructs respondents to report monthly nominal costs, rather than annual average costs, to mitigate the distortive impact of inflation on the dumping calculations." *Id.* at 23. Commerce disagreed with Kaptan's proposal to simply "calculate a monthly DIFMER from unindexed per unit costs to limit the DIFMER to physical characteristics, rather than timing differences." *Id.* Commerce explained that such an approach would present a "piecemeal approach to our high inflation method." *Id.* Rather, because "Kaptan's costs are affected by high inflation in Turkey{,}…the DIFMER is likewise affected by this high inflation since the DIFMER adjustment is calculated as the difference in the variable costs between similar CONNUMs." *Id.* In short, Commerce explained that it "cannot account for high inflation in the calculation of COP and CV, but then ignore it for purposes of the DIFMER." *Id.* at 23-24.

Commerce found that Kaptan had a weighted-average dumping margin of 25.86 percent. 88 Fed. Reg. at 89,663. That same rate was also applied to companies not selected for individual review for which a review had been requested, including Icdas Celik Enerji Tersane Veulasim Sanayi, A.S. (ICDAS). *Id.*

## SUMMARY OF THE ARGUMENT

Commerce's determination to use the invoice dates, rather than the contract dates, as the date of sale for Kaptan's sales is supported by substantial evidence, in accordance with law, and consistent with Commerce's past practice. By regulation, Commerce will normally use the date of invoice as the date of sale, and Kaptan has not established that Commerce should depart from that default. Kaptan's argument that the Supreme Court's decision in *Loper Bright* requires this Court to throw out decades of precedent and find Commerce's "date of sale" methodology to be contrary to statute is wrong. *Loper Bright* is not applicable here because the term "date of sale" is not ambiguous, and this Court has already found that Commerce's definition of "date of sale"

to be a reasonable interpretation of the statute. Kaptan's citation to certain other administrative determinations is unavailing because those proceedings are factually distinguishable; as Kaptan itself points out, Commerce conducts its date of sale analysis on a case-by-case. Furthermore, to the extent that "date of sale" is ambiguous, Congress specifically granted deference to Commerce to craft regulations to fill in the gap.

Record evidence supports Commerce's conclusion that the material terms could change after the contract date. Based on that evidence, Commerce reasonably concluded that Kaptan's board resolution did not modify or change any of the language in Kaptan's sales contracts. In addition, Commerce did not deviate from established practice or inappropriately rely on prior reviews; rather, Commerce based its decision on the record of this review.

Finally, Commerce properly calculated the DIFMER adjustment given the high inflation Turkey had experienced during the POR. The DIFMER calculations are not distortive but represent Kaptan's actual annual weighted average costs adjusted for inflation.

## ARGUMENT

### I.    Standard Of Review

This Court sustains any determination, finding, or conclusion by Commerce unless it is unsupported by substantial evidence, or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B); *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Substantial evidence may be "less than the weight of the evidence," and the possibility of drawing inconsistent conclusions from the record does not make Commerce's findings unsupported by substantial evidence. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). Thus, a party

challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation and internal quotation marks omitted), and the Court sustains Commerce's factual determinations as long as they are reasonable and supported by the record as a whole, even if some evidence detracts from the agency's conclusions. *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

II.    **Commerce's Decision To Use The Earlier Of The Invoice Date Or Shipment Date As The Date Of Sale Is Supported By Substantial Evidence And Otherwise In Accordance With Law**

A.    **Relevant Legal Background**

The antidumping statute provides that, in making a dumping comparison, the normal value sales "shall be . . . at a time reasonably corresponding to the time of the . . ." United States sales but does not further define the date of sale.  19 U.S.C. § 1677b(a)(1)(A).  The Statement of Administrative Action (SAA) which accompanies the statute, provides that the date of sale is the "date when the material terms of sale are established."  Uruguay Round Agreements Act, SAA, H.R. Doc. 103-316 at 810 (1994), *as reported in* 1994 U.S.C.C.A.N. 4040, 4153.

Commerce's regulations define the date of sale for both United States sales and comparison market sales by establishing a presumption that the date of sale "normally" will be the invoice date.  19 C.F.R. § 351.401(i).  A respondent proposing something other than invoice date must demonstrate that the material terms of sale were "firmly" and "finally" established on its proposed date of sale. Antidumping Duties; *Countervailing Duties: Final Rule,* 62 Fed. Reg. 27,296, 27,348-49 (Dep't of Commerce May 19, 1997) (Preamble); *see generally Yieh Phui Enter. Co. v. United States*, 791 F. Supp. 2d 1319, 1322-24 (Ct. Int'l Trade 2011).  Two of the primary material terms of sale are price and quantity.  *Nucor Corp., et al., v. United States*, 612

13

F. Supp. 2d 1264, 1312-13 (Ct. Int'l Trade 2009).  The parties to a contract must reach a "meeting of the minds" regarding the material terms of sale in order to depart from the invoice date presumption and use the contract or purchase order date as the date of sale. *See id.* at 1300 (citing Preamble, 62 Fed. Reg. at 27,349)).

This standard "squarely plac{es} the burden on the interested party challenging the presumptive invoice date, to remove any doubt about when material terms are firmly and finally set, so that a reasonable mind has one, and only one, date of sale choice."  *Toscelik Profil ve sac Endustrici, A.S. v. United States*, 256 F. Supp. 3d 1260, 1263 (Ct. Int'l Trade 2017) (citing *Allied Tube & Conduit Corp. v. United States*, 127 F. Supp. 2d 207, 220 (Ct. Int'l Trade 2000) ("Plaintiff, therefore, must demonstrate that it presented Commerce with evidence of sufficient weight and authority as to justify its {date of sale} as the only reasonable outcome.")).

Whether there were material changes to Kaptan's sales between the contract and the invoice date is a factual question. *U.S. Steel Corp. v. United States*, 953 F. Supp. 2d 1332, 1340 (Ct. Int'l Trade 2013).  Specifically, "{i}n choosing a date of sale, Commerce weighs the evidence presented and determines the significance of any changes to the terms of sale involved." *Sahaviriya Steel Indus. Pub.c Co. Ltd. v. United States*, 714 F. Supp. 2d 1263, 1280 (Ct. Int'l Trade 2010).

