# UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE JANE A. RESTANI

| | |
|---|---|
| KAPTAN DEMIR CELIK ENDUSTRISI VE TICARET A.S., | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| ICDAS CELIK ENERJI TERSANE VE ULASIM SANAYI, A.S., | ) **NON-CONFIDENTIAL VERSION** |
| | ) |
| *Plaintiff-Intervenor*, | ) |
| | ) Court No. 24-00018 |
| v. | ) |
| | ) Confidential Business Proprietary |
| THE UNITED STATES, | ) Information Deleted from Pages: 13-17. |
| | ) |
| *Defendant*, | ) |
| | ) |
| and | ) |
| | ) |
| REBAR TRADE ACTION COALITION, | ) |
| | ) |
| *Defendant-Intervenor.* | ) |

# REPLY BRIEF OF KAPTAN DEMIR CELIK ENDUSTRISI VE TICARET A.S.

Leah N. Scarpelli
Nancy Noonan
Jessica R. DiPietro
Matthew M. Nolan

ArentFox Schiff LLP
1717 K Street, NW
Washington, DC 20006
Tel: (202) 857-6013
*Counsel for Kaptan Demir Celik Endustrisi ve Ticaret A.S.*

November 1, 2024

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     SUMMARY OF ARGUMENT ............................................................................. 2

III.    ARGUMENT ........................................................................................................ 3

        A.    *Loper Bright* Is Applicable And Undermines Commerce's Presumption In
              Favor Of The Date Of Invoice As The Date Of Sale .............................................. 3

              1.    **Loper Bright Is Applicable And The Court Should
                    Independently Interpret The Statute** ....................................................... 5

              2.    **Commerce's Regulatory Presumption Is Incompatible With
                    The Statute's Best Meaning** ..................................................................... 8

        B.    Substantial Evidence Shows That Kaptan Changed Its Trade Practices
              And Established Material Terms On The Contract Date .................................... 11

              1.    **Commerce Did Not Properly Consider Evidence Detracting
                    From Its Conclusion** ............................................................................... 12

              2.    **The Material Terms of Kaptan's U.S. Sales Were Established
                    In The Contract** ...................................................................................... 16

        C.    There Is No Justification For The Distortions In Commerce's DIFMER
              Adjustment ............................................................................................................ 18

IV.     CONCLUSION ................................................................................................... 21

AFSDOCS:300625093.1

**TABLE OF AUTHORITIES**

**Page(s)**

**Federal Cases**

*Allied Tube and Conduit Corp. v. United States*,
  127 F.Supp.2d 207 (Ct. Int'l Trade 2000) ..................................................... *passim*

*Burlington Truck Lines, Inc. v. United States*,
  371 U.S. 156 (1962) ............................................................................................17

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*,
  467 U.S. 837 (1984) ..............................................................................................7

*Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States*,
  625 F. Supp. 2d 1339 (Ct. Int'l Trade 2009) .................................................. 13-14

*Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*,
  693 F. Supp. 3d 1368 (Ct. Int'l Trade 2024) ......................................................16

*Kumho Tire (Viet.) Co. v. United States*,
  No. 21-00397, slip op. 24-115, 2024 WL 4579775 (Ct. Int'l Trade Oct. 18,
  2024) .......................................................................................................................6

*Loper Bright Enterprises v. Raimondo*,
  144 S. Ct. 2244 (2024) ................................................................................ *passim*

*Marbury v. Madison*,
  5 U.S. (1 Cranch) 137 (1803) ...............................................................................4

*Nakornthai Strip Mill Pub. Co. v. United States*,
  558 F.Supp.2d 1319 (Ct. Int'l Trade 2008) ......................................................4, 7

*Nakornthai Strip Mill Pub. Co. v. United States*,
  614 F.Supp.2d 1323 (Ct. Int'l Trade 2009) ........................................................16

*NTN Bearing Corp. v. United States*,
  74 F.3d 1204 (Fed. Cir. 1995) ............................................................................18

*Nucor Corp. v. United States*,
  612 F.Supp.2d 1264 (Ct. Int'l Trade 2009) ........................................................10

*Payne v. Tennessee*,
  501 U.S. 808 (1991) ..............................................................................................7

*Shenzhen Xinboda Indus. Co. v. United States*,
  456 F.Supp.3d 1272 (Ct. Int'l Trade 2020) ........................................................12

AFSDOCS:300625093.1

*Skidmore v. Swift & Co.*,
   323 U.S. 134 (1944) ..........................................................................................6

*Universal Camera Corp. v. Nat'l Lab. Rels. Bd.*,
   340 U.S. 474 (1951) ........................................................................................12

**Federal Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ...........................................................................6

19 U.S.C. § 1673 ................................................................................................7

19 U.S.C. § 1677a ..............................................................................................7

19 U.S.C. § 1677a(a) ................................................................................ *passim*

19 U.S.C. § 3512(d) ...........................................................................................8

**Regulations**

19 C.F.R. § 351.401(i) ...................................................................................3, 10

**Administrative Determinations**

*Certain Carbon and Alloy Steel Cut-To-Length Plate From Belgium*,
   85 Fed. Reg. 3028 (Dep't Commerce Jan. 17, 2020) (final AD results; 2017-
   2018), and accompanying Issues and Decision Memorandum ..............................19

*Steel Concrete Reinforcing Bar From the Republic of Turkey*,
   88 Fed. Reg. 89663 (Dep't Commerce Ded. 8, 2023) (final AD results; 2021-
   2022), and accompanying Issues and Decision Memorandum ....................... *passim*

**Other Authorities**

*Agreement on the Implementation of Article VI of the General Agreements on
   Tariffs and Trade 1994*, Article 2.4.1 .........................................................9

H.R. Rep. No. 103-316, vol. 1 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040 ..............9

AFSDOCS:300625093.1

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE JANE A. RESTANI**

| | |
|---|---|
| KAPTAN DEMIR CELIK ENDUSTRISI VE TICARET A.S., | ) ) ) |
| *Plaintiff,* | ) ) ) |
| and | ) ) |
| ICDAS CELIK ENERJI TERSANE VE ULASIM SANAYI, A.S., | ) ) ) |
| *Plaintiff-Intervenor,* | ) ) |
| v. | ) ) |
| THE UNITED STATES, | ) ) ) |
| *Defendant,* | ) ) |
| and | ) ) |
| REBAR TRADE ACTION COALITION, | ) ) ) |
| *Defendant-Intervenor.* | ) ) |

<u>**NON-CONFIDENTIAL VERSION**</u>

Court No. 24-00018

Confidential Business Proprietary
Information Deleted from Pages: 13-17.

