Slip Op. 25-4

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| KAPTAN DEMIR CELIK ENDUSTRISI VE TICARET A.S., | |
| Plaintiff, | Before: Jane A. Restani, Judge |
| ICDAS CELIK ENERJI TERSANE VE ULASIM SANAYI, A.S., | Court No. 24-00018 |
| Plaintiff-Intervenor, | |
| v. | |
| UNITED STATES, | |
| Defendant, | |
| REBAR TRADE ACTION COALITION, | |
| Defendant-Intervenor. | |

## OPINION AND ORDER

[The court sustains the Department of Commerce's date of sale determination, its DIFMER analysis, and the resulting antidumping rate in its Final Result of the Periodic Review and denies Plaintiff's Motion for Judgment on the Agency Record.]

Dated: January 15, 2025

Leah N. Scarpelli, ArentFox Schiff LLP, of Washington, DC, argued for the plaintiff, Kaptan Demir Celik Endustrisi ve Ticaret A.S., and for the plaintiff-intervenor, ICDAS Celik Enerji Tersane ve Ulasim Sanayi, A.S. With her on the brief were Jessica R. DiPietro, Matthew Mosher Nolan, and Nancy Aileen Noonan.

Joshua Wilson Moore, U.S. Department of Justice, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant. With him on the brief was David W. Richardson, U.S. Department of Commerce, Office of Chief Counsel for Trade Enforcement and Compliance of Washington, DC.

Maureen E. Thorson, Wiley Rein, LLP, of Washington, DC, argued for defendant-intervenor, Rebar Trade Action Coalition. With her on the brief were Alan H. Price, Jeffrey O. Frank, John R. Shane, and Stephen A. Morrison.

Restani, Judge: Before the court is a motion for judgment on the agency record pursuant to USCIT Rule 56.2 challenging the final results of the United States Department of Commerce ("Commerce").  Pl.'s Final Mot. for J. on the Agency Record, ECF No. 42 (July 23, 2024) ("Pl. Mot.").  The final results at issue stem from Commerce's administrative review into allegations that domestic sales of certain Steel Concrete Reinforcing Bar ("Rebar") from the Republic of Turkey were made at less-than-fair-market-value between July 1, 2021, and June 30, 2022.  <u>See Initiation of Antidumping and Countervailing Duty Administrative Reviews</u>, 87 Fed. Reg. 54463 (Dep't Commerce Sept. 6, 2022) ("<u>Initiation of Investigation</u>"); <u>Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results of the Antidumping Duty Administrative Review; 2021-2022</u>, 88 Fed. Reg. 89663 (Dec. 28, 2023) ("<u>Final Results</u>"); <u>Steel Concrete Reinforcing Bar From the Republic of Turkey and Japan: Amended Final Affirmative Antidumping Duty Determination for the Republic of Turkey and Antidumping Duty Orders</u>, 82 Fed. Reg. 32532 (Dep't Commerce July 14, 2017) ("<u>Antidumping Order</u>").

Plaintiff, Kaptan Demir Celik Endustrisi ve Ticaret A.S. ("Kaptan") and Plaintiff-Intervenor, Icdas Celik Enerji Tersane ve Ulasim Sanayi, A.S. ("Icdas"), request the court hold that Commerce's decision to use the invoice date as the date of sale for sales of subject merchandise to the U.S. market is unsupported by substantial evidence.  They also challenge Commerce's calculation of the differences in merchandise ("DIFMER") adjustment as impermissibly distortive.  Defendant, the United States ("Government") and defendant-intervenor, the Rebar Trade Action Coalition, ask that the court sustain the Final Results.

## BACKGROUND

On July 14, 2017, Commerce published in the Federal Register the Antidumping Order on steel concrete reinforcing bar from the Republic of Turkey ("Turkey").  <u>Antidumping Order</u>, 82

Fed. Reg. 32532.  On September 6, 2022, Commerce published the initiation notice for the 2021–2022 administrative review of the Antidumping Order covering steel rebar from Turkey.  See Initiation of Antidumping and Countervailing Duty Administrative Reviews, 87 Fed. Reg. 54463, 54473 (Dep't Commerce Sept. 6, 2022).  Commerce selected Kaptan as a mandatory respondent for individual examination.  See Memorandum from R. Copyak to S. Thomson re: Respondent Selection Memorandum for Administrative Review of the Antidumping Duty Order on Steel Concrete Reinforcing Bar from the Republic of Turkey; 2021-2022 at 1, C.R. 5, P.R. 29 (Oct. 7, 2022).  On July 27, 2022, Plaintiff filed a request for administrative review.  Kaptan's Request for Antidumping Administrative Review, P.R. 4 (July 27, 2022).  Plaintiff-Intervenor Icdas also filed a request for an administrative review on July 28, 2022.  Turkish Parties' Request for Antidumping Administrative Review, P.R. 6 (July 28, 2022).

