# United States Court of Appeals for the Federal Circuit

---

**KAPTAN DEMIR CELIK ENDUSTRISI VE TICARET A.S.,**
*Plaintiff-Appellant*

**ICDAS CELIK ENERJI TERSANE VE ULASIM SANAYI, A.S.,**
*Plaintiff*

**v.**

**UNITED STATES, REBAR TRADE ACTION COALITION,**
*Defendants-Appellees*

---

2025-1559

---

Appeal from the United States Court of International Trade in No. 1:24-cv-00018-JAR, Senior Judge Jane A. Restani.

---

Decided: November 13, 2026

---

DANIEL L. DELNERO, BGD Legal & Consulting LLC, Atlanta, GA, argued for plaintiff-appellant. Also represented by ALLEN W. YEE.

AUGUSTUS GOLDEN, Commercial Litigation Branch,

Case 1:24-cv-00159-JAR Document 75 Filed 11/13/26 Page 2 of 13
Case: 25-1559 Document: 67 Page: 2 Filed: 11/13/2026



Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee United States. Also represented by PATRICIA M. MCCARTHY, BRETT SHUMATE, FRANKLIN E. WHITE, JR.; CHARLIE CHUNG, IAN ANDREW MCINERNEY, United States Department of Commerce, Washington, DC.

MAUREEN E. THORSON, Wiley Rein, LLP, Washington, DC, argued for defendant-appellee Rebar Trade Action Coalition. Also represented by JEFFREY OWEN FRANK, STEPHEN MORRISON, ALAN H. PRICE, JOHN R. SHANE.

---

Before STOLL and STARK, *Circuit Judges*, and BARKER, *District Judge*.[1]

STARK, *Circuit Judge*.

Kaptan Demir Celik Endustrisi ve Ticaret A.S. ("Kaptan") appeals a judgment of the U.S. Court of International Trade ("Trade Court") upholding the Department of Commerce's ("Commerce") use of Kaptan's invoice date as the "date of sale" for purposes of calculating an antidumping duty rate. We affirm.

I

A

Under the Tariff Act of 1930, 19 U.S.C. § 1202 et seq., Commerce may impose antidumping duties when it determines that a class or kind of foreign merchandise is, or is likely to be, sold in the United States at less than "normal value," and that such a sale materially injures or threatens material injury to domestic industry. *See* 19 U.S.C.

---

[1] Honorable J. Campbell Barker, District Judge, United States District Court for the Eastern District of Texas, sitting by designation.

§§ 1673, 1677b. "Normal value" is the price of the goods in the home market (from which they are exported) at a "time reasonably corresponding to the time of sale used to determine the export price." 19 U.S.C. § 1677b(a)(1)(A). Determining the "time of sale," therefore, is a necessary step in assessing antidumping duties.

A Commerce regulation, 19 C.F.R. § 351.401(i), implements this statutory provision by treating the "time of sale" as the "date of sale" and describing how to determine the date of sale. Specifically, § 351.401(i) directs:

> In identifying the date of sale of the subject merchandise or foreign like product, the Secretary normally will use the date of invoice, as recorded in the exporter or producer's records kept in the ordinary course of business. However, the Secretary may use a date other than the date of invoice if the Secretary is satisfied that a different date better reflects the date on which the exporter or producer establishes the material terms of sale.

In adopting § 351.401(i), Commerce set out a starting point for determining the date of sale – "normally . . . the date of invoice" – which was derived from the agency's observation that "price and quantity are often subject to continued negotiation between the buyer and seller until a sale is invoiced." Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27296, 27348-49 (May 19, 1997).[2]

---

[2] The same concepts embedded in § 351.401(i) also appear in the Statement of Administrative Action ("SAA"), which states that the "time of sale" is the "date when the material terms of sale are established." Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep. No. 103-316, vol. 1, at 810 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4153; *see also* 19 U.S.C. § 3512(d) (designating SAA as "authoritative expression by the United States

B

In 2017, Commerce began investigating whether imports of steel concrete reinforcing bar, known more commonly as "rebar," from the Republic of Turkey, were sold in the U.S. at less than normal value. *See Steel Concrete Reinforcing Bar From the Republic of Turkey and Japan: Amended Final Affirmative Antidumping Duty Determination for the Republic of Turkey and Antidumping Duty Orders*, 82 Fed. Reg. 32532 (Dep't Com. July 14, 2017). On July 14, 2017, Commerce concluded its investigation and imposed antidumping duties on imports of rebar from Turkey. *See id.* at 32532-33.

Pursuant to 19 U.S.C. § 1675(c), this order is subject to an administrative review every five years. Accordingly, in 2022, Commerce undertook an administrative review, which ultimately involved review of Kaptan and six other Turkish rebar producers. The Period of Review ("POR") was July 1, 2021, to June 30, 2022.