B.    ***Loper Bright* Does Not Undermine Commerce's Decision To Use The Earlier Of Shipping Date Or Invoice Date As The Date of Sale**

  1. ***Loper Bright* Framework**

Construing the Administrative Procedure Act, 5 U.S.C. § 706, the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2254, 219 L. Ed. 2d 832 (2024) overruled *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc*., 467 U.S. 837 (1984). Under *Chevron*, courts employed a two-step framework for an agency's interpretation of statutes that Congress entrusted them to administer. *Loper Bright*, 144 S. Ct. at 2254. Under step one, a court discerned whether Congress had directly spoken to the precise question at issue, and if congressional intent was clear, that ended the inquiry. *Id.* Under step two, if a court determined that the statute was silent or ambiguous with respect to the specific issue at hand, the court deferred to the agency's interpretation if it as based on a permissible construction of the statute. *Id*.

In *Loper Bright*, the Court held that mere ambiguity in the statute is not a delegation of law interpreting power to the agency and that "{c}ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority." *Id.* at 2273. Although it overruled step two of the *Chevron* framework, in which courts deferred to agencies' reasonable interpretation of silent or ambiguous statutes, the Court stated:

> In exercising such judgment, though, courts may—as they have from the start—seek aid from the interpretations of those responsible for implementing particular statutes. Such interpretations "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance" consistent with the {Administrative Procedures Act}.

*Id.* at 2262 (quoting *Skidmore v. Swift & Co*, 323 U.S. 134 (1944) (*Skidmore*)). Further, in cases in which a statutory ambiguity implicates a technical matter, the Court observed that:

> In an agency case in particular, the court will go about its task with the agency's "body of experience and informed judgment," among other information, at its disposal. And although an agency's interpretation of a statute "cannot bind a court," it may be especially informative "to the extent it rests on factual premises within {the agency's} expertise." Such expertise has always been one of the factors which may give an Executive Branch interpretation particular "power to persuade, if lacking power to control."

*Id.* at 2267 (quoting *Skidmore*, 323 U.S. at 140; *Bureau of Alcohol, Tobacco & Firearms v. FLRA*, 464 U.S. 89, 98 n.8 (1983)). Thus, courts are informed by agencies' interpretation and experience with statutes that Congress entrusted them to administer.

The Court also recognized there are instances in which a statute either expressly or impliedly authorizes an agency to exercise discretion and flexibility:

> the statute's meaning may well be that the agency is authorized to exercise a degree of discretion. Congress has often enacted such statutes. For example, some statutes expressly delegate{} to an agency the authority to give meaning to a particular statutory term. Others empower an agency to prescribe rules to fill up the details of a statutory scheme, or to regulate subject to the limits imposed by a term or phrase that leaves agencies with flexibility, such as appropriate or reasonable.

*Loper Bright*, 144 S. Ct. at 2263 (internal citations and quotation marks omitted). In such instances, reviewing courts "independently interpret the statute and effectuate the will of Congress subject to constitutional limits" "by recognizing constitutional delegations, fix{ing} the boundaries of {the} delegated authority, and ensuring the agency has engaged in reasonable decision making within those boundaries." *Id.* (internal citations and quotation marks omitted).

Additionally, the Court directed that earlier cases relying on *Chevron* remain good law:

> {H}owever, we do not call into question prior cases that relied on the *Chevron* framework. The holdings of those cases that specific agency actions are lawful—including the Clean Air Act holding of *Chevron* itself—are still subject to statutory *stare decisis* despite our change in interpretive methodology. Mere reliance on *Chevron*

> cannot constitute a "special justification" for overruling such a
> holding, because to say a precedent relied on *Chevron* is, at best,
> just an argument that the precedent was wrongly decided.  That is
> not enough to justify overruling a statutory precedent.

*Id.* at 2273 (citing *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 456 (2008); *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 266 (2014); *Dickerson v. United States*, 530 U.S. 428, 443 (2000)).  Thus, precedent sustaining Commerce's interpretation of the antidumping and countervailing duty statutes remains in effect under the principle of *stare decisis* even if a court had reached its decision under step two of the *Chevron* analysis.

And lastly, *Loper Bright* construed the APA, which "specifies that courts, not agencies, will decide '*all* relevant questions of law' arising on review of agency action, . . . —even those involving ambiguous laws—and set aside any such action inconsistent with the law as they interpret it." 144 S. Ct. at 2261 (quoting 5 U.S.C. § 706) (emphasis by Court).  Unlike *Loper Bright*'s reliance on the APA, the standard of review for Commerce's sunset proceedings lacks any similar admonition.  19 U.S.C. § 1516a(b)(1)(B)(i) (standard limited to setting aside determinations that are "unsupported by substantial evidence on the record, or otherwise not in accordance with law").

### 2. *Loper Bright* Does Not Undermine Commerce's Decision To Establish A Rebuttable Presumption That The Date Of Sale Is The Invoice Date

*Loper Bright* overturned the second step of the *Chevron* analysis, directing courts to "use every tool at their disposal to determine the best reading of the statute and resolve the ambiguity." 144 S. Ct. at 2266.  However, here there is no statutory ambiguity to resolve because the traditional tools of statutory construction establish the meaning of the statute.  And to the extent there is any gap or ambiguity in the statute, Congress delegated authority to Commerce to fill it.

Kaptan argues that the term "date of sale" is "not clearly defined in statute." Kaptan Br. at 10. It proposes that the "best" reading of the term requires that Commerce "determine the date of sale based on an independent analysis of the circumstances present in each period of review." Kaptan Br. at 10-12. And Commerce's regulations, which assumes that Commerce will "normally will use the date of invoice" as the "date of sale" unless it is "satisfied that a different date better reflects the date on which the exporter or producer establishes the material terms of sale," 19 C.F.R. § 351.401(i), should be owed no deference by this Court. Kaptan is wrong.