**REPLY BRIEF OF KAPTAN DEMIR CELIK ENDUSTRISI VE TICARET A.S.**

## I.     INTRODUCTION

Pursuant to Rule 56.2 of the Rules of the United States Court of International Trade, we

respectfully submit this reply on behalf of Plaintiff Kaptan Demir Celik Endustrisi ve Ticaret A.S.

("Kaptan")[1] in response to Defendant United States' Response Brief ("Def. Resp."), ECF Nos. 53

---

[1] In the opening brief, ECF Nos. 42 and 43, Plaintiff-Intervenor Icdas Celik Enerji Tersane ve Ulasim Sanayi A.S. ("Icdas") argued that its margin as a company not selected for individual examination should be recalculated in the event the margin for Kaptan is redetermined pursuant to this appeal. In its response, Defendant agreed that Icdas should have the results of the litigation applied to its entries. Def. Resp. at 37. Petitioners similarly stated that they "d{o} not dispute this point." RTAC Resp. at 2 n.3. Therefore, this Reply Brief is submitted on behalf of Kaptan only.

and 54, and the Rebar Trade Action Coalition's ("Petitioners" or "RTAC") Response Brief, ECF Nos. 51 and 52 ("RTAC Resp."), filed on September 20, 2024.

For the reasons set forth in the opening brief ("Plaintiffs' Br."), ECF Nos. 42 and 43, and below, the U.S. Department of Commerce's ("Commerce") final determination in the antidumping duty ("AD") investigation regarding the 2021-2022 administrative review of the antidumping duty order on *Steel Concrete Reinforcing Bar From the Republic of Turkey* ("Rebar from Turkey") is not supported by substantial evidence or otherwise in accordance with law. *Steel Concrete Reinforcing Bar From the Republic of Turkey,* 88 Fed. Reg. 89663 (Dep't Commerce Dec. 28, 2023) (final AD results; 2021-2022) ("*Final AD Results*"), P.R. 154, ECF 29-4, and accompanying Issues and Decision Memorandum ("*Final IDM*"), P.R. 150, ECF 29-5.

## II.     SUMMARY OF ARGUMENT

Kaptan's reply addresses three issues raised by Defendant and Petitioners in their responses: (1) whether Commerce's regulatory presumption in favor of using date of invoice is permissible in light of the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*; (2) whether Commerce's selection of date of sale in this case is supported by substantial evidence; and (3) whether Commerce's DIFMER analysis is supported by substantial evidence. 144 S. Ct. 2244 (2024).

First, Defendant and Petitioners offer a litany of reasons for why *Loper Bright* is inapplicable to Commerce's determination in this case, none of which are availing. This Court should employ its "full interpretive toolkit" to examine whether Commerce's regulatory presumption reflects the best meaning of 19 U.S.C. § 1677a(a). *Id.* at 2271. Accordingly, the Court should remand the case for Commerce to conduct an independent analysis, free of the impermissible presumption.

Second, Commerce's selection of the earlier of the date of invoice or shipment as the date

of sale is unsupported by substantial evidence. Record evidence detracts from Commerce's determination that the date of invoice is the proper date of sale, so remand is appropriate for Commerce to further consider whether the date of contract better reflects the date on which material terms were established.

Finally, Commerce's DIFMER adjustment is unsupported by substantial evidence because it does not reflect true cost differences and is distorted by timing differences. The Court should remand the issue for Commerce to calculate a monthly DIFMER adjustment from unindexed submitted per unit costs to avoid timing-related distortions.

## III.    ARGUMENT

### A.    *Loper Bright* Is Applicable And Undermines Commerce's Presumption In Favor Of The Date Of Invoice As The Date Of Sale

In the *Final AD Determination*, Commerce relied on the date of invoice as the date of U.S. sales, despite Kaptan reporting the contract date as the date on which material terms are fixed. *Final IDM* at 13, 20–21, P.R. 150. Commerce based this determination on the agency's regulatory presumption to "normally … use the date of invoice" when "identifying the date of sale of the subject merchandise or foreign like product." *See id.* at 13 (quoting 19 C.F.R. § 351.401(i)). The agency also "will only consider a different date if it is satisfied that the material terms of sale are established on a date other than the invoice date." *Id.* at 14. This presumption does not reflect the best meaning of 19 U.S.C. § 1677a(a), and the Court should reexamine its interpretation in light of the Supreme Court's holding that "{c}ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority." *Loper Bright*, 144 S. Ct. at 2273; *see* Plaintiffs' Br. at 12, ECF Nos. 42, 43 (arguing that the statute requires Commerce to "comprehensively review evidence on the record in each review … without a presumption in favor of a specific date").