On August 1, 2023, Commerce issued its preliminary results for Period of Review ("POR") of July 1, 2021, through June 30, 2022, in which it found that Kaptan's sales of the subject merchandise to the United States were below normal value.  Steel Concrete Reinforcing Bar From the Republic of Turkey, 88 Fed. Reg. 50100-02, 50100–01 (Dep't Commerce Aug. 1, 2023) ("Preliminary Results"), and accompanying Preliminary Decision Memorandum, Memorandum from J. Maeder to A. Elouaradia, re: Decision Memorandum for the Preliminary Results of the Antidumping Duty Administrative Review of Steel Concrete Reinforcing Bar from the Republic of Turkey; 2021-2022, P.R. 120 (July 26, 2023) ("PDM").  Commerce assigned Kaptan a dumping margin of 29.30 percent.  Memorandum from B. Ballesteros to The File, re: Preliminary Results Analysis Memorandum for Kaptan Demir Celik Endustrisi Ve Ticaret A.S./Kaptan Metal Dis Ticaret Ve Nakliyat A.S. at 1, P.R. 121 (July 6, 2023) ("PAM").  In its analysis, Commerce relied on the invoice date rather than the contract date as the date of sale.  PDM at 9.  Kaptan submitted

a case brief to Commerce on August 31, 2023, contesting Commerce's choice of the invoice date

as the date of sale.   See Kaptan's Admin. Case Brief, C.R. 377, P.R. 136 (Aug. 31, 2023) ("Case

Br."). To support its factual contention that the contract date was the date of sale, Kaptan cited

the lack of any changes to the material terms of the contract at issue, its business practices for its

U.S. exports, and a Board Resolution barring changes to price and quantity terms of a contract

without Board approval.   Case Br. at 16–27.   Kaptan also contested Commerce's DIFMER

adjustment methodology as distorting the calculation of the dumping margin.[1]  Id. at 31.

On December 20, 2023, Commerce issued the Final Results of the administrative review.

The results were published in the Federal Register on December 28, 2023.   See Final Results, 88

Fed. Reg. 89663.  In the Final Results, Commerce maintained its use of the invoice date as the date

of sale and its DIFMER adjustment methodology.   See Memorandum from S. Fullerton to J.

Maeder, re: Issues and Decision Memorandum for the Final Results of the Antidumping Duty

Administrative Review Antidumping; 2021-2022 at 13–21, P.R. 150 (Dec. 20, 2023) ("IDM"). It

assigned Kaptan a 25.86 percent dumping rate.   Memorandum from B. Ballesteros to The File, re:

Final Results Analysis Memorandum for Kaptan Demir Celik Endustrisi Ve Ticaret A.S./Kaptan

Metal Dis Ticaret Ve Nakliyat A.S. at 1, P.R. 151 (Dec. 20, 2023).   During the POR for this

antidumping analysis, Turkey experienced an annual inflation rate of greater than twenty-five

percent.  Letter from Colakoglu & Kaptan to U.S. Dep't of Commerce, re: Notice of Inflation Rate

Above 25 Percent at 1, Attachment 1, P.R. 37 (Oct. 21, 2022); see also PDM.

---

[1] The DIFMER analysis is part of Commerce's calculation of the normal value of the subject merchandise.  When the exact product being exported into the United States is not also sold in the home market, Commerce selects a similar merchandise and calculates the normal value of that merchandise as a stand-in.  Commerce then conducts the DIFMER analysis to adjust the normal value so that it does not improperly reflect production cost discrepancies that arise from physical differences in the products.  See 19 C.F.R. § 351.411; 19 U.S.C. § 1677b(a)(6)(C)(ii).  This process will be discussed in further detail.

Commerce primarily relied on three factors to make its determination that the invoice date was the proper date of sale.  First, Kaptan's response in its section A questionnaire indicated that the parties could amend the shipment date, size breakdown, and potentially the quantity until the goods are shipped or invoiced.  IDM at 15.  Second, one version of the contract left the size breakdown open until a later date.  Id. at 16.  Third, Kaptan's contracts allowed for changes to be made to material terms after the contract date.  Id.  Based on these considerations, Commerce concluded that the material terms of the sale were established on the invoice date and that its calculation of the dumping rate should reflect the invoice date, not the contract date.

On January 29, 2024, Kaptan commenced the instant action against the Government pursuant to 19 U.S.C. § 1516a(a)(2)(A)(i)(II).  Summons, ECF No. 1 (Jan. 29, 2024).  In its Complaint, Kaptan claims that the Antidumping Order is unsupported by substantial evidence or is otherwise contrary to law because Commerce incorrectly determined Kaptan's date of sale and that Commerce's calculation of Kaptan's duty rate using an inflation-adjusted DIFMER calculation improperly caused distortions based on time differences rather than differences between the product characteristics.  Compl. at 7–8, ECF No. 9 (Feb. 26, 2024).