Commerce designated Kaptan a mandatory respondent, which required Kaptan to respond to several questionnaires and produce certain documents. As part of its response, Kaptan reported that during the POR, Turkey was undergoing hyperinflation, experiencing an annualized inflation rate of more than 25 percent for multiple months.

On August 1, 2023, Commerce issued the preliminary results of its administrative review. Consistent with § 351.401(i), Commerce used Kaptan's invoice date as the date of sale. Doing so, Commerce found that Kaptan had made sales of rebar to the U.S. at prices below normal value and, consequently, assigned Kaptan a preliminary dumping margin of 29.30%. *See Steel Concrete Reinforcing Bar*

---

concerning the interpretation and application of the Uruguay Round Agreements and this Act").

*From the Republic of Turkey: Preliminary Results of Antidumping Duty Administrative Review; 2021-2022*, 88 Fed. Reg. 50100, 50101 (Dep't Com. Aug. 1, 2023).

On August 31, 2023, Kaptan filed a case brief with Commerce, arguing that the agency should have used the contract date as the date of sale, and should not have used the invoice date for this purpose. Emphasizing that hyperinflation occurred during the POR, Kaptan asserted that prices in Turkey had rapidly increased between the contract date – when Kaptan had purportedly negotiated the material terms of sale with its U.S. counterparts – and the later invoice date, when Kaptan delivered specific quantities of rebar to the U.S. Kaptan further explained that there had been no material changes to its contracts between the contract date and invoice date; it also pointed to an internal board resolution it had in place during the POR, which barred changes to contractually agreed-upon prices or quantities without the board's approval.

Commerce issued an Issues and Decision Memorandum containing its final results on December 20, 2023. *See* J.A. 204-17. It was not persuaded by Kaptan's arguments and continued to use the invoice date as the date of sale. *See Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results of the Antidumping Duty Administrative Review*, 2021-2022, 88 Fed. Reg. 89663, 89663 (Dep't Com. Dec. 28, 2023). Commerce assigned Kaptan a final antidumping duty rate of 25.86%.

C

Kaptan then filed suit against Commerce in the Trade Court. It challenged Commerce's authority to adopt § 351.401(i) and contended that, even under that regulation, it had rebutted the presumption that its invoice date was the date of sale, by proving that the material terms of its rebar sales had been established by the date of the contract. Commerce defended its decisions in the Trade Court.

The Rebar Trade Action Coalition intervened to support Commerce as well.

The Trade Court sustained Commerce's dumping rate. It determined that substantial evidence supported Commerce's use of the invoice date as Kaptan's date of sale and further supported the agency's rejection of Kaptan's request that it use the contract date instead. The Trade Court decided it need not resolve whether Commerce had authority to adopt § 351.401(i), given that there was no dispute between the parties about the "ambiguity or meaning of the statute" the regulation was implementing. J.A. 9 n.4. Accordingly, the Trade Court granted the government's motion for judgment based on the agency record.

Kaptan timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(5).

II

We review the Trade Court's interpretation of the Tariff Act de novo. *See Guajarat Fluorochems. Ltd. v. United States*, 153 F.4th 1376, 1381 (Fed. Cir. 2025) ("Questions of regulatory interpretation we review de novo."). We also review the Trade Court's grant or denial of judgment on the agency record *de novo*, using "the same standard of review applied by the Court of International Trade." *Nucor Corp. v. United States*, 927 F.3d 1243, 1248 (Fed. Cir. 2019). Therefore, we may only reverse Commerce's use of Kaptan's invoice date as the date of sale if the decision to use the invoice date is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1335 (Fed. Cir. 2002) (internal quotation marks omitted).(a

III

Kaptan makes two principal arguments on appeal. First, it argues that Commerce exceeded its statutory authority under the Tariff Act by adopting a regulatory presumption that the date of sale is the invoice date. Second, it contends that Commerce's use of the invoice date in this case is not supported by substantial evidence.

A

Kaptan's efforts to manufacture an issue of statutory interpretation fail. As the Trade Court correctly noted, the parties do not actually have any disagreement over the meaning of any statutory term. To the contrary, both Kaptan and Commerce agree that "time of sale" means the date on which the material terms of the transaction are established, just as Commerce has defined it in 19 C.F.R. § 351.401(i). *Compare* Open. Br. at 20 ("Kaptan and Commerce stipulated below that the 'time of sale' is the date on which there is a meeting of the minds as to the material terms of sale."), *with* Defendant-Appellee Resp. Br. at 26 ("All parties to this appeal, including Kaptan, agree on the definition of the term 'date of sale' – the 'date on which the material terms of sale are established'.") (internal citation omitted). Nor does Kaptan argue that any term in the statute is ambiguous. Hence, there is no need for us to engage in statutory interpretation or apply the Supreme Court's teachings in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024).