First, the term "date of sale" is not ambiguous. As explained above, while the Tariff Act does not specifically define "date of sale," the Uruguay Round Agreements state that "normally, the date of sale would be the date of contract, purchase order, order confirmation or invoice, whichever establishes the material terms of sale." Agreement on the Implementation of Article VI of the General Agreements on Tariffs and Trade 1994, Article 2.4.1, fn. 8. As this Court has already found, the "language of this provision is unambiguous—the date of sale is to be the 'date on which the material terms of sale are established.'" *Allied Tube & Conduit Corp. v. United States*, 127 F. Supp. 2d 207, 217 (Ct. Intl Trade 2000) (citing H.R. Rep. No. 103–316, vol. 1 at 810 (1994)); *see also Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States*, 625 F. Supp. 2d 1339, 1372 (Ct. Int'l Trade 2009) (same). *Loper Bright*, which solely concerned step two of the *Chevron* analysis, is therefore not applicable to this case. Rather, Kaptan asks this Court overturn decades of precedent affirming Commerce's definition of "date of sale" despite the fact that there has not been a change in law to support such a sweeping change.[3] Indeed, this Court has already determined that that Commerce's interpretation of "date of sale" is reasonable

---

[3] And, even if *Loper Bright* were applicable to this case, the Court in *Loper Bright* explained that prior decisions "are still subject to statutory *stare decisis* despite our change in interpretive methodology." *Loper Bright*, 144 S. Ct. at 2273.

and "consistent with the requirements of the Tariff Act." *Allied Tube*, 127 F. Supp. 2d at 219.

As the Court in *Allied Tube* found:

> By establishing a presumption in favor of invoice date as the date of sale Commerce has not foreclosed the possibility that another date could be chosen as the date of sale. Rather, consistent with the URAA and the SAA, parties are free to offer evidence that another date better reflects the true date on which the material elements of sale were established. Similarly, neither Commerce's practice nor 19 C.F.R. § 351.401(i) impose upon parties seeking to establish a different date of sale an evidentiary standard that is inconsistent with Congress' intent. As in the past, parties must provide satisfactory and compelling evidence that another date is the more appropriate date of sale. This standard is directly in keeping with the URAA's requirements because, under the SAA's broad mandate and Commerce's methodology for determining the date of sale, interested parties bear the burden of providing evidence establishing the specific date of sale.

*Id.* Kaptan offers little argument otherwise. Kaptan argues, citing to a variety of decisions from both Commerce and this Court, that because "Commerce has applied its date of sale methodology inconsistently," its interpretation of the statute is not "the best."[4] Kaptan Br. at 14-15 (citing cases). Kaptan further argues that the "date of sale" determination is not the "best" because Commerce does not have a "reliable" definition of "what constitutes a sale, a material term of a sale, and a final agreement." Kaptan Br. at 19. However, Kaptan concedes that Commerce's interpretation of the statute is "permissible." Kaptan Br. at 17.

---

[4] Kaptan complains that Commerce's standard "causes so much uncertainty for participants like Kaptan." Kaptan Br. at 17-18. In fact, Commerce enacted the regulation at issue because "the use of a uniform date of sale makes more efficient use of the Department's resources and increases the predictability of outcomes." Antidumping Duties; Countervailing Duties—Final Rule, 62 Fed. Reg. 27,296, 27,348 (Dep't of Commerce May 19, 1997). Indeed, prior to Commerce enacting the regulation, "Commerce's customary practice dictated that the date of sale was the date the evidence established as finalizing the material elements of sale." *Allied Tube*, 127 F. Supp. 2d at 217.. This practice was "plagued with significant problems—i.e. "delayed proceedings, increased ... cost[s] to the respondents, complicated verification, and ... unpredictab[ility]." *Id.* (citing Antidumping Duties; Countervailing Duties—Notice of Proposed Rulemaking and Request for Public Comments, 61 Fed. Reg. 7,308, 7,330 (Dep't of Commerce February 27, 1996)).

But whether Commerce has applied its date of sale methodology appropriately in a specific case is a separate question from whether Commerce's regulations—as written—are reasonable given the statutory language.  Indeed, if anything, Kaptan's case citations support the conclusion that, as this Court has previously held, "Commerce's date of sale regulation and the Preamble to the agency's antidumping regulations establish only a 'rebuttable presumption'— and, indeed, one that has been successfully rebutted in numerous cases in the past…" *Nucor Corp.*, 612 F. Supp. 2d at 1304.  And Kaptan fails to acknowledge the significant factual differences that underlie Commerce's decisions and the cited court decisions which, taken together, show a practice of analyzing the record facts in each case to determine whether there has been a meeting of the minds of the buyer and seller to firmly set the material terms of sale.[5] *See* Kaptan Br. at 14-17 (citing cases).

For example, Kaptan cites a preliminary determination from Commerce in *CTL Plate from Romania*, claiming that Commerce found that quantity tolerances within a certain level are not material terms of sale.  Kaptan Br. at 16.  Notwithstanding that a preliminary determination cannot be said to "establish a Commerce practice," there is no indication that the facts of that case are analogous to the present case.  And Kaptan attempts to contrast the *CTL Plate from Romania* administrative decision with a case that *this* Court decided last year, *Kaptan Demir Celik Endustrisi v. Ticaret A.S. v. United States*, 693 F. Supp. 3d 1368 (Ct. Int'l Trade 2024).  Kaptan appears to take issue with the fact that this Court—which cited to and distinguished *CTl Plate from Romania*—concluded that Commerce's decision was "reasonable."  *Kaptan Demir*,

---

[5]  To the extent that Kaptan believes that Commerce's decision in the underlying review of *this* case is inconsistent with prior cases, it is free to make that argument to the Court. However, whether Commerce made findings inconsistent with prior rulings in the present case before the Court is not relevant to whether Commerce's regulation is reasonable in light of the statutory language.

693 F. Supp. 3d at 1376.  But if Kaptan believed this Court erred in its decision, it should have appealed that decision, which it did not do.