3

As Kaptan discussed in its opening brief, 19 U.S.C. § 1677a(a) does not define the terms "sold" or "agreed" to be sold, which previously left "the precise definition of 'date of sale' to the agency." Plaintiffs' Br. at 10 (quoting *Nakornthai Strip Mill Pub. Co. v. United States*, 558 F.Supp.2d 1319, 1325 (Ct. Int'l Trade 2008). The Defendant argues "date of sale" is not ambiguous but acknowledges that the statute is silent on its meaning. Def. Resp. at 18 (stating that "the Tariff Act does not specifically define 'date of sale'"); *cf.* RTAC Resp. at 20 (stating that "'date of sale' is not explicitly defined in the Act"). Under the *Chevron* regime, the Court took different approaches to resolving the interpretive question. *Compare Nakornthai*, 558 F.Supp.2d at 1325 (noting the statute is "ambiguous" and applying *Chevron* deference because the statute left "the precise definition of 'date of sale' to the agency"), *with Allied Tube and Conduit Corp. v. United States*, 127 F.Supp.2d 207, 216–17 (Ct. Int'l Trade 2000) (noting that the "Tariff Act is silent regarding the appropriate date of sale" but holding that "Congress has stated that the {Statement of Administrative Action} constitutes an authoritative expression concerning the application and interpretation of the Uruguay Round Agreements in any judicial proceeding," so the court "must determine whether Commerce's date of sale policy … {is} consistent with the Uruguay Round Agreements' requirements and Congress' intent"). *Id.* at 217.

*Loper Bright* reiterates that it is "'emphatically the province and duty of the judicial department,'" not the agency, "'to say what the law is.'" *Loper Bright*, 144 S. Ct. at 2257 (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803)). The Defendant and Petitioners offer no compelling reason for why this Court should not: (1) apply its full "interpretive toolkit" to interpret the "best meaning" of the statute and (2) hold that the best reading of the statute does not include a regulatory presumption favoring date of invoice. *Id.* at 2271. Should the Court hold that

AFSDOCS:300625093.1

Commerce's regulatory presumption is unlawful, remand is appropriate for the agency to reconsider its date of sale determination.

1.       *Loper Bright Is Applicable And The Court Should Independently Interpret The Statute*

Defendant and Petitioners offer a litany of reasons for why *Loper Bright* is inapplicable in this case and why this Court should not independently interpret the best meaning of the statute, none of which are availing. RTAC Resp. at 19–27; Def. Resp. at 15–21.

The Petitioners contend that "Commerce's selection of the appropriate 'date of sale' … arose from the agency's resolution of a question of fact as to when material terms of Kaptan's U.S. sales were firmly and finally established, rather than its interpretation of a statute." RTAC Resp. at 19. However, Kaptan challenges both the legality of Commerce's interpretation, including its regulatory presumption in favor of date of invoice, and the sufficiency of its factual determination for the proper date of sale.[2]  Plaintiffs' Br. at 12 (arguing that the "best" interpretation requires Commerce to independently analyze the circumstance in each period of review); *id.* at 20-31 (arguing that Commerce's determination is unsupported by substantial evidence); *cf.* Def. Resp. at 20 ("{W}hether Commerce has applied its date of sale methodology appropriately in a specific case is a separate question from whether Commerce's regulations—as written—are reasonable given the statutory language."). Statutory analysis and this legal question are squarely within the purview of the Court.

---

[2] Defendant also argues that if "date of sale" is ambiguous, Commerce is entitled to deference because its analysis was "'intertwined with the agency's factfinding.'" Def. Resp. at 23 (quoting *Loper Bright*, 144 S. Ct. at 2259–60). This argument only applies to Commerce's factual determination, which would be analyzed under substantial evidence review, and not whether Commerce's presumption comports with the statute. *See id.* at 23–24. In any case, Commerce's determination is unsupported by substantial evidence and its regulation is invalid under the statute's best meaning.

5

Defendant attempts to distinguish *Loper Bright* because the case involved the Administrative Procedure Act ("APA") and not the substantial evidence standard. *Compare* Def. Resp. at 17 (noting APA language "that courts, not agencies, will decide all relevant questions of law." (quoting *Loper Bright*, 144 S. Ct. at 2261) (internal quotation marks omitted)), *with* 19 U.S.C. § 1516a(b)(1)(B)(i) (requiring that this Court set aside determinations that are "unsupported by substantial evidence on the record, or otherwise not in accordance with law."). This argument is a distinction without a difference that overlooks the clear holding that "{c}ourts must exercise their independent judgement in deciding whether an agency has acted within its statutory authority." *Loper Bright*, 144 S. Ct. at 2273. When deciding whether an agency action is in accordance with law under substantial evidence review — as it would in deciding whether an agency has acted within its statutory authority under the APA — the Court must still use its independent judgment to say what the law is. *See Kumho Tire (Viet.) Co. v. United States*, No. 21-00397, slip op. 24-115, 2024 WL 4579775, at *43 (Ct. Int'l Trade Oct. 18, 2024) (applying *Loper Bright* as "holding that there is a best reading of a statute, which is 'the reading a court would have reached' if no agency were involved." (quoting *Loper Bright*, 144 S. Ct. at 2266)).

Defendant and Petitioners also invoke agency expertise. RTAC Resp. at 20 (arguing that Commerce's "special expertise" entitles it to deference distinct from *Chevron*); Def. Resp. at 15–16 (same). But as noted in *Loper Bright*, "{I}n an agency case in particular, the reviewing court will go about its task with the agency's 'body of experience and informed judgment,' among other information, at its disposal." 144 S. Ct. at 2267 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). Kaptan is requesting that the Court interpret the statute and analyze whether the regulation comports with its best meaning, so Commerce's agency expertise is of limited value and should not be entitled to additional deference.

6

Finally, Defendant and Petitioners heavily rely on *Allied Tube* as foreclosing interpreting the statute anew because: (1) *Loper Bright* does not disturb the statutory *stare decisis* effects of prior constructions and (2) there is no ambiguity because *Allied Tube* interpreted the statute and upheld Commerce's regulation (so that holding did not rely on the now-defunct *Chevron* step two). Def. Resp. at 15–19; RTAC Resp. at 20.[3] The Court should not apply *stare decisis* to the interpretation in *Allied Tube*, and a reexamination of that case's analysis undermines the validity of Commerce's regulatory presumption.