For the reasons set out below, the court sustains the Department of Commerce's Final Results and denies Plaintiff's Motion for Judgment on the Agency Record.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) and section 516A of the Tariff Act of 1930 (the "Act"), codified as amended, 19 U.S.C. § 1516(a)(2) (2012).  The court sustains Commerce's results in an AD investigation unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law[.]"  19 U.S.C. § 1516a(b)(1)(B)(i); see also Fujitsu Gen. Ltd. v. United States, 88 F.3d 1034, 1038 (Fed. Cir. 1996).

## DISCUSSION

### I.    Legal Framework

In an antidumping analysis, Commerce determines whether the subject merchandise is being sold or likely to be sold at a less than fair value price in the United States.  19 U.S.C. § 1673. Thus, Commerce must conduct a "fair comparison" of the prices for a good sold in the respondent company's home market ("normal value") with the prices that they charge for the same or similar good in the U.S. market ("export price")[2] to determine whether the good is being, or is likely to be, sold at less than fair value.  See 19 U.S.C. §§ 1677a; 1677b(a); see also Smith-Corona Grp. v. United States, 713 F.2d 1568, 1577–78 (Fed Cir. 1983).

To determine the normal value of the subject merchandise, after eliminating below cost sales, Commerce considers the price for goods sold in the home market during the relevant POR. The normal value must be from "a time reasonably corresponding to the time of sale used to determine the export price," leading Commerce to identify a specific date on which the sale occurred (the "date of sale").  19 U.S.C. § 1677b(a)(1)(A).  The date of sale is the date on which "the exporter or producer establishes the material terms of the sale."   19 C.F.R. § 351.401(i) (2020).  The date of sale becomes an important variable at this stage of the process because, while it affects the price comparison, it also establishes which sales are within the POR and thus subject to that POR's administrative review.  Commerce's regulations provide that:

> In identifying the date of sale of the subject merchandise or foreign like product, [Commerce] normally will use the date of invoice, as recorded in the exporter or producer's records kept in the ordinary course of business.  However, [Commerce] may use a date other than the date of invoice if [Commerce] is satisfied that a different date better reflects the date on which the exporter or producer establishes the material terms of sale.

---

[2] The court will use "export price" to mean export price or constructed export price.

Id.  Thus, under normal circumstances, the date of sale regulation "establishes a 'rebuttable

presumption' in favor of the invoice date unless the proponent of a different date produces

satisfactory evidence that the material terms of sale were established on that alternate date."  Eregli

Demir ve Celik Fabrikalari T.A.S. v. United States, 308 F. Supp. 3d 1297, 1306 (CIT 2018)

(citations omitted).  The material terms generally include the terms of price, quantity, payment,

and delivery.  Id. at 1307 (citing Sahaviriya Steel Indus. Pub. Co. v. United States, 34 CIT 709,

727, 714 F. Supp. 2d 1263, 1280 (2010), aff'd, 649 F.3d 1371 (Fed. Cir. 2011)).

To determine which sales to use for the price comparison, Commerce calculates the Cost

of Production ("COP") during a time period that would permit production of the product in the

ordinary course of business.  19 U.S.C. § 1677b(b)(3)(A).  Once Commerce determines the COP,

it then calculates the weighted average COP for each individual product model, also called

"CONNUMs,"[3] across the POR with production quantity as the weighting factor.  IDM at 23.

When, as here, the home market experienced high inflation, Commerce calculates the COP on a

monthly basis rather than across the entire POR to minimize the impact of inflation on the analysis.

Id. at 23.  Once Commerce has calculated the COP, it then compares the COP to the price of home

market sales to determine which sales were made below cost and excludes these sales from the

home market sales database.  19 U.S.C. § 1677b(b)(1).  Ordinarily, Commerce then compares the

---

[3] Commerce uses the term "CONNUM" to refer to an individual product model.  See, e.g.,
Memorandum from S. Fullerton to J. Maeder, re: Issues and Decision Memorandum for the Final
Results of the Antidumping Duty Administrative Review Antidumping; 2021-2022, at 2, P.R. 150,
(Dec. 20, 2023) ("IDM").  This is an abbreviation of "control number."  Id.  A "control number"
is assigned to each distinct model of subject merchandise sold in the home and U.S. markets based
on relevant product characteristics.  See, e.g., Kaptan's Response to the Department's Section C
Questionnaire at C-10, C.R. 48-70, P.R. 61 (Dec. 8, 2022).  The court uses "CONNUM,"
"product," and "merchandise" interchangeably.

normal value to the export price to determine whether and how much dumping has occurred.  19

U.S.C. §§ 1673; 1677a; 1677b.

Commerce, however, employs an additional step in the analysis when the exporter does

not sell the same merchandise in the home market.  In such a scenario, Commerce picks similar

merchandise being sold in the home market as the merchandise being exported.  Commerce

conducts a DIFMER analysis to determine what production cost differences arise from physical

differences in the products and adjusts the normal value accordingly.  In high inflation contexts,

similar to its COP process described above, Commerce conducts the DIFMER analysis on a

monthly-indexed basis rather than across the entire POR to minimize the impact of inflation on

the analysis.  See 19 C.F.R. § 351.411; 19 U.S.C. § 1677b(a)(6)(C)(ii); IDM at 22–24.