On appeal, Kaptan asserts that while it does not quarrel with the meaning of the statutory term "time of sale," or with that of the regulatory term "date of sale," the issue it means to press is whether, under *Loper Bright*, § 351.401(i)'s "rebuttable presumption in favor of the invoice date" exceeds the agency's "gap-filling" authority because it fails to rest on the "best meaning" of the statute. Open. Br. at 18-19. "The issue," Kaptan insists, "is that Commerce's invoice-date presumption rule is inconsistent

with the statute and cannot survive without the agency deference that was specifically rejected by the Supreme Court in *Loper*." *Id.* at 18.

Kaptan's contention does not actually require us to apply *Loper Bright*. No statutory ambiguity is presented here. Because the parties agree that "date of sale" means the date on which the material terms are established, we are not called upon to decide the "best meaning" of a disputed statutory term. At most, Kaptan invites us to review Commerce's interpretation of its own regulation, a task "distinct from those raised in connection with judicial deference to agency interpretations of statutes enacted by Congress." *Kisor v. Wilkie*, 588 U.S. 558, 591 (2019) (Roberts, C.J., concurring in part). And since Kaptan does not address *Kisor* or brief any challenge to Commerce's understanding of its own regulation, it has forfeited any argument that we should not defer to Commerce's interpretation of § 351.401.

Kaptan insists that *Loper Bright* applies for another reason. In its view, the Tariff Act is silent as to the meaning of "time of sale," and Commerce's regulation "fills up the details" arising from that silence with a presumption in favor of using the invoice date. Even if we accept, for the sake of argument, that this contention is properly before us – notwithstanding the fact that Kaptan never argued to the Trade Court that § 351.401 constitutes impermissible gap filling under *Loper Bright* – we do not see any *Loper Bright* violation here.

As an initial matter, § 351.401 does not use the word "presumption." Although the Trade Court and Commerce describe the regulation as creating a presumption, we do not view it as such. Rather, we agree with the Rebar Trade Action Coalition's characterization of the regulation as a starting point. That is, "normally" the invoice date will be the date when the material terms of the sale transaction are established, but sometimes the necessarily fact-bound

and case-specific inquiry required will reveal that some other date "better reflects" when those material terms were set. The regulation does not impose any additional burden of production on a mandatory respondent, who will have already produced documents and responses in the investigation.

At oral argument, counsel for Kaptan conceded that if we view the regulation as establishing only a starting point, and not imposing a presumption, he has no argument that the regulation exceeds Commerce's authority to adopt. *See* Oral Arg. at 37:00-:10. That is precisely our conclusion.

Further, it is well-settled that Congress delegated substantial authority to Commerce to issue implementing regulations on Tariff Act matters such as how to assess a date of sale. *See Archroma U.S., Inc. v. Dep't of Com.*, 185 F.4th 1341, 1348 (Fed. Cir. 2026) ("Our conclusion that the Tariff Act provides Commerce 'fill up the details' authority is based on the statutory provision authorizing 'appropriate officers of the United States Government' to 'issue such regulations[ ] *as may be necessary* to ensure that any provision of [the Tariff] Act . . . is appropriately implemented.'") (citing 19 U.S.C. § 3513(a)(2)) (alterations and emphasis in original); *see also Allied Tube and Conduit Corp. v. United States*, 127 F. Supp.2d 207, 218-19 (Ct. Int'l Tr. 2000) (finding, pre-*Loper Bright*, that § 351.401 is reasonable, permissible agency interpretation of statutory obligation).

Even if all this were not true, Kaptan has also failed to identify any inconsistency between Commerce's statutory obligation, which in the end is to calculate antidumping duties accurately, *see, e.g.*, *Tau-Ken Temir LLP v. United States*, 147 F.4th 1363, 1373-74 (Fed. Cir. 2025) (holding that purpose of antidumping statute is "determining margins as accurately as possible") (internal quotation marks omitted), and the regulation, which, we reiterate, sets out

a starting point (the invoice date) and then directs Commerce to use a different date if it "better reflects" the realities of the situation. Kaptan's repeated refrain that invoices are "document[s] created by a single party," while contracts are "executed by the buyer and seller and set[] forth the terms of the agreement," Open. Br. at 20, does not show that the material terms of a sale are necessarily established as of the contract date.

For at least these reasons, Kaptan has not shown any error by the Trade Court in relation to *Loper Bright*.

B

We turn now to Commerce's application of 19 C.F.R. § 351.401(i) to the facts of this case. Commerce found that the appropriate date of sale was Kaptan's invoice date. Kaptan argues that Commerce should have, instead, used the contract date. Like the Trade Court, we conclude that substantial evidence supports Commerce's decision to use the invoice date.