In any event, Kaptan does not explain how Commerce's *presumption* in favor of invoice date as date of sale is in anyway contrary to the statutory language.  That is because it cannot. As this Court has held, Commerce's regulation is consistent with the URAA and the SAA, in that parties are "free to offer evidence that another date better reflects the true date on which the material elements of sale were established."  *Allied Tube*, 127 F. Supp. 2d at 219.  Furthermore, "neither Commerce's practice nor 19 C.F.R. § 351.401(i) impose upon parties seeking to establish a different date of sale an evidentiary standard that is inconsistent with Congress' intent."  *Id.*

### 3.   Congress Delegated Authority and Discretion to Commerce

As explained above, the term "date of sale" is not ambiguous.  However, to the extent the Court disagrees, Congress has plainly delegated authority and discretion to Commerce to regulate and determine what constitutes the date of sale in antidumping proceedings.  Although *Loper Bright* overruled *Chevron* deference to agency interpretations of silent or ambiguous statutes under the APA, it did not disturb the Federal Circuit's longstanding recognition that Commerce's determinations in antidumping and countervailing duty matters are entitled to deference *distinct* from *Chevron*, due to the Act's complex and technical nature. *Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. Am. Cast Iron Pipe Co.*, 5 F.4th 1367, 1374-75 (Fed. Cir. 2021) (recognizing "deference {that} is both greater than and distinct from that accorded the agency in interpreting the statutes it administers, because it is based on Commerce's technical expertise"); *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1039 (Fed. Cir. 1996) (same); *Smith-Corona Grp. v. United States*, 713 F.2d 1568, 1582 (Fed. Cir. 1983)

(holding that "review of the statute reveals tremendous deference to the expertise of {} Commerce in administering the antidumping law").

Indeed, the statutory scheme reinforces that Congress intended to delegate significant discretion to Commerce in its implementation of the antidumping duty laws. For example, in the Uruguay Round Agreements Act (URAA), which enacted 19 U.S.C. § 1675(c), Congress expressly approved the Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, Vol. 1 (1994) (SAA), designated the SAA an "authoritative expression by the United States concerning the interpretation and application of" the URAA. 19 U.S.C. § 3512(d). Similarly, the URAA delegated authority to "Commerce to adopt 'such regulations as may be necessary to ensure that any provision of {the URAA}, or amendment made by {the URAA}, that takes effect on the date any of the Uruguay Round Agreements enters into force with respect to the United States is appropriately implemented on such date.'" *Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negots. v. United States*, 66 F.4th 968, 977 (Fed. Cir. 2023) (quoting 19 U.S.C. § 3513(a)(2)) (bracketing by Court).

The broad discretion that Commerce enjoys in its implementation of antidumping and countervailing duty legislation flows from the "intricate framework" established by the Tariff Act of 1930, as amended, and Congress's inability to anticipate in legislation every possible intricacy. *See Smith-Corona Grp.*, 713 F.2d at 1571 (decided a year prior to *Chevron*); *see also Melamine Chems., Inc. v. United States*, 732 F.2d 924, 930 (Fed. Cir. 1984) (holding that Commerce has broad discretion when filling statutory gaps because there is no "prescient Congress . . . devoting a majority of its effort to writing statutes on the daily management of our international trade relations, including much of what may be considered administrivia."). "The number of factors involved, complicated by the difficulty in quantification of these factors and

the foreign policy repercussions of a dumping determination, makes the enforcement of the antidumping law a difficult and supremely delicate endeavor." *Smith-Corona Grp.*, 713 F.2d at 1571. Thus, while the Tariff Act of 1930, as amended, imposes certain "general standards" that must be followed, within the statutory framework, Commerce "has been entrusted with responsibility for implementing the antidumping law {and t}he Secretary has broad discretion in executing the law." *Id.*

Moreover, recently, the Federal Circuit in *Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States* considered whether the market for raw olives was "substantially dependent" on the market for table olives, as required by 19 U.S.C. § 1677-2. 102 F.4th 1252, 1256 (Fed. Cir. 2024). The Court regarded the term "substantially dependent" as general but not ambiguous, and found the case was "more properly viewed as one involving implied delegation of adjudicative authority to the agency rather than deference to the agency's interpretation of an ambiguous statute." *Id.* at 1261. The Court further stated,

> Congress's use of the term "substantially dependent" in section 1677-2 gives Commerce considerable discretion in determining whether particular facts meet that standard. Congress's use of more general language indicates its understanding that assessing dependence, for purposes of section 1677-2, is a holistic determination. It further shows that Congress delegated the task of making that determination to Commerce, based on the circumstances of each case.

*Id.* at 1260.

Furthermore, Commerce's analysis here was "intertwined with the agency's factfinding" and it also entitled to deference for that reason. The Supreme Court recognized in *Loper Bright* that deference may also be owed to "factbound determinations" where "application of a statutory term was sufficiently intertwined with the agency's factfinding." *See* 144 S. Ct. at 2259-60. Commerce's interpretation of the "date of sale" as applied to the facts of this investigation is

inarguably a "factbound determination."  The determination of whether the terms are truly established in the minds of the buyer and seller, is a factual inquiry based on the record evidence. *Kaptan Demir,*, 693 F. Supp. 3d at 1373) ("[T]he question here is whether the evidence relied on by Respondents supports using the contract date rather than the invoice date as the date of sale.").  That factual inquiry is subject to review by this Court for whether the determination is supported by substantial evidence or not in accordance with 19 U.S.C. § 1516a(b)(1)(B).  As we demonstrate below, substantial evidence supports Commerce's finding that the material terms of sale are not set on Kaptan's contract date.

### C.    Substantial Record Evidence Supports Commerce's Determination That Kaptan's Contract Date Was Not The Date of Sale

Contrary to Kaptan's claims, substantial record evidence demonstrates that the material terms of sale of Kaptan's contracts were not set on the date of contract.  Kaptan explained in its section A questionnaire response, describing the type of changes which may take place after the initial agreement, "{f}or U.S. sales, *the parties may amend* the latest shipment date, size breakdown, and, to a lesser extent, quantity *until the goods are shipped/invoiced*."  *Final IDM* at 15 (P.R. 150) (*quoting,* Section A Questionnaire Response at A-22 to A-23 (emphasis added) (P.R. 45)).  Kaptan also included the further explanation that "{h}owever it *appears* that no such amendments occurred in the POR . . ."  *Final IDM* at 15 (P.R. 150) (citing Kaptan Section A Questionnaire Response at A-20 and A-23 (emphasis added)).  These statements make clear that the material terms of the contract can change.  This admission alone demonstrates that at least one party, Kaptan, understood the terms to be mutable until the earlier of the shipping or invoice date.