First, it is well established that "{*s*}*tare decisis* is not an 'inexorable command,'" *Loper Bright*, 144 S. Ct. at 2270 (quoting *Payne v. Tennessee*, 501 U.S. 808, 828 (1991)), and courts should not feel "constrained to follow precedent" when governing decisions are "unworkable or are badly reasoned." *Payne*, 501 U.S. at 827. Defendant and Petitioners offer no explanation for why the Court must apply *stare decisis* to *Allied Tube*, which purported to interpret the statute under *Chevron* step one, when a more recent opinion resolved the same interpretive question under *Chevron* step two. *Nakornthai*, 558 F.Supp.2d at 1325 ("Because the statute is ambiguous, the court will defer to Commerce's reasonable interpretation of {19 U.S.C. §§ 1673 and 1677a}" (citing generally *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984))). To the extent *Allied Tube* employed the tools of statutory interpretation to construe the statute, such tools would be available to aid the Court here. But the Defendant and Petitioners offer no reason why *Loper Bright* requires standing by *Allied Tube* when the Court did not do so under *Chevron*. Because the CIT has not consistently applied *Chevron* (or *Allied Tube*) to the statutory provisions at issue, the Court should interpret the statute anew under *Loper Bright*.

---

[3] Specifically, the Supreme Court stated that in overruling *Chevron* "we do not call into question prior cases that relied on the *Chevron* framework{,}" and that the holdings are still subject to statutory *stare decisis*. *Loper Bright*, 144 S. Ct. at 2273.

7

Second, Defendant and Petitioners cite *Allied Tube* because "Congress has 'authoritatively' expressed its intent{,} and the agency's date of sale regulations and selection of date of sale based on the record evidence conform with that intent." RTAC Resp. at 20 (citing *Allied Tube*, 127 F.Supp.2d at 216–21; *see also* Def. Resp. 17–19 (characterizing *Allied Tube* as having used "the traditional tools of statutory construction {to} establish the meaning of the statute."). Because the CIT has not consistently applied the reasoning in *Allied Tube*, however, the Court should reexamine whether that case truly reflects the best meaning of the statute. Following the Supreme Court's opinion in *Loper Bright*, this Court should look with fresh eyes at Commerce's regulation, including its regulatory presumption in favor of date of invoice.

## 2.  *Commerce's Regulatory Presumption Is Incompatible With The Statute's Best Meaning*

As detailed above, this Court should not afford *stare decisis* effects to the holding in *Allied Tube*. However, it should consider a similar interpretive analysis, informed by the Statement of Administrative Action ("SAA") and the Uruguay Round Agreements ("URAA"). *Loper Bright*, 144 S. Ct. at 2262 (mandating that courts exercise "independent judgment in determining the meaning of statutory provisions" but stating "courts may … seek aid" in "interpretations issued contemporaneously with the statute at issue{.}"); *see also* 19 U.S.C. § 3512(d) (stating that the SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the {URAA} and this Act in any judicial proceeding in which a question arises concerning such interpretation or application"). All parties agree that the SAA and URAA are important tools to interpret "date of sale." Plaintiffs' Br. at 10–11; Def. Resp. at 18; RTAC Resp. at 3, 21.  And after noting that "the Tariff Act is silent regarding the appropriate date of sale{,}" the *Allied Tube* court looked to both these sources to construe the statute. *Allied Tube*, 127 F.Supp.2d at 216–17. However, the language of those interpretations — particularly the URAA

AFSDOCS:300625093.1

— does not support Commerce's regulatory presumption in favor of invoice date, and neither Defendant nor Petitioner anchor Commerce's regulatory presumption in the language of the statute, the URAA, or the SAA beyond quoting those provisions. Def. Resp. at 18; RTAC Resp. at 3.

The statute, 19 U.S.C. § 1677a(a), does not define the terms "sold" or "agreed" to be sold, much less contemplate a presumption to determine the proper date of sale. The SAA provides more detail, stating that the date of sale is the "date when the material terms of sale are established." H.R. Rep. No. 103-316, vol. 1, at 810 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4153. The main clause of the URAA adds that "Normally, the date of sale would be the date of contract, purchase order, order confirmation or invoice{.}" *Agreement on the Implementation of Article VI of the General Agreements on Tariffs and Trade 1994*, Article 2.4.1 n.8. The subordinate clause modifies the main clause by imposing a condition: "whichever {of the options provided in the main clause} establishes the material terms of sale" is the date of sale. *Id.* However, neither clause expresses an inherent preference for which date is *more* likely to or presumptively establishes the material terms of sale. If anything, the URAA holds the date of contract and invoice as equally probable. *Compare id.* ("Normally the date of sale would be the date of contract … or invoice, whichever establishes the material terms of sale."), *with Final IDM* at 14, P.R. 150 ("{T}he date of invoice is the preferred date of sale, and Commerce will *only* consider a different date if it is satisfied that the material terms of sale are established on a date other than the invoice date.") (emphasis added). Beyond citing *Allied Tube*, the Defendant and Petitioners do not explain why this analysis must begin with a regulatory presumption in favor of the invoice or date of sale. This is problematic given that the *Allied Tube* court concluded from its analysis of both the SAA and URAA that the date of sale is the date when "the material terms of sale are established," *Allied*

*Tube*, 127 F.Supp.2d at 217, but otherwise did not engage with the main clause in the URAA provision.    Instead, the *Allied Tube* court accepted Commerce's presumption based on "administrative efficiency and commercial practicality" considerations and previous issues with Commerce's "customary practice" that "the date of sale" was "the date the evidence established as finalizing the material elements of sale." *Allied Tube*, 127 F.Supp.2d at 217-18.  Additionally, the court was satisfied that the presumption would provide a "consistent methodology" and "allow{} Commerce and parties the flexibility to alter the date of sale where satisfactory evidence demonstrates that another date better reflects when the material elements of sale were finalized." *Id.* at 219.    Accordingly, the court held that 19 C.F.R. § 351.401(i) was "*consistent* with the requirements of the Tariff Act, as amended by the URAA." *Id.* (emphasis added).  It did not rule whether Commerce's regulation was the *best reading* of those provisions.