## II.    Commerce's use of the invoice date for the date of sale is supported by substantial evidence

Kaptan argues that Commerce improperly used the invoice date to determine the date of

sale.  Kaptan asserts that instead, Commerce should have used the contract date because the

material terms of the sale were established on the contract date and did not change during the POR.

Pl. Mot. at 9.  Kaptan contends that the material terms were set at the time of the contract because

of Kaptan's sales practices for its exports to the United States, along with an internal resolution of

Kaptan's Board of Directors that required that all contracts be approved by the Board and once

approved, could not be altered.  Id. at 5.  Commerce argues that its use of the invoice date as the

date of sale was supported by substantial evidence because the initial questionnaire response

indicated that the material terms of sale were not set on the date of contract.  Def.'s Resp. to Pl.'s

Mot. for J. on the Agency Record at 27, ECF No. 53 (Sept. 20, 2024) ("Gov. Resp.").   Further,

Commerce points to ambiguity as to when the contracts were actually signed, along with language

in the contract indicating that the parties could revise and modify the contract after the contract date, to argue that the material terms were not set on the contract date.  Oral Argument at 41:20; Gov. Resp. at 26.

The governing statute does not specify the method by which Commerce must determine the date of sale for the purposes of determining the normal value of the subject merchandise.[4]  The Statement of Administrative Action accompanying the Uruguay Round Agreements Act defines "date of sale" as "a date when the material terms of sale are established."  Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep. No 103-316, vol. 1, at 810 (1994),

---

[4] The parties dedicate much of their briefing to the issue of the deference owed to Commerce's antidumping determination in the wake of the <u>Loper Bright</u> decision due to the statute's silence regarding the proper method to determine the date of sale.  <u>See</u> Pl.'s Final Mot. for J. on the Agency Record at 10–20, ECF No. 42 (July 23, 2024) ("Pl. Mot."); Def.'s Resp. to Pl.'s Mot. for J. on the Agency Record at 15–24, ECF No. 53 (Sept. 20, 2024) ("Gov. Resp."); Rebar Trade Coalition Resp. to Pl. Mot. for J. on the Agency Record at 19–27, ECF No. 51 (Sept. 20, 2024) ("Rebar Resp."); Pl. Reply Br. at 3–11, ECF No. 57 (Nov. 1, 2024) ("Pl. Reply").  Commerce contends that <u>Loper Bright</u> is not applicable here because <u>Loper Bright</u> only concerns step two of the <u>Chevron</u> analysis, which occurs when a statute is ambiguous.  Gov. Resp. at 17.  Commerce argues that the term "date of sale" in the statute is not ambiguous because it simply means the "date on which the material terms of sale are established."  Gov. Resp. at 18 (citing <u>Allied Tube & Conduit Corp. v. United States</u>, 24 CIT 1357, 1368, 127 F. Supp. 2d 207, 217 (2000)); <u>see also</u> Rebar Resp. at 20.  Kaptan argues that the statute is ambiguous because it does not define "date of sale," meaning the court must independently interpret the statute's best meaning.  Pl. Mot. at 10 (citing <u>Loper Bright Enterprises v. Raimondo</u>, 603 U.S. 369, 399 (2024)).  Kaptan does not dispute, however, that "date of sale" in the statute means the date at which the material terms of the sale were established.  Pl. Mot. at 10–11.  Rather, Kaptan disputes Commerce's methodology for determining when the material terms of the sale are established.  Under step two of <u>Chevron</u>, when a statute was silent or ambiguous with respect to the specific issue at hand, the court evaluated whether Commerce's interpretation was "based on a permissible construction of the statute" and then inquired into "the reasonableness of Commerce's interpretation."  <u>Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.</u>, 467 U.S. 837, 843 (1984).  Now, generally courts exercise their independent judgment in deciding statutory meaning when the statute is silent or ambiguous regarding Commerce's authority.  <u>See Loper Bright</u>, 603 U.S. at 393.  The court need not resolve this issue, however, because both parties agree that "date of sale" in the statute means the date when the material terms of sale were established.  There is therefore no real dispute about the ambiguity or meaning of the statute.  The court looks only to whether Commerce's date of sale analysis was supported by substantial evidence as required by 19 U.S.C. § 1516a(b)(1)(B)(i).

reprinted in 1994 U.S.C.C.A.N. 4040, 4153.  Congress designated the Statement of Administrative

Action as "an authoritative expression by the United States concerning the interpretation of the

Uruguay Round Agreements and this Act . . ." 19 U.S.C. § 3512(d).  The material terms of sale may

include price, quantity, delivery and payment terms, and quantity tolerance level.  See, e.g.,

Sahaviriya Steel Indus., 34 CIT at 727, 714 F. Supp. 2d at 1280.