As Commerce observed, Kaptan's own responses to the agency's questionnaires acknowledged that its contract terms permitted changes to material terms after the contract date. In particular, *according to Kaptan itself*, during the POR the parties to Kaptan's U.S. sales could amend the shipment date, size breakdown,[3] and quantity of goods involved in a transaction until the date the goods were shipped or invoiced. J.A. 467 ("For U.S. sales, the parties may amend the latest shipment date, size breakdown, and, to a lesser extent, quantity until the goods are shipped/invoiced.").

---

[3] Commerce's memorandum describing its final results describe "size breakdowns" as "the specific price and quantity for each unique rebar product." J.A. 213.

On appeal, Kaptan insists that Commerce erred by relying on its questionnaire responses, due to purported inaccuracies in them. We are not persuaded. Like the Trade Court, we find it noteworthy that at no point during the investigation did Kaptan clarify its supposedly incomplete or inaccurate questionnaire responses, rendering it entirely reasonable for Commerce to rely on the responses Kaptan actually provided. J.A. 12-13 ("Even if the court were to accept Kaptan's contention that the response was either improperly included or was merely an imprecise initial response that was clarified by the later questionnaire responses, Kaptan has cited no evidence of record that it explicitly alerted Commerce to such a mistake."). Kaptan's questionnaire responses are, self-evidently, strong evidence that the material terms of its sales were not established at the contract date.

As Commerce also noted, the contracts Kaptan submitted to Commerce appear to lack complete information about the size breakdown of the rebar Kaptan was to supply. Kaptan provided two versions of contracts in connection with its responses to the questionnaires. In one version, one page of the contract indicated that the size breakdown would be provided on a date *after* the date that contract was executed, but also attached a size breakdown. The second version of this same contract indicated that the size breakdown is attached; and some size breakdown is, indeed, attached to this version. As there was no way to be sure that the first contract was merely a draft and the second contract was the only one that was executed, Commerce reasonably found from this indeterminate evidence that Kaptan's contracts contemplated "providing the size breakdown after the contract date," which meant that not all material terms were "established" as of the contract date. J.A. 209.

In short, the totality of the record evidence was sufficient to persuade a reasonable mind that the material terms of Kaptan's sales, including the size breakdown of

the rebar it would supply to its U.S. counterparties, were not established at the contract date and were not settled until the invoice date.

Kaptan fails to demonstrate that Commerce's findings lack substantial evidence. Instead, it mostly quarrels with Commerce's evaluation of Kaptan's questionnaire responses, its assessment of the contracts and whether they are mere drafts, and the import of the apparent fact that none of the contracts during the POR were actually amended (even though, by their own terms, it would have been permissible to amend them, as we have discussed above). Even assuming the record could be viewed as supporting Kaptan's contentions, this would not undermine the reasonableness of Commerce's contrary findings. *See SolarWorld Ams., Inc. v. United States*, 910 F.3d 1216, 1222 (Fed. Cir. 2018) ("Commerce's finding may still be supported by substantial evidence even if two inconsistent conclusions can be drawn from the evidence.") (internal quotation marks omitted).

Nor do Kaptan's passing references to its internal board resolution, which seems to have mandated board approval of any change in material terms after the date of contract, make Commerce's findings unreasonable. Viewing the internal board resolution in light of the entire record, Commerce reasonably determined that it did not warrant treating the contract date as the date of sale.

Finally, Kaptan makes a policy argument, urging us to eliminate the unfairness of it being "punished" – by having to pay approximately $20 million more in antidumping duties – by honoring contract terms it agreed to with U.S. importers before Turkey experienced hyperinflation, drastically driving up Kaptan's costs and the apparent "normal value" price of rebar in Turkey. Whatever the merit of Kaptan's complaint, a matter we do not reach, we are not permitted to impose our own policy preferences on

an agency whose actions are supported by substantial evidence and are not otherwise inconsistent with the law. *See Ohio v. Env. Prot. Agency*, 603 U.S. 279, 292 (2024) ("[A] court may not substitute its judgment for that of the agency.") (internal quotation marks omitted).

Therefore, substantial evidence supports Commerce's decision to use Kaptan's invoice date as the date of sale. Kaptan makes no argument that the antidumping duty Commerce calculated based on the invoice date otherwise contains error. Hence, our resolution of the date of sale issue compels us to affirm the judgment of the Trade Court.

## IV

We have considered Kaptan's remaining arguments and find they lack merit. Accordingly, for the reasons given above, we affirm the judgment of the Trade Court.

**AFFIRMED**

COSTS

Each party to bear its own costs.