However, Commerce did not stop its analysis at this point.  Commerce analyzed the contracts with the parties and found that the terms had not changed after the board's internal

resolution and those terms included [████████████████████████████

████████████████████████████████████.]  Final Results Analysis

Memorandum for Kaptan Demir Celik Endustrisi Ve Ticaret A.S./Kaptan Metal Dis Ticaret Ve

Nakliyat A.S. at 2 (Dec. 20, 2023), (*Final Analysis Mem.*) at 2 (C.R. 382), *Final IDM* at 16 (P.R.

150).  Commerce made this finding based on the actual terms in the contract which did not

prohibit such changes but explained the condition under which they could occur.  *Final IDM* at

16 (P.R. 150) (*citing* Kaptan contracts in C-6.b. (C.R. 48) which contain the following term:

"[████████████████████████████████████████████████

████████████████████████████████████████████]).

Finally, Commerce found that [███████████████] a material term, the size[6] breakdown,

was not always included in the contract before the contract was signed.  *Id.* at 16.

Kaptan attempts to overcome these significant factual findings by making several

arguments, none of which have merit.  First, Kaptan argues that the "structure" of its U.S. sales

supports that the appropriate date of sale is the contract date.  Kaptan Br. at 20-23.  Kaptan

explains that, for business reasons, it must set the terms of the contract at the time of the signing

of the contract.  This is especially true, it argues, due to the "fluctuations in steel prices . . . over

the past several years."  Kaptan Br. at 23.  And because Kaptan sets it prices based on the price

of cost of input scrap, it is in Kaptan's interest to set the terms of the contract at the time the

contract is signed.  Kaptan Br. at 23.  In response to this environment, Kaptan claims that its

Board of Directors issued a resolution with the following instructions:



---

[6] "[T]he size breakdown is a reference to the [████████████████] included in the
contract which not only reference the [████████████████], and other material terms.
*Final Analysis Mem.* at 2 (C.R. 382).

[REDACTED]

These instructions, Kaptan argues, demonstrate that the contract terms were set on the signing of the contract.  Kaptan Br. at 28.  This is further supported by the fact that, according to Kaptan, there were, in fact, no changes between the contract date and the earlier of shipping or invoice date.  Kaptan Br. at 20.

While we cannot comment on whether it would be *beneficial* for Kaptan to structure its contracts the way it suggests, the record evidence in this case unequivocally demonstrates that Kaptan did not, in fact, structure its sales contracts that way.  Rather, the "language in Kaptan's sales contracts indicate that parties can revise and modify contracts after signature" and "the language included in Kaptan's sales contracts did not prevent changes from occurring to the material terms of sale after the contract date."  *Final IDM* at 16 (P.R. 150).  Indeed, there is evidence in the record that the material terms of sale were not established on the contract date "because the size breakdown was not always included with the contract."  *Id.* at 16.  And, as Commerce pointed out, Kaptan's supposed reasoning for the date of sale to be the contract date does not hold up to scrutiny.  *Id.* at 18.  As Commerce explained, the "disincentive to incur production costs would date only from production of the made-to-order merchandise, not from the prior contract signing."  *Id.* at 18.  Furthermore, Commerce explained that it has a high inflation methodology which would compensate for such concerns but that the circumstances of this case did not meet the threshold of significant cost changes requiring the use of quarterly costs.  *Id.* at 20-21.

In any event, Commerce found, based on the evidence in the record, that "Kaptan's sales contracts remain unchanged following the board's internal resolution."  *Id.* at 16.  This is because

the record evidence does not show that the board resolution amended the terms of Kaptan's sales contracts.  *Id.* at 16.  Nor is there any evidence in the record that Kaptan ever communicated the board resolution to its U.S. customers. *Id.*  Kaptan claims that the board resolution itself states that [███████████████████████████████████████████████████████].  Kaptan Br. at 28.  But Kaptan failed to place any evidence on the record demonstrating that the board resolution had, in fact, been communicated to its U.S. customers.  *Id.* at 16.  Kaptan also claims that Commerce incorrectly found that the "internal resolution allows [████████████ ██████████████████]." Kaptan Br. at 28.  However, the language of the board resolution plainly *does* allow for [███████████████████.]  Indeed, Kaptan's internal resolution allows [████████████████████████████████████] other material terms of sale.  Accordingly, the evidence on the record does not indicate that the board's internal resolution [████████████████] material terms of the sale. *See Final Analysis Mem.* at 2 (C.R. 382); *Final IDM* at 16 (P.R. 150).  The sales contracts are the only record evidence which show what terms the parties agreed to on the contract date.  And, as Kaptan admits, its sales contracts did not prevent changes from occurring to the material terms of sale after the contract date.  *Final IDM* at 15 (P.R. 150) (quoting, Section A Questionnaire Response at A-22 to A-23 ("{f}or U.S. sales, *the parties may amend* the latest shipment date, size, breakdown, and, to a lesser extent, quantity *until the goods are shipped/invoiced*.") (emphasis added) (P.R. 45)).

Kaptan's argument that the date of sale should be the contract date because during the underlying period of review there were no actual changes in material terms between contract date and invoice or shipping date mischaracterizes the prevailing standard.  *See* Kaptan Br. at 18.  If the material terms are not generally considered to be set until the invoice or shipping date, whether changes actually occur is inconsequential.  Put another way, if the material terms may

27

change up until the earlier of the shipment or invoice date then, they are not set at the contract

date, as no meeting of the minds has occurred.  Indeed, this Court has countenanced

Commerce's decision to rely on the contract date as the date of sale "absent any record evidence

that the material terms of {the respondent's} U.S. sales either had changed or were subject to

change." *Habas Sinai*, 625 F. Supp. 2d at 1373.  Thus, even assuming, arguendo, that no

material terms actually changed between the contract date and the invoice date, Kaptan's explicit

concessions that the material terms *could* change after the contract date precludes a finding that

the material terms of the sale were fixed at the contract date.