Here, the Court should examine whether the *Allied Tube* court employed its "full interpretive toolkit" and fully construed the statute before it concluded that Commerce's regulatory presumption was reasonable.  *See Loper Bright*, 144 S. Ct. at 2271.  In particular, the Court's relative silence on the URAA provision's main clause weakens its holding.  *See id.* at 2266 ("{C}ourts use every tool at their disposal to determine the best reading of the statute and resolve {any} ambiguity.").  Contrary to the court's understanding in *Allied Tube*, Commerce's standard has proven unpredictable and "effectively un-rebuttable." *Compare* Plaintiffs' Br. at 14–15, *with Nucor Corp. v. United States*, 612 F.Supp.2d 1264, 1300 (Ct. Int'l Trade 2009) ("Congress thus 'expressed its intent that, for antidumping purposes, the date of sale be *flexible* so as to accurately reflect the true date on which material elements of sale were established.'" (quoting *Allied Tube*, 127 F.Supp.2d at 219)).

AFSDOCS:300625093.1

Using all tools of statutory construction and seeking the best meaning of the statute, as construed by the URAA and SAA, forecloses Commerce's presumption in favor of invoice date. Instead, 19 U.S.C. § 1677a(a) requires Commerce to determine the date of sale "based on an independent analysis of the circumstances present in each period of review." Plaintiffs' Br. at 12. Because Commerce's regulation undergirds its date of sale determination, remand is appropriate for Commerce to reconsider its determination without the impermissible presumption.

### B.    Substantial Evidence Shows That Kaptan Changed Its Trade Practices And Established Material Terms On The Contract Date

Even if Commerce's presumption in favor of invoice date is a permissible interpretation, which Kaptan maintains it is not, the determination to use the earlier of the invoice date or date of shipment as date of sale is unsupported by substantial evidence. In its opening brief, Kaptan identified record evidence demonstrating that the material terms of its U.S. sales were finalized on the dates of its contracts and did not, and could not, change.  Plaintiffs' Br. at 20–25. Kaptan also described how the structure of its U.S. sales differs from home market sales, necessitating a formal written contract that memorializes material terms, such as price and quantity, before production even begins. *Id.* at 21–24. Finally, Kaptan described how a Board of Directors resolution amended the company's export sales procedures due to steel price volatility. *Id.* at 24–25.

In its opening brief, Kaptan addressed each of four primary factors in Commerce's determination to use the earlier of shipment or invoice date as date of sale: (1) the agency's findings in previous review periods, (2) Kaptan's Board resolution, (3) language in Kaptan's sales contracts, and (4) an alleged discrepancy in a particular sales contract. *Id.* at 26–31. Contrary to Defendant and Petitioners' contentions, the material terms of Kaptan's U.S. sales were established in its contracts, those material terms did not change outside of quantity tolerances prior to invoice date,

AFSDOCS:300625093.1

and could not, in fact, change. Therefore, Commerce's determination to use date of invoice or shipment as the date of sale lacks substantial evidentiary support.

        1.    ***Commerce Did Not Properly Consider Evidence Detracting From Its Conclusion***

In making its determination, Commerce improperly relied on its prior review in reaching its determination and did not properly weigh new evidence on the record detracting from its conclusion to continue relying on invoice date as the date of sale in this segment. *See Universal Camera Corp. v. Nat'l Lab. Rels. Bd.*, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must take into account whatever in the record fairly detracts from its weight.").

As an initial matter, Commerce claims that "Kaptan never stated that its export sales process changed or provided documentation to demonstrate a change" until Commerce "requested that Kaptan 'provide a detailed explanation of any changes in {its} sales process since the prior administrative review." However, Commerce's longstanding practice is to treat each review as its own separate proceeding. *See, e.g.*, *Shenzhen Xinboda Indus. Co. v. United States*, 456 F.Supp.3d 1272, 1285 n.22 (Ct. Int'l Trade 2020) ("{E}ach administrative review is a separate segment of an antidumping proceeding and each with its own, unique administrative record{.}"). Moreover, Commerce can hardly fault Kaptan for providing responsive documentation to a question that it asked for in a supplemental questionnaire.

While both Defendant and Petitioners argue that Commerce properly relied on language in Kaptan's Section A questionnaire response as demonstrating that the material terms were not set on the date of contract, Def. Resp. at 24 & RTAC Resp. at 27–28, this focus on Kaptan's initial questionnaire response fails to properly consider other record evidence Kaptan properly submitted throughout the review. Specifically, Commerce did not fully grapple with a resolution from its Board that amended Kaptan's export sales procedures to "explicitly prohibi{t} changes from

AFSDOCS:300625093.1

occurring to the material terms of sale after the contract date." Def. Resp. at 27–28. Despite

recognizing the existence of this resolution, Commerce's determination, as well as the response

briefs from Defendant and Petitioners, RTAC Resp. at 29–30; Def. Resp. at 24–27, all suffer from

the same defective throughline: a hypothetical focus on whether the material terms *could change*,

over facts that they *did not and could not* change as a practical matter. *See* Plaintiffs' Br. at 29.

Defendant and Petitioners argue that Kaptan's contracts contain form language contemplating

changes and speculate that the resolution was not communicated to Kaptan's suppliers and

customers.[4] RTAC Resp. at 29–30; Def. Resp. at 24–27. The Defendant further states that the

resolution was not reflected in any contract amendments. Def. Resp. at 26–27 (citing *Final IDM*

at 16, P.R. 150). [5] Finally, the Defendant cites *Habas Sinai ve Tibbi Gazlar Istihsal Endustrisi A.S.

v. United States* for the proposition that even if no material terms actually change between the

contract date and the invoice date, "Kaptan's explicit concessions that the material terms *could*

change after the contract date" preclude finding that the material terms were fixed on the contract

date. Def. Resp. at 28 (citing 625 F.Supp.2d 1339, 1373 (Ct. Int'l Trade 2009)).