       As discussed above, Commerce's regulations create a rebuttable presumption that

Commerce will use the invoice date as the date of sale, but that Commerce may use another date

if it better reflects the date on which the material terms of the sale were established.  See 19 C.F.R.

§ 351.401(i); see also Eregli, 308 F. Supp. 3d at 1306.  This presumption is meant to be flexible

and is not irrefutable.  For example, the Preamble to Commerce's regulation states that "[i]n some

cases, it may be inappropriate to rely on the date of invoice as the date of sale, because the evidence

may indicate that, for a particular respondent, the material terms of sale usually are established on

some date other than the date of invoice." Preamble, 62 Fed. Reg. 27296, 27349 (Dep't Commerce

May 19, 1997) ("Preamble"); see also 19 C.F.R. § 351.401(i).  Commerce has a "'well-established

and longstanding practice' of looking beyond the invoice date to the parties' actual course of

conduct, as well as the parties' expectations concerning the transaction, to determine whether an

earlier date—such as the contract date—represents the point at which the parties reached a meeting

of the minds on the material terms of sale."[5] Nucor Corp. v. United States, 33 CIT 207, 259–260,

612 F. Supp. 2d 1264, 1308 (2009).

---

[5] In its brief, Kaptan argues that Commerce has been inconsistent in its approach to the date of sale
determination, meaning that it has not applied the "single, best meaning" of the statute as required
by Loper Bright.  Pl. Mot. at 17 (citing Loper Bright, 603 U.S. at 400).  Kaptan argues that
Commerce has been contradictory in its definition of what is a "material" term of sale and what
constitutes a material change to those terms.  Pl. Mot. at 15–16.  Kaptan does not allege, however,
that Commerce misidentified a material term in the contract at issue.  Rather, this dispute centers
on whether the material terms themselves were set at the time of the contract.  The court therefore

A party proposing a date other than the invoice date must show that the administrative record as a whole demonstrates that the material terms were "finally" and "firmly" established on that date and that the agreement was not merely a preliminary agreement in an industry where renegotiation is common.  See Preamble at 27348–49; see also Yieh Phui Enterprise Co. v. United States, 35 CIT 1122, 1125–28, 791 F. Supp. 2d 1319, 1322–25 (2011).  Accordingly, the question here is whether Kaptan has pointed to sufficient evidence in the administrative record to show that Commerce's decision to use the invoice date as the date of sale was not supported by substantial evidence.

Kaptan reported in its initial questionnaires that the material terms of sale were established on the contract date.  Kaptan's Response to the Department's Section A Questionnaire at A-20, C.R. 7-18, P.R. 45 (Nov. 7, 2022) ("Kaptan's Sec. A").  In its Final Results, Commerce, however, found that the administrative record as a whole did not rebut the presumption in favor of using the invoice date and that the material terms were not established until the invoice date.  IDM at 13, 20–21.  To make this determination, Commerce relied on several pieces of evidence.  First, in its response to Commerce's Anti-Dumping Questionnaire, Kaptan stated that "[f]or U.S. sales, the parties may amend the latest shipment date, size breakdown, and, to a lesser extent, quantity until the goods are shipped/invoiced."  Kaptan's Sec. A at A-23; IDM at 15.  Second, one of the signed versions of the contract states that the size breakdown "will be advise[d] latest by 15.02.2022" but contradictorily has a size breakdown attached.  Kaptan's Sec. A Ex. A-7 at 67; see IDM at 16; PAM at 3.  Third, a provision of the contract states that "any revision and/or modification to the present contract are [sic] valid only if made in writing and duly signed by both parties."  Kaptan's

---

does not address whether Commerce has been inconsistent in what it considers to be a "material" term of sale or a material change to those terms.

Response to the Department's Section C Questionnaire Ex. C-6.b at 138, C.R. 48-70, P.R. 61 (Dec. 8, 2022) ("Kaptan's Sec. C"); see IDM at 16.  Presumably, this indicated to Commerce that amendments to the contract were possible.  The court addresses each of these considerations in turn.

> ### a. Kaptan's questionnaire response suggests that the material terms were not established on the contract date.

Commerce argues that Kaptan's section A questionnaire response indicates that the material terms of sale were not established at the date of contract.  Gov. Resp. at 24.  Kaptan contends that this response was merely a general answer that was clarified by Kaptan's subsequent questionnaire responses which shows that there were no changes to the material terms of the contract.  Oral Argument at 7:19.  Kaptan argues that Commerce's reliance on this initial questionnaire fails to properly consider other evidence that Kaptan submitted throughout the review.  Pl. Reply at 12–13.

As indicated, the response at issue states that "[f]or U.S. sales, the parties may amend the latest shipment date, size breakdown, and, to a lesser extent, quantity until the goods are shipped/invoiced."  Kaptan's Sec. A at A-23; IDM at 15.  In the questionnaire response, Kaptan also notes that "Kaptan continues to review its books and records and will provide further data in support of its date of sale reporting in the Section C questionnaire response."  Kaptan's Sec. A at A-20.