Kaptan's citation to Commerce's decision in *CTL Plate From Romania* and this Court's

decision in *Nucor Corp. v. United States* are inapposite.  *See* Kaptan Br. at 25.  In *Nucor*, while

Commerce *initially* found that the contract date was the appropriate date of sale, it later reversed

course and found the invoice date to be the proper date of sale.  *Nucor Corp.*, 612 F. Supp. 2d at

1302).[7]  And the contract at issue in *CTL Plate from Romania* provided that "all parties agree

that there can thereafter be no changes in the terms of the sale." *Final IDM* at 18-19 (P.R. 150)

(citing *CTL Plate from Romania* IDM at Issue 1).  This stands in stark contrast to the contract

language in this case, which [███████████████████████].  Moreover, in

*CTL Plate from Romania*, the record contained affidavits from customers explaining that the

terms were material terms fixed in the contract, Commerce conducted a verification, and the

---

[7]  The Court in *Nucor* ultimately remanded the case back to Commerce for a second time.
*See Nucor Corp.*, 612 F. Supp. 2d at 1340-41.  On remand, Commerce again found that the
invoice date to be the proper date of sale, which the Court sustained.  *See Nucor Corp. v. United
States* (05-616), ECF No. 117 at 44 (Final Results of Redetermination Pursuant to Court
Remand); *Nucor Corp. v. United States*, 34 C.I.T. 31 (2010) (sustaining Commerce's Final
Results of Redetermination Pursuant to Court Remand).

respondent in that case had changed its sales practices. *Final IDM* at 19 (P.R. 150). None of these factors are present here.

Next, Kaptan claims that Commerce's decision was somehow flawed as a result of *Kaptan*'s failure to accurately inform Commerce that its export sales process had allegedly changed. *See* Kaptan Br. at 26. Kaptan argues that Commerce inappropriately "relied upon" a prior review to make its findings in this case. Kaptan is wrong. Commerce did not "merely rely" on its determination from a prior review to make its decision in this case. *Final IDM* at 17 (P.R. 150). Rather, Commerce based its decision on the record in front of it in this review. *See id.* at 17. Commerce explained that Kaptan originally stated that its export sales process had not changed from the prior review. *Id.* at 17. And only after Commerce requested additional information to confirm that statement did Kaptan provide the board resolution discussed above. *Id.* at 17. But Commerce found that Kaptan's sales contracts remain unchanged following the board's internal resolution. *Id.* at 17. It was therefore appropriate for Commerce to refer to the prior review's findings for context. *See Kaptain Demir*, 693 F. Supp. 3d at 1374 ("[T]he fact that there had been no change to sales processes which had been previously resulted in using the invoice date, although no determinative itself, supports a presumption of using the invoice date.").

Kaptan claims that the prior review is distinguishable because, in that review, there were not post-contract changes during the period of review. Kaptan Br. at 27. But the record evidence demonstrates that here the material terms of the contract were not set at the time the contract was signed. *Final IDM* at 16-17 (P.R. 150). Kaptan also alleges the board's resolution was not in front of Commerce during the prior review. Kaptan Br. at 27. But Commerce specifically addressed this issue and found that the board resolution did not change the fact that

the sales contracts allowed for changes to material terms of sale. *Final IDM* at 16-17 (P.R. 150). Thus, the situation in the prior review is analogous and further supports Commerce's finding that Kaptan considered the material terms to be changeable after the contract.

Kaptan also argues that Commerce's reliance on language in its sales contracts—███ ████████████████████████████████████████████████████████ ███████████████████████████████████—to conclude that material changes could be made to the contract was unfounded. Kaptan alleges that the language is "boilerplate" and therefore is "of no real significance." Kaptan Br. at 29. Kaptan is wrong. An explicit term that allows [████████████████████████████ ████████████████████████] is not "of no real significance." Rather, it specifically addresses the crux of the date of sale analysis – that is, when were the material terms set. Kaptan's reliance on this Court's decision from *Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States*, 625 F. Supp. 2d 1339, 1376 (2009) is inapposite. *See* Kaptan Br. at 29. In that case, it was *Commerce* who determined that the proprietary contract clause at issue was "boilerplate." *Habas Sinai*, 625 F. Supp. 2d. at 1376. But Commerce based its decision in the *Habas Sinai* case on the underlying facts and record of *that* case, and the Court found that Commerce's determination was owed deference. *Id.* So too here. Commerce determined, based on its review of the record, that the contract clause at issue is <u>not</u> boilerplate, but rather has direct bearing on whether the material terms of the contract were in fact set or not. *Final Analysis Mem.* at 2 (C.R. 382), *Final IDM* at 16 (P.R. 150). Commerce's determination is both reasonable and supported by substantial evidence in the record.

Finally, Kaptan argues that Commerce's conclusion that a material term of one of the contracts—the size—was not established on the contract date is misplaced.[8]  Kaptan claims that the contract Commerce relied upon was a "draft" contract it had inadvertently provided to Commerce, and that Kaptan later provided a "final" version of the contract which indicated that the size breakdown was established [██████████████████].  Kaptan Br. at 30.  But Commerce properly relied on the contract submitted by Kaptan that plainly did not [██████ ██████████████].  See *Final Analysis Mem.* at 2 (C.R. 382) ("Specifically, one of Kaptan's sales contracts, [████████████████], which was signed [██████████████ ████████████] indicates that the size breakdown ██████████████████ ████.").  Kaptan's arguments that it was a "draft" is unsupported by the record evidence, which shows that the contract [████████████████████████████ ██████████████████████████].  *See Final Analysis Mem.* at 2 (C.R. 382) (citing Kaptan's Response to the Department's Section A Questionnaire, dated November 7, 2022 at Exhibit A-7 at 1).  While Kaptan believes that Commerce should have ignored the contract, it was *Kaptan* who put the contract in the record, and Commerce properly exercised its discretion to rely on it.