---

[4] The Petitioners also state that one of Kaptan's contracts occurred before the Board resolution. RTAC Resp. at 30. However, the Petitioners do not contend that the material terms of this contract changed after the date of the contract. *See id.*

[5] In its opening brief, Kaptan explained that "Commerce misinterpreted language in the Board resolution, which provides that '[                                                                                          ],' to mean that the 'internal resolution allows [                                               ].'" Plaintiffs' Br. at 28 (citing Memorandum from B. Ballesteros to the File, re: Final Results Analysis Memorandum for Kaptan Demir Celik Endustrisi Ve Ticaret A.S./Kaptan Metal Dis Ticaret Ve Nakliyat A.S. at 2 (Dec. 20, 2023), C.R. 382, P.R. 151 ("Final Analysis Memo")). Petitioners claim that this appears to be a typo. *See* RTAC Resp. at 29 n.10. However, the Defendant takes Commerce's interpretation at face value, arguing that "the language of the board resolution plainly *does* allow for [                          ]" and "[                                               ] other material terms of sale." Def. Resp. at 27 (citing Final Analysis Memo at 2). Kaptan reiterates that the resolution permits [                          ], which are [                          ]. Plaintiffs' Br. at 28. The latter periodically constitute a material term for Commerce, but the former never has. *Id.* (citing Footnotes 1 & 4, *supra*).

AFSDOCS:300625093.1

None of these arguments are supported by the record. First, Commerce's reliance on form language in Kaptan's contracts is misplaced and Commerce has found standard, boilerplate language to be "of no real significance" previously. *Habas Sinai*, 625 F.Supp.2d at 1376. The form language in question provides that [

]. Final Analysis Memo at 2, C.R. 382, P.R. 151 (citation omitted). The Government and Petitioners exaggerate the significance of this language, Def. Resp. at 30; RTAC Resp. at 29, which simply mandates that [                                               ]. The statement does not seriously contemplate that there will actually be changes; when read in conjunction with the Board resolution, it does the opposite. Kaptan's contracts state that [

]. The Board resolution in effect during the POR confirms that [

] and that [

]. In other words, [

]. This is consistent with Kaptan's actual contracts during the POR, which "were finalized on the date of contract and were *always* consistent with the final invoice, within permissible tolerances." Plaintiffs' Br. at 29 (quoting Kaptan's Response to the Department's Supplemental Sections A-C Questionnaire at Exh. S1-40 (June 1, 2023) ("Supp. A-C QR"), C.R. 186, P.R. 89); *id.* at 31 (citing Kaptan's Response to the Department's Section C Questionnaire at Exh. C-6a-b (Dec. 8, 2022) ("Sec. C QR"), C.R. 48–49, P.R. 61). A reasonable factfinder would thus find that the material terms of Kaptan's contracts could not, and did not, change, regardless of the form language.

14

Second, Commerce's conclusion that "Kaptan has not provided any evidence that this change {in its export sales procedures in the resolution} was communicated to its U.S. customers" lacks evidentiary support. *Final IDM* at 16, P.R. 150. The language of the resolution provides that the [                                                                                              ], requires for Board approval of *every* U.S. sale and scrap purchase contract, and forbids post-contract amendments. Plaintiffs' Br. at 28 (citing Supp. A-C QR at 27 and Exh. S1-40, C.R. 180, 186 P.R. 89–90; Kaptan's Responses to the Department's Third and Fourth Supplemental Questionnaires at Exh. S3-14 (July 20, 2023) ("3rd&4th Supp. QR"), C.R. 335, P.R. 117). These provisions necessarily indicate that the change was "communicated and actionable" for Kaptan's U.S. sales during the POR, as substantiated by the fact that there were no changes to Kaptan's contacts during the POR. Plaintiffs' Br. at 28. Indeed, Kaptan provided the Board approval documents for specific invoices selected by Commerce, which substantiates that this policy was in effect throughout the review period. Plaintiffs' Br. at 28 (citing 3rd&4th Supp. QR at Exh. S3-14).

Finally, Defendant's reliance on *Habas Sinai* is likewise misplaced. Kaptan pointed to record evidence that its Board took steps to limit material changes after the contract date. Plaintiffs' Br. at 31. It also reported that "all major terms of sale, including the price, quantity, size breakdown, and latest date of shipment were finalized on the date of contract and did not change between the invoice and contract date," Plaintiffs' Br. at 5 (citing Sec. C QR at C-19–20, C.R. 48, P.R. 61), and provided a "comparison chart, which demonstrates that the material terms of Kaptan's sales are set on the contract date and are consistent with the final invoice, within permissible tolerances." Plaintiffs' Br. at 5 (citing Sec. C QR at C-20, Exh. C-6.a).  That the material terms did not in fact change outside of permissible tolerances supports Kaptan's assertion that they could not change because of the Board resolution. This fact also detracts from Commerce's singular reliance on

15

boilerplate contract language for the notion that the material terms were set after date of contract because the terms hypothetically *could* change (despite the plain language of the Board resolution establishing that, practically, they could not).

In relying on *Habas Sinai*, the Defendant claims that, even assuming no material terms actually changed, "Kaptan's concessions that the material terms *could* change … precludes a finding that the material terms of the sale were fixed at the contract date." Def. Resp. at 28. However, this Court has not articulated such an exacting standard. *See e.g., Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States*, 693 F.Supp.3d 1368, 1375 (Ct. Int'l Trade 2024) ("Prior caselaw is filled with examples of Commerce considering contracts that allow for minor changes between the contracting and invoicing stages. Commerce has decided cases both ways{.}"); *see also Nakornthai Strip Mill Pub. Co. v. United States*, 614 F.Supp.2d 1323,  1331-33 (Ct. Int'l Trade 2009) (rejecting the "hypothetical reasoning" that respondents could "manipulate the 'product mix'" within the overall quantity of a contract such that is would constitute a material change). Commerce failed to consider record evidence that Kaptan could not and did not change the material terms after the date of contract in this review.