Kaptan's section A questionnaire response suggests that the material terms were not established on the contract date because they could be amended by the contracting parties up until the shipment or invoice date.  Even if the court were to accept Kaptan's contention that the response was either improperly included or was merely an imprecise initial response that was

clarified by the later questionnaire responses, Kaptan has cited no evidence of record that it explicitly alerted Commerce to such a mistake. Oral Argument at 9:55. Commerce therefore properly relied on this general description as part of its date of sale analysis. Commerce however should ground its date of sale analysis primarily on the facts of the sale in question, as well as the practice of the relevant industry. See Preamble at 27348–49; see also Yieh Phui Enterprise, 35 CIT at 1123–1127, 791 F. Supp. 2d at 1322–25. Accordingly, the court turns to the other pieces of evidence on which Commerce relied as those considerations focus on the actual sale at issue.

**b. The versions of the sales contract provided do not establish when the material terms were set.**

Commerce argues that the material terms of the sale were not established on the contract date because one of the two signed versions of the contract did not establish the size breakdown. Gov. Resp. at 31. Kaptan contends that the version of the contract Commerce references was merely a prior draft of the contract and that the first page of the draft contract was removed and replaced with the updated version when the contract was finalized and signed. Pl. Mot. at 30 (citing Kaptan's Response to the Department's Supplemental Sections A-C Questionnaire at 29, C.R. 180-246, P.R. 89-90 (June 1, 2023) ("Kaptan's Supp. A-C")).

The version of the contract on which Commerce relies states that the size breakdown "will be advise[d] latest by 15.02.2022." Kaptan's Sec. A Ex. A-7 at 67. A size breakdown is attached to this version of the contract. Id. at 73–74. This version has the date printed on the top of the page and is signed and initialed. Id. at 67–74. Every page of both the contract and the size breakdown attachment is initialed. Id. None of the signatures or initials, however, are dated. Id. The other version of the same contract specifies that the size breakdown is "as per attached sheet" and has the same date printed on the top of the page. Kaptan's Sec. C Ex. C-6.b at 199. This

version of the contract also attaches the same size breakdown, and every page of the contract and size breakdown is signed or initialed.  Id. at 199–206.  The pagination on both versions of the contract and the size breakdown is identical.  Kaptan's Sec. A Ex. A-7 at 67–74; Kaptan's Sec. C Ex. C-6.b at 199–206.

The fact that a prior version of the contract states that the size breakdown "will be advise[d] latest by 15.02.2022" has little bearing on whether the material terms were established on the contract date.  Even if the court were, arguendo, to agree with Commerce that this version of the contract was more than a rough draft, the version of the contract with the size breakdown "as per attached sheet" is dated with the same date.  This would mean that the contract is the same regardless of which version the court considers.  Instead, the court notes the lack of record evidence that the final contract was actually signed after the size breakdown was attached, as Commerce points out in the Preliminary Analysis Memorandum.  PAM at 3.  While the contract is signed and initialed, none of the signatures are dated or have any kind of time stamp.  Similarly, the size breakdown attachment is not dated.  As noted above, Kaptan has the burden of showing that the record demonstrates that the material terms were firmly and finally established on the contract date rather than the invoice date.  See Preamble at 27348–49; see also Yieh Phui Enterprise, 35 CIT at 1125-28, 791 F. Supp. at 1322–25.  Kaptan has not provided any evidence to suggest that the contract with size breakdowns was actually signed on the date printed on either of the two versions of the contract.[6]  As the contract date is ambiguous in the two documents, Commerce reasonably found that it was not determinative evidence of the date of sale.

---

[6] The first page of the "rough draft" and the "final" version of the contract submitted are identical except for the phrase regarding provision of the size breakdown.  Tellingly, the initials on both pages are identical in both form and placement.  That the initials are identical suggests to the court that an incomplete version of this page was initialed, and the terms were amended later.  This

### c.  The terms of the contract and the Board Resolution allow for deviation in the material terms of the sale.

Commerce argues that the material terms of the sale were not established on the contract date because the contract itself required the parties to agree to any revisions to the contract terms in signed writing.  From this provision, Commerce extrapolates that the material terms were not established on the contract date because it was possible for the parties to amend the contract.  See Gov. Resp. at 25.  Kaptan contends that this contract language is boilerplate, and that the language actually suggests that the material terms of the contract were established on the contract date because any revision to the terms requires a formal modification process.  Pl. Reply at 14.  Kaptan argues that this contract provision, along with the Board Resolution barring changes to price and quantity terms of a contract without board approval, suggests that the contract date was the proper date of sale.  Pl. Mot. at 29; Case Br. at 16–27.