Finally, Kaptan argues that use of invoice date as the date of sale results in an absurd outcome.  Kaptan Br. at 31.  Kaptan's argument is based on the fact that the assigned dumping rate is higher than in years past.  *See* Kaptan Br. at 32-33.  But the fact that a margin changes from year to year depends on pricing decisions and fluctuations in costs and the date the material terms are set.  Here, the record evidence demonstrates that the material terms were not set at the

---

[8]  Kaptan does not dispute that Commerce correctly found that the size breakdown in Kaptan's contract was a material term.  *See Final IDM* at 19-20 (P.R. 150); *see also Final Analysis Mem.* at 2 (C.R. 382) (explaining why size is a material term in this contract).

contract date but invoice date.  *Final IDM* at 16 (P.R. 150).  Merely because that date is [█

████] after the contract date does not invalidate that finding or distort the calculation because

the date the terms are fixed is the date that the pricing decision was fixed, and that is the date of

sale used for the comparison window methodology under the dumping calculations.  *See* Kaptan

Br. at 23.  The fact that the preliminary negotiations were some time before the date the material

terms of sale were fixed does not change the fact that the meeting of the minds fixing the

material terms of sale did not take place until the invoice date.

      Kaptan argues that Commerce's interpretation puts the effect of scrap volatility on

Kaptan which does not comport with commercial reality.  Kaptan Br. at 32.  But it is not

Commerce that has put scrap steel price volatility on Kaptan's shoulders; rather, this is the result

of Kaptan's contracts which do not address the volatility of scrap steel pricing and its effect on

subject merchandise pricing.

      Substantial evidence supports Commerce's conclusion that the date of sale for Kaptan's

U.S. sales should be the invoice date.

### III.    Commerce's Decision Use Indexed Annual Weighted-Average Costs For The Calculation Of The DIFMER Adjustment Is Supported By Substantial Record Evidence And Is Otherwise In Accordance With Law

      Kaptan challenges Commerce's difference-in-merchandise (DIFMER) calculation

claiming that it is using more than cost differences for physical characteristics and distorting

costs based on timing.  Kaptan Br. at 33-35.  Somewhat confusingly, Kaptan does not allege that

Commerce should not have used the weighted-average methodology for the COP or CV values.

Rather, Kaptan claims that—solely for the DIFMER analysis—Commerce should use an entirely

different methodology.  *See* Kaptan Br. at 33-34.  But Kaptan does not explain why its approach

is more reasonable when compared to Commerce's approach other than that Kaptan's proposed

approach is more beneficial *to Kaptan*. Indeed, Kaptan spends less than 3 pages of its brief

arguing that the Commerce's approach to the DIFMER analysis is wrong. *Id.* at 33-35. This

Court should reject Kaptan's results-oriented approach.

As Commerce explained, in cases where inflation is present, Commerce employs special

methodologies for comparing prices, and for calculating CV, COP, and DIFMERs to account for

the distortive effect of prices and costs that are increasing rapidly over time. *PDM* at 19 (P.R.

120), *Final IDM* at 22-23 (P.R. 150). In cases where high inflation is present—like the current

case[9]—Commerce requires that a respondent report current monthly costs for the calculation of

COP and CV. *PDM* at 19 (P.R. 120). The reported monthly costs for each CONNUM are

restated to the currency value at the end of the POR using an inflation index to calculate

"constant currency" weighted-average costs. *Id.* at 19. In this way, monthly nominal costs are

adjusted for the cumulative effects of inflation to the end of the POR. *Id.* at 19. Once all

monthly production costs have been expressed in common, end-of-period inflation-adjusted

currency values, Commerce calculates a weighted-average cost for each CONNUM which is

then indexed back (*i.e.*, "deflated") to the respective months of the POR. *Id.* at 19. Commerce

uses the CONNUM-specific deflated indexed weighted-average POR cost of production for

purposes of the sales-below cost test and to calculate constructed value. *Final IDM* at 23 (P.R.

150). This is consistent with Commerce's practice involving cases with high inflation. *Id.* at 23

n.167 (citing *Raw Honey from Argentina: Final Determination of Sales at Less Than Fair Value*

---

[9] Kaptan does not dispute Commerce's finding that Turkey experienced high inflation during the POR. Nor does Kaptan dispute Commerce's conclusion that the use of quarterly cost methodology was not warranted because there was never a 25% or more price difference between quarters. *See PDM* at 19 (P.R. 120).

*and Final Affirmative Determination of Critical Circumstances*, 87 Fed. Reg. 22179 (April 14, 2022) (Raw Honey from Argentina), and accompanying IDM at Comment 3).[10]

In addition, where Commerce matches non-identical products, Commerce's standard high inflation methodology relies on the indexed POR weighted-average variable manufacturing costs (VCOM) in calculating the DIFMER adjustment to normal value.[11]  These indexed figures used in the dumping calculation reflect the real monetary value of any prices or costs being analyzed and express those prices and costs in constant monetary units used in administrative reviews.

Kaptan argues that Commerce should use the unindexed monthly average historical variable costs to calculate the DIFMER adjustment rather than the indexed annual weighted-average costs.  Kaptan Br. at 33.  Kaptan's proposed methodology represents a piecemeal and distortive approach to Commerce's high inflation methodology in that it would have Commerce use indexed POR weighted-average costs for the cost test and for the calculation of CV, yet unindexed monthly average historical variable costs to derive the DIFMER adjustment.  Such a proposal is methodologically inconsistent, and contrary to Commerce's practice which is to use

---

[10]  In relevant part, this Court initially remanded Commerce's decision in *Raw Honey* "for further consideration or explanation Commerce's determination that high inflation in Argentina justified its use of monthly comparisons of Nexco's sales with third country sales when the relevant sales were all made in U.S. dollars." *Nexco S.A. v. United States*, 687 F. Supp. 3d 1296, 1299 (Ct. Int'l Trade 2024).  On remand, Commerce continued to use its "month-to-month comparison for its high inflation methodology because it is consistent with 19 C.F.R. § 351.414(d)(3) and Commerce's practice." *Id.*  The Court sustained Commerce's decision on remand and found that Commerce's "choice to use a monthly averaging period for U.S. and comparison market prices is reasonable." *Id.* at 1307-08.

[11]  In the SAS program, the DIFMER adjustment is calculated as the difference between the variable costs of the home/comparison market model and the variable costs of the U.S. model (*i.e.*, DIFMER = HMVCOM − AVGVCOM).  Ultimately, in deriving normal value, the per-unit DIFMER is deducted from the home/comparison market net price.  Thus, where the home market/comparison market model has a VCOM that is greater than the U.S. model, the DIFMER will be a negative value, which when deducted from net price will yield a higher NV.