2. ***The Material Terms of Kaptan's U.S. Sales Were Established In The Contract***

Defendant and Petitioners claim that "the record showed that for at least one contract, the size breakdown … was not finalized until after the contract date." RTAC Resp. at 25, 30–31; *see also* Def. Resp. Br. at 31. Specifically, Commerce alleged that "a material term of sale was not established on the contract date" because sales contract [                    ] "was signed [                                        ]." Final Analysis Memo at 2-3, C.R. 382, P.R. 151. However, Kaptan has established that Commerce misinterpreted the record evidence – though Kaptan inadvertently provided a draft contract in Kaptan's its Section A response, the final version

16

of the same contract was provided in Kaptan's Section C response. *See* Plaintiffs' Br. at 30; *Compare* Sec. A QR at Exh. A-7, C.R. 7, P.R. 45, *with* Sec. C QR at Exh. C-6.b, C.R. 48–49, P.R. 61. The final version of Kaptan's contract includes the size breakdown.

Nevertheless, Defendant and Petitioners argue that the draft contract is controlling because it was signed, with a first page indicating that the term [

]. Def. Resp. at 31; *see also* RTAC Resp. at 30. However, Kaptan has consistently stated and certified to Commerce that "{t}he size breakdown of Kaptan's sales is *not* determined after the contract date." Plaintiffs' Br. at 30 (quoting Supp. A-C QR at 29, C.R. 180, P.R. 89; Case Br. at 26, C.R. 377, P.R. 136). Kaptan also provided the size breakdown in the final version of the contract, which is the date that it submits Commerce should use as the date of sale. *See* Kaptan's Response to the Department's Section A Questionnaire at Exh. A-7 (Nov. 7, 2022) ("Sec. A QR"), C.R. 7, P.R. 45; *see also* Sec. C QR at Exh. C-6.b, C.R. 48–49, P.R. 61. Kaptan further clarified this issue in its supplemental questionnaire response, which explains the inadvertent placement of the draft, rather than final, version of the contract on the record. Supp. A-C QR at 29, C.R. 180, P.R. 89. Commerce failed to consider record evidence that clarifies the alleged discrepancy, so its determination is unsupported by substantial evidence.[6]

Finally, Petitioners and Defendant contend that Commerce's date of sale determination did not yield absurd results. RTAC Resp. at 32–34; Def. Resp. at 31–32. As detailed in the opening brief, however, Commerce's date of sale determination unquestionably drove Kaptan's unusually

---

[6] Though Petitioners separately argue that there are other alleged discrepancies with Kaptan's contracts, Commerce's determination did not rest on these additional facts. *Compare* RTAC Resp. at 31, *with* Final Analysis Memo at 2, C.R. 382, P.R. 151. The Court should therefore reject the Petitioners' additional post hoc reasoning. *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962) ("The courts may not accept appellate counsel's *post hoc* rationalizations for agency action{.}").

high margin in this review. This is because fluctuations in raw material costs, while not sufficient to warrant an alternative cost reporting methodology, still informed Kaptan's practice of selling rebar based on the price of scrap at the date of contract, not the date of shipment or invoice. Plaintiffs' Br. at 32 (citing Kaptan's Case Brief at Exh. 1 (Aug. 31, 2023) ("Kaptan Case Br.")), C.R. 377, P.R. 136. The Defendant correctly notes that the margin depends, at least in part, on "the date material terms are set" — a factor dictated by Commerce's date of sale determination. Def. Resp. at 31. As Kaptan explained, the antidumping margin in this review was aberrational, Plaintiffs' Br. at 31–32 & n.7, and Commerce failed to fully analyze the record to determine Kaptan's dumping margin as accurately as possible in this review. *See e.g.*, *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 1995).

### C. There Is No Justification For The Distortions In Commerce's DIFMER Adjustment

In its opening brief, Kaptan argued that Commerce's calculation of the DIFMER adjusted created distortions due to timing differences. Specifically, when U.S. CONNUMs are produced in higher volumes in the months where the unit cost is higher compared to the comparison market CONNUM, the per unit cost of the U.S. CONNUM increases and the DIFMER adjustment is significantly inflated. As an example, Kaptan provided the price comparison between two U.S. CONNUMs, which were initially with a negative DIFMER based on monthly costs, but ultimately turned positive as the result of Commerce's averaging and indexing. Plaintiffs' Br. at 34-35 (citing Kaptan Case Br. at Exh. 2, C.R. 377, P.R. 136).

In their response, Defendant and Petitioners make several arguments in defense of Commerce's methodology. For the reasons that follow, however, none of these have merit, nor justify the distortive impact of Commerce's indexed and averaged DIFMER calculation in the *Final AD Determination*. The primary argument of both Defendant and Petitioners is that the same

18

high inflation methodology applicable to CV and COP must also apply to DIFMER, and that because Kaptan does not challenge Commerce's use of the weighted-average methodology for the COP or CV values, its challenge to DIFMER is without merit. Def. Br. at 32-33; RTAC Br. at 38-39. Despite these claims, Kaptan's proposed DIFMER methodology is not "methodologically inconsistent," "mismatched," or "piecemeal." Def. Br. at 34; RTAC Br. at 36. As an initial point, in a high inflation environment, Commerce relies on reported monthly indexed costs are used to determine whether domestic sales are above or below cost. DIFMER, by contrast, is used as a tool to compare the prices of two non-identical CONNUMs that match as "SIMILAR." These are different calculations that are used by Commerce in different ways –while the COP is used in the comparison market portion of the SAS program, DIFMER is used in the margin calculation program.