Prior case law focuses on the issue of whether the presence of quantity tolerances in the contract mean that the material terms were not established in the contract.  See Kaptan Demir Celik Endustrisi ve Ticaret A.S. v. United States, 693 F. Supp. 3d 1368 (CIT 2024) (citing Nakornthai Strip Mill Co. Ltd. v. United States, 33 CIT 326, 614 F. Supp. 2d 1323 (2009); Eregli, 308 F. Supp. 3d at 1297; Certain Cut-to-Length Carbon Steel Plate from Romania, 72 Fed. Reg. 6522 (Dep't Commerce Feb. 12, 2007)).  Apparently, tolerances were within normal minimal levels and the parties do not raise this issue.  Instead, they dispute the rigidity of the contract language required for a material term to be set.  As discussed previously, the relevant standard for the point in time at which the material terms of sale are set is the date at which there was a "meeting of the minds"

---

inference is consistent with Commerce's statement in the Preliminary Analysis Memorandum that the pages were signed before the size breakdown was provided.  PAM at 3.

as to the terms.  See Nucor Corp., 33 CIT at 259–260, 612 F. Supp. 2d at 1308; Eregli, 308 F. Supp. 3d at 1306–07 (citations omitted).  The material terms generally include the terms of price, quantity, payment, and delivery.  Eregli, 308 F. Supp. 3d at 1306–07 (citing Sahaviriya Steel Indus., 34 CIT at 727, 714 F. Supp. 2d at 1280).  A party proposing a date other than the invoice date must show that the administrative record as a whole demonstrates that the material terms were "finally" and "firmly" established on that date and that the agreement was not merely a preliminary agreement in an industry where renegotiation is common.  See Preamble at 27348–49; see also Yieh Phui Enterprise Co., 35 CIT at 1125–28, 791 F. Supp. 2d at 1323–26.

The provision in question appears in Section 10 of the contract which lists "special provisions."  The provision states that "any revision and/or modification to the present contract are [sic] valid only if made in writing and duly signed by both parties."  Kaptan's Sec. C Ex. C-6.b at 202.  The Board Resolution states that "[N]o changes related to price and quantity (except for changes within quantity tolerance) will be accepted under any circumstances."  Kaptan's Supp. A-C Ex. S1-40 at 315.

Kaptan contends that the contract provision indicates that the parties could not change the material terms of the contract.  Yet, Kaptan itself notes that historically, parties often made changes to the material terms of the contract (specifically the price and quantity) after contracting, and this was the very reason why Kaptan adopted the Board Resolution.  Oral Argument at 16:24.  Further, Commerce notes, and Kaptan does not contest, that the Board Resolution did not result in amendment to the terms of Kaptan's sales contracts.  This means that prior contracts had the same provision, even in the period prior to the Board Resolution when renegotiation was common.[7]

---

[7] One such contract was provided in the record.  The contract is dated before the Board Resolution and contained the exact same provision.  Kaptan's Response to the Department's Section C Questionnaire Ex. C-6.b at 138, C.R. 48-70, P.R. 61 (Dec. 8, 2022) ("Kaptan's Sec. C").  This

IDM at 16; see Pl. Reply at 14–15.  Accordingly, the presence of this provision in the contract

alone would not lead the contracting parties to believe that the material terms were being "firmly"

and "finally" set.

This leaves the Board Resolution as the only evidence that the material terms were set on

the contract date.[8]  While Kaptan argues that the Board Resolution prohibits parties without Board

approval from modifying all material terms of the sale, the Board Resolution only speaks to price

and quantity.  Pl. Mot. at 28; Kaptan's Supp. A-C Ex. S1-40 at 315; Oral Argument at 1:18:44.

Kaptan itself notes that the Board Resolution was not prepared with all material terms in mind.

Oral Argument at 1:20:16.  In particular, the Resolution makes no mention of other material terms

such as size breakdowns, payment, and delivery dates.[9]  Given that the language of the contracts

---

[8] Kaptan also points to evidence of its sales practice for its U.S. exports along with the fact that the material terms of this contract did not change to support its argument that the material terms were established in the contract.  This argument is not convincing.  Kaptan describes its sales practice for its U.S. exports as requiring the contract terms to be particularly rigid given the long lead time of its U.S. orders along with fluctuations in the price of scrap metal.  Pl. Mot. at 22–24. This dynamic led Kaptan's Board to adopt the Resolution.  Yet, the Resolution only speaks to price and quantity terms, not other material terms.  Kaptan's Response to the Department's Supplemental Sections A-C Questionnaire Ex. S1-40 at 315, C.R. 180-246, P.R. 89-90 (June 1, 2023) ("Kaptan's Supp. A-C")).  Given that renegotiation of contracts was common prior to the Board Resolution, Kaptan has not pointed to record evidence showing that the market dynamics necessarily show that parties may not renegotiate other material terms.  Further, that the material terms of this particular contract did not change between the contract and invoice date has little bearing on whether the material terms were set in the contract.  The proper analysis is a prospective rather than retrospective one to establish whether there was a meeting of the minds regarding the material terms on the contract date.  See Nucor Corp. v. United States, 33 CIT 207, 259–260, 612 F. Supp. 2d 1264, 1308 (2009).  That the material terms did not change after the contract date is not sufficient evidence to show that the contracting parties intended the material terms to be firmly and finally set at the time of contracting.