POR average costs to calculate the COP. Commerce does so to even out swings in the production costs experienced by the respondent over short periods of time. This way, it mitigates the effect of cost differences that are not explained by the products' physical characteristics and that result from fluctuating raw material costs, erratic production levels, major repairs and maintenance, inefficient production runs, and seasonality. Further, the use of POR average costs ensures that accounting adjustments made at year-end in a respondent's normal books and records are fully reflected in the reported costs. *Final Results of Antidumping Duty Administrative Review: Circular Welded Non-Alloy Steel Pipe from the Republic of Korea: 2012-2013*, 80 Fed. Reg. 32937 (Dep't of Commerce June 10, 2015) and accompanying Issues and Decision Memorandum at Comment 8, Department's Position.

Kaptan's citation to *HRS from Korea* and *CORE from Korea* are inapposite. Kaptan Br. at 33-34. Both cases did not deal with a high-inflation environment, making them inapposite to the current case. Those cases concerned circumstances where specific costs—such as production costs—fluctuated based on the production batch size, causing the price of identical CONNUMs to diverge. *See Final IDM* at 23-24 (P.R. 150). But here, economy-wide inflation affects all costs. Using indexed costs in calculating the DIFMER adjusts for these inflationary effects on input costs.

In cases not involving high inflation, the DIFMER adjustment to NV (which is based on the variable costs of the products which are compared) reflects a weighted-average POR average figure, consistent with the total COPs for each CONNUM that are used in the sales-below-cost test or to compute CV. In high inflation cases, the DIFMER adjustment similarly should be calculated on the same value terms as the indexed weighted-average POI or POR COP and CV

to ensure consistency.[12]  In addition, using the monthly historical figures for DIFMER as Kaptan proposes could result in the inappropriate exclusion of certain periodic (*e.g.*, year-end) cost adjustments that are booked only in one month.

Kaptan's proposal to rely on the unindexed monthly costs for DIFMER presents another complication in high inflation proceedings because it is often the case that not every CONNUM is produced in every month of the POR.  Taking a simple example, assume that a U.S. sale of CONNUM A in the month of March is matched for purposes of the price-to-price comparison to similar CONNUM B sold in that month.  If CONNUM B was not produced during the month of March, there would be no reported historical variable costs for that CONNUM that Commerce could use as the basis for the DIFMER adjustment under Kaptan's scenario.  The indexing methodology to derive a POR weighted average variable unit cost as described above addresses this issue.  Commerce cannot make an adjustment to a calculation involving costs, COP and CV, based on indexed annual weighted-average costs with a DIFMER of unindexed monthly historical weighted-average variable costs.

Kaptan's challenge to the basis of the DIFMER calculation is also an unstated challenge to Commerce's standard practice of preferring annual weighted-average costs in its dumping calculations.  Kaptan Br. at 34.  Kaptan argues that weight-averaging the annual costs for the DIFMER adjustment results are distortive because the U.S. products are made in months with

---

[12]  Commerce does not normally compare products for which the DIFMER adjustment (*i.e.*, variable costs of the home market product less the variable costs of the U.S. product) is more than 20 percent of the total cost of manufacture of the U.S. product.  The purpose of this guideline is to prevent comparing U.S. products to comparison market products that are too dissimilar to render a meaningful comparison.  To determine whether the 20 percent threshold for comparability is met, Commerce uses the following formula: (HMVCOM-USVCOM)/USTOTCOM.  It would be distortive to use a DIFMER based on unindexed monthly historical VCOMS in conjunction with a TOTCOM that reflects the indexed POR average costs.

higher volume and production costs than the NV, thereby skewing cost differences. *Id.* This is inaccurate. The DIFMER calculations are not distortive but represent Kaptan's actual annual weighted average costs adjusted for inflation by indexing first to adjust costs to a similar point in time (i.e. the last month of the POR) to calculate an annual weighted-average cost which is then indexed again back to the month of the comparison NV being used. *PDM* at 19 (P.R. 120), *Final IDM* at 23 (P.R. 150). In other words, the purpose of the high inflation methodology is to ensure that the dumping calculation is not distorted by differences in timing as a result of month-to-month swings in inflation. The alleged "distortion" is not distortion at all but an accurate reflection of Kaptan's annual weighted-average costs indexed for inflation. Kaptan has not challenged the use of the indexed annual weighted-average costs for calculation of COP and CV. The only reason Kaptan calls it a "distortion" in the DIFMER calculation is because using unindexed monthly costs rather than an annual weighted average cost, which is inconsistent with the cost basis used for COP in the below cost test and for computing CV, results in a lower margin *for Kaptan*. Thus, Kaptan's challenge to the DIFMER adjustment must be rejected.

## IV.  Commerce Agrees that Icdas Celik Enerji Tersane ve Ulasim Sanayi, A.S. Should Have The Results Of This Litigation Applied To Its Unliquidated Entries Subject To Its Injunction

Commerce agrees that Icdas Celik Enerji Tersane ve Ulasim Sanayi, A.S., as a plaintiff-intervenor, with an injunction for its entries subject to this litigation, is entitled to have its liquidation and cash deposit rate for the 2021-2022 administrative review changed if the results of this litigation affect the all-others cash deposit rate to which its entries are subject.

## CONCLUSION

For these reasons, we respectfully request that the Court sustain Commerce's final results and deny Kaptan's motion.

Respectfully Submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

s/ L. Misha Preheim
L. MISHA PREHEIM
Assistant Director

OF COUNSEL:

DAVID RICHARDSON
Attorney
U.S. Department of Commerce
Office of the Chief Counsel for Trade
    Enforcement and Compliance
1401 Constitution Avenue, NW
Washington, D.C. 20230


September 20, 2024

s/ Joshua W. Moore
JOSHUA W. MOORE
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Telephone:    (202) 305-2312
Email: Joshua.w.moore@usdoj.gov

*Attorneys for Defendant*

## CERTIFICATE OF COMPLIANCE

I hereby certify, pursuant to section 2(B) of the Standard Chambers Procedures of this Court, that this brief contains 11,890 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

s/Joshua W. Moore
Joshua W. Moore