Unlike COP or CV, the issue with Commerce's calculation of the DIFMER adjustment is not related to the existence of inflation, but rather an indirect consequence of the fact that Commerce's high inflation methodology relies on monthly costs. Generally, Kaptan calculates a single, POR-wide direct material cost (DIRMAT) for each CONNUM, which removes the impact of timing differences at issue here. This is consistent with Commerce's precedent that the DIFMER adjustment should only reflect the cost differences arising from physical characteristics and nothing else. *See, e.g.*, *Certain Carbon and Alloy Steel Cut-To-Length Plate From Belgium*, 85 Fed. Reg. 3028 (Dep't Commerce Jan. 17, 2020) (final AD results; 2017-2018), and accompanying Issues and Decision Memorandum at 25. Though Petitioners claim that "Kaptan's choice to produce more or less of particular CONNUMs at different times in the POR, they reflect such differences no more nor less than they do outside of the high inflationary context," this is plainly untrue. RTAC Br. at 38. In a high inflation environment, the mandated reporting of monthly costs

does not account for such timing issues throughout the POR. Despite parties' claims, Def. Br. at 35 & RTAC Br. at 39-40, the need for DIFMER to reflect only cost differences arising from physical characteristics is no less important in a high inflation context.

As shown in the example provided in the opening brief, Commerce's use of indexing and averaging in its DIFMER calculation in this case does not reflect the true differences in the cost of production of two CONNUMs arising only from physical characteristics. Plaintiffs' Br. at 34-35 (citing Kaptan Case Br. at Exh. 2, C.R. 377, P.R. 136) (showing the distortive impact of averaging and indexing on the DIFMER ratio). Still, Defendant's maintain that its methodology is needed because "economy-wide inflation affects all costs" and "using indexed costs in calculating the DIFMER adjusts for these inflationary effects on input costs." Def. Br at 35. While this would be true if the two CONNUMs in the DIFMER comparison were produced in the same quantities every month, or only in one month of the POR, leading to inflation affecting the costs of the two products in the exact same way, that is not the scenario at issue here. As Kaptan has explained, Commerce's methodology fails due to timing differences, with month to month differences in production quantities between the two comparison products skewing the cost difference. Plaintiffs' Br. at 34. As an example, consider the comparison of two products – Product A and Product B:

- For Product A, if 10 tons are produced in Month 1 at $1,000/ton and, in Month 2, 40 tons are provided at a 10% higher cost of $1,200/ton, the weighted average cost would be $1,160/ton.[7]

- For Product B, if 40 tons are produced in Month 1 at $1,100/ton and, in Month 2, 10 tons are produced at a 10% higher cost of $1,320/ton, the weighted average cost would be $1,144/ton.[8]

While the unit cost for Product A and Product B both increased 10% from Month 1 to Month 2, the weighted average costs did not increase by 10% due to production quantity differences between

---

[7] Weighted average cost ($1,160/ton) = (10,000 + 48,000) / 50.
[8] Weighted average cost ($1,144/ton) = (44,000 + 13,200) / 50.

AFSDOCS:300625093.1

the two months. In fact, the *less* costly Product A became *more* costly in the weighted average calculation. These same distortive impacts resulted in the change in the DIFMER from *negative* to *positive* after Commerce's averaging and indexing methodology.

Though Defendant maintains that Commerce's calculation is required "even out swings in the production costs experienced by the respondent over short periods of time," Def. Br. at 35, it does not address Commerce's introduction of these clear inaccuracies, nor explain why they are preferable to Kaptan's proposed methodology. As detailed in Kaptan's opening brief, even Commerce has admitted that "the difference in costs between products may not be large," *Final IDM* at 23, P.R. 150. There is thus little justification for the obvious inaccuracies Commerce has introduced in the DIFMER calculation in trying to account for these small differences in costs.

Finally, Defendant maintains that "Kaptan's methodology is not reasonable because not every CONNUM is produced in every month of the POR" and therefore "Commerce cannot make an adjustment to a calculation involving costs, COP and CV, based on indexed annual weighted-average costs with a DIFMER of unindexed monthly historical weighted-average variable costs." Def. Br. at 36. However, this "complication" can be easily fixed by indexing the cost difference only (irrespective of the quantity produced) when a given product is not produced in the month a DIFMER is needed. Otherwise, Commerce should simply calculate and use a monthly DIFMER adjustment from unindexed submitted per unit costs, which reflect the true cost differences and are not impacted by timing differences. Plaintiffs' Br. at 35 (citing Kaptan Case Br. at Exh. 3, C.R. 377, P.R. 136).

## IV.    CONCLUSION

For the foregoing reasons, Kaptan respectfully requests that this Court find that Commerce's *Final AD Determination* was not based on substantial evidence, nor was it in

AFSDOCS:300625093.1

accordance with the law with respect to the issues set forth in this Reply Brief and in Plaintiffs'

Brief in Support of Its Motion for Judgment on the Agency Record.

Respectfully submitted,

**/s/ Leah N. Scarpelli**
Leah N. Scarpelli
Nancy A. Noonan
Jessica R. DiPietro
Matthew M. Nolan

ArentFox Schiff LLP
1717 K Street, NW
Washington, DC 20006
Tel: (202) 857-6013

*Counsel for Kaptan Demir Celik Endustrisi ve*
*Ticaret A.S.*

November 1, 2024

22

## CERTIFICATE OF COMPLIANCE

Pursuant to the Court's Standard Chamber Procedure 2(b)(1), the undersigned certifies that Plaintiffs' Reply Brief filed on November 1, 2024 complies with the word limitation requirement. The word count for Plaintiffs' Brief, as computed by ArentFox Schiff LLP's word processing system is 6,933.

**/s/ Leah N. Scarpelli**
Leah N. Scarpelli

*Counsel for Kaptan Demir Celik Endustrisi ve Ticaret A.S.*

AFSDOCS:300624922.2