[9] Kaptan does not dispute that the size breakdown is a material term.  In its brief, Kaptan notes that Commerce alleges that not all the material terms were established in the contract because the size breakdown was not specified.  Rather than arguing that size breakdown is not a material term, Kaptan only disputes whether the size breakdown was provided in the contract.  Pl. Mot. at 30–31; Pl. Reply at 16–17.

has not been historically binding on contracting parties and that the Board Resolution does not bar changes to all material terms, this factor does not favor plaintiff. Overall, the court concludes that substantial evidence on this record supports Commerce's use of the invoice date rather than the contract date as the date of sale.

### III. Commerce's DIFMER adjustment methodology is supported by substantial evidence

Kaptan also argues that Commerce's differences-in-merchandise DIFMER calculation was distorted because of the way it accounted for inflation. Pl. Mot. at 33. Commerce contends that it conducted its DIFMER analysis using monthly indexes that control for inflation, meaning that its DIFMER analysis was not distorted by time-based variables. Gov. Resp. at 33–34. Commerce notes that it used monthly-indexed costs to calculate the cost of production to even out swings in the production costs over short periods of time experienced by Kaptan due to inflation. Id. at 34–35. It argues that this process therefore mitigated the impact of inflation on the analysis because Commerce could compare the export price of the CONNUM sold in the United States to the CONNUM sold in the home market on a month-to-month basis, making inflation a more stable variable in the comparison. Id. at 36.

As discussed above, when Commerce calculates the dumping margin, it compares the export price of the subject merchandise (the price at which it is sold in the U.S.) to its normal value (the price at which it is sold in its home market). See 19 U.S.C. § 1677b(a). When the exact product is not sold in the home market, Commerce must use a CONNUM with similar physical characteristics sold in the home market to calculate the normal value. See 19 C.F.R. § 351.411; 19 U.S.C. § 1677b(a)(6)(C)(ii). This requires an adjustment to account for the costs related to the physical differences (DIFMER).

In a high inflation context, Commerce instructs respondents to report monthly rather than annual costs. IDM at 23. Commerce then restates every month's variable costs in the final period of review month's dollar value. Id.; Oral Argument at 45:20. Once these costs are restated, Commerce follows its normal practice of calculating the annual weighted average cost of production for each CONNUM across the period of review with production quantity as the weighting factor. IDM at 23; see Oral Argument at 45:42, 50:56. Commerce then deflates the adjusted weighted average cost of production back to the original dollar value of each month in the period of review. Oral Argument at 45:54; 52:31. Commerce then conducts a month-to-month comparison of those variable costs of the home market and exported goods to account for the cost related to the physical differences in the products. Oral Argument at 45:55, 52:38; see 19 C.F.R. § 351.411; 19 U.S.C. § 1677b(a)(6)(C)(ii). This adjustment in the calculation of normal value is the DIFMER adjustment and is the step of the process with which Kaptan takes issue. See Pl. Reply at 19.

Kaptan argues that before this monthly indexing, the DIFMER was negative, which would call for a decrease of the normal values of sales of the home-market CONNUMS. Pl. Mot. at 34. After such monthly indexing, the DIFMER turned positive, which means the normal values determined for sales of the home-market CONNUMS were increased. Id. at 34–35. Kaptan does not explain why such an impermissible distortion only occurs in the DIFMER adjustment and not the corresponding cost of production calculation beyond arguing that they are "different calculations that are used by Commerce in different ways." Pl. Reply at 19. As Commerce notes, an analysis that uses this methodology at one stage of the analysis but not the other would be inconsistent and would distort the analysis as it would control for inflation at one stage while virtually ignoring inflation at the other. See Gov. Resp. at 34–35.

Kaptan does not make clear that the impact of the monthly indexing for the DIFMER calculation is distortive. Kaptan notes only that the monthly indexing caused a large change in the DIFMER but does not point to any evidence that this change was a distortion. See Pl. Mot. at 34–35. If anything, it could be the case that an unindexed DIFMER calculation would be inaccurate and improperly allow inflation to influence the analysis, whereas Commerce's indexing method produces the proper result. Kaptan has not presented sufficient evidence for the court to conclude that Commerce's approach to the DIFMER analysis in inflationary contexts is unreasonable, particularly given that the monthly indexing process as conducted seems to the court to be a reasonable way to minimize the impact of inflation on the DIFMER analysis. The court therefore concludes that Commerce's DIFMER calculation methodology is supported by substantial evidence and is in accordance with law.

## CONCLUSION

For the foregoing reasons, the court sustains Commerce's date of sale determination, its DIFMER analysis, and the resulting dumping rate in its Final Results and denies Plaintiff's Motion for Judgment on the Agency Record.

　/s/Jane A. Restani　
Jane A. Restani, Judge

Dated: January 15, 2025
　　　New York